UNITED STATES v. UNITED STATES STEEL CORPORATION et al.

(District Court, D. New Jersey.  June 3, 1915.)

No. 6214.

1. MONOPOLIES ☜24—ANTI-TRUST ACT—SUIT TO RESTRAIN VIOLATION—RELIEF.

The purpose of a suit in equity by the United States to prevent and restrain violations of Sherman Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (Comp. St. 1913, § 8823 et seq.), brought under section 4 of the act, is to restrain present and prevent future violations through the power of injunction; but where the evil effects of past undue restraint or monopoly of trade continue to be effective and harmful, and if to prevent continuance of such wrongs a dissolution of the unlawful combination is necessary to make the relief effective, the court has power to decree such dissolution; but, unless so necessary, such power will not be exercised.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ☜24.]

2. MONOPOLIES ☜24—ANTI-TRUST ACT—VIOLATION.

The United States Steel Corporation was organized by the consolidation of a number of large steel-making concerns in 1901.  During the ensuing ten years previous to suit it at all times had active and increasing competition.  It manufactured about half of the steel produced in the United States, and its proportionate part during that time decreased in nearly all lines.  The testimony, largely of competitors and customers, showed that it has been fair to competitors, has steadily increased its production, and that, while competition has been close, it has abstained from radical cutting of prices, and has usually publicly announced its prices in advance and maintained the same; that with the exception of a short intermediate period none of its prices have been the result of agreement with other manufacturers, but all have been independently adopted, have been reasonable and conservative, and have helped to keep the market steady.  Several competitors testified that they did not believe it possible for it to force them out of business or obtain a monopoly of the steel-making industry.  Held, that such evidence was insufficient to establish any purpose, either in the organization of the corporation or in the conduct of its business, to create a monopoly or to unduly restrain trade to the detriment of the public, in violation of Sherman Anti-Trust Act July 2, 1890.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ☜24.]

3. MONOPOLIES ☜12—SHERMAN ANTI-TRUST ACT—VIOLATION.

An important purpose of the organization of the Steel Corporation was the building up of an export trade.  Such trade in iron and steel at that time was sporadic, consisting of dumping products in foreign countries when the domestic market was overcrowded, and on the whole was not profitable.  The Steel Corporation, by reason of its large capital and organization, for the first time created and maintains a regular and permanent market, by organizing a subsidiary corporation to sell the large line of diversified products, manufactured by its associate subsidiary companies, such as must be kept in stock, sending the same for distribution to the 300 warehouses which it established and maintains in 60 different countries, sending to each the things most in demand.  In this manner it increased the value of its foreign trade from $31,000,000 in 1904 to $91,000,000 in 1913, controls from 80 to 90 per cent. of such trade in iron and steel, and has been able to command better prices, although domestic prices have been generally reduced.  Held, that such action was not in restraint of foreign commerce, in violation of Anti-Trust Act July 2, 1890, but was in aid of it by legitimate

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

methods; such trade having in fact been thereby largely created, and not taken from others.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ☞12.]

4. MONOPOLIES ☞24 — ANTI-TRUST ACT — COMBINATIONS IN RESTRAINT OF TRADE.

The history of the organization of the United States Steel Corporation in 1901 reviewed, and *held* not to evidence any intention or purpose on the part of the organizers to monopolize or restrain trade, especially in view of the fact that no such thing was attempted, but to show that the consolidation was the natural outgrowth of the changing conditions in the trade in its transition from iron to steel, and the tendency to integrate the plants back to ore supply and forward to the finished products, and to secure greater economy of management and large capital necessary to meet the demands of structural contracts and the development of export trade.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ☞24.]

5. MONOPOLIES ☞17, 26—SHERMAN ANTI-TRUST ACT—SUIT FOR VIOLATION—AGREEMENT IN RESTRAINT OF COMPETITION.

At a time of panic and threatened serious financial disturbance representatives of a number of the largest steel manufacturers, who were competitors, met and after discussion came to an informal agreement or understanding to maintain prices for their own protection and the protection of customers who had stocks on hand. At later meetings committees were appointed, who considered and assented to specific prices to be maintained by each company until it should find reason to change them, in which case it was understood that it should notify the others, that another meeting might be held. These tacit agreements were more or less observed by the parties until normal conditions were restored, although there were many other manufacturers who did not take part in nor regard them. *Held* that, while no formal words of contract were used, the understanding amounted to an agreement in restraint of competition, in violation of Anti-Trust Act July 2, 1890, § 1 (Comp. St. 1913, § 8820), but that such agreement would not justify the court in dissolving participating corporations on a bill filed by the government after it had ceased to be observed.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. §§ 13, 17; Dec. Dig. ☞17, 26.]

*Per Woolley, Circuit Judge, concurring.*

6. MONOPOLIES ☞12—ANTI-TRUST ACT—VIOLATION—"RESTRAINT OF TRADE."

Whether a manufacturing combination is one in "restraint of trade," or has monopolized or attempted to monopolize commerce, in violation of Sherman Anti-Trust Act July 2, 1890, §§ 1, 2 (Comp. St. 1913, §§ 8820, 8821), depends upon the inherent nature or effect of the combination, the evident purpose of its acts, or the intent to be inferred from the extent of control secured over the industry, the method by which such control has been brought about, and the manner in which it has been exerted, resulting in prejudice to the public interests by unduly restricting competition or unduly obstructing the course of trade.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ☞12.

For other definitions, see Words and Phrases, First and Second Series, Restraint of Trade.]

7. CORPORATIONS ☞306 — LEGALITY OF ORGANIZATION — LIABILITY OF DIRECTOR.

The fact alone that a corporation after its organization paid for property purchased with stock and then elected the seller a member of its

board of directors does not render him responsible for any alleged illegality in its organization.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1457, 1458; Dec. Dig. ⏤306.]

**8. Monopolies ⏤20—Anti-Trust Act—Violation.**

A corporation, although a combination of other large manufacturing corporations and having a very large capital, cannot be said to be inherently a monopoly, where during ten years its increase in percentage of business is much less than that of its principal competitors.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. ⏤20.]

**9. Monopolies ⏤20—Anti-Trust Act—Violation.**

That the United States Steel Corporation was formed by combining as constituent members corporations which were themselves large combinations, recently formed, and which had demonstrated their power to unlawfully monopolize trade in their several lines of business, warrants a finding that the organizers of the Steel Corporation intended to unite and perpetuate such monopolies and combined for that purpose. The corporation itself, however, neither attempted nor possessed the power alone to do the unlawful things intended by its formation, but it unlawfully combined with competitors, by means of pools and informal understandings, to restrain trade by controlling prices.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. ⏤20.]

**10. Monopolies ⏤24—Anti-Trust Act—Suit for Violation—Relief.**

A corporation which is not in and of itself a monopoly nor a combination in restraint of trade, within the meaning of Anti-Trust Act July 2, 1890, §§ 1, 2 (Comp. St. 1913, §§ 8820, 8821), should not be dissolved because it may in the past have combined with others to restrain trade by controlling prices, where such unlawful acts have been discontinued.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ⏤24.]

In Equity.   Suit by the United States against the United States Steel Corporation and others.   Decree for defendants.

J. M. Dickinson, of Chicago, Ill., and Henry E. Colton, of Washington, D. C., for the United States.

Lindabury, Depue & Faulks, of Newark, N. J. (Joseph H. Choate, of New York City, John G. Johnson, of Philadelphia, Pa., Francis Lynde Stetson, of New York City, David A. Reed, of Pittsburgh, Pa., Raynal C. Bolling, of New York City, Cordenio A. Severance, of St. Paul, Minn., and Richard V. Lindabury, of Newark, N. J., of counsel), for defendants United States Steel Corporation and others.

Murray, Prentice & Howland, of New York City (George Welwood Murray, of New York City, of counsel), for defendants Rockefeller.

Kellogg & Emery, of New York City (Frederic R. Kellogg and Chester W. Cuthell, both of New York City, and J. D. Armstrong, of St. Paul, Minn., of counsel), for defendants Louis W. Hill and others.

Before BUFFINGTON, HUNT, McPHERSON and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge.   We may say in advance that all the members of this court are in agreement as to the decree that will be entered in this case, although we are not in complete accord concerning every step by which that result is reached.

⏤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The subject-matter of the litigation is of such magnitude and complexity, and the record is of such size, that the effort to set bounds to this discussion has not been easy. So many questions, large or small, were laid before us in the oral argument, and so many are considered in the extended briefs of counsel, that we cannot hope to give them all a place in such discussion. But we trust that one or other of the two following opinions will pay adequate attention to the most important, with the result of avoiding repetition as far as possible, while presenting somewhat different aspects of the controlling principles by which the case must be decided. Without a needless expansion of the discussion, it would scarcely be practicable to take up each detail for the purpose of pointing out just where we are in complete agreement, and where certain divergencies of view exist. We have thought it best, therefore, to adopt the course referred to, believing that the two opinions will cover the whole case, and will also sufficiently indicate the reasons that have led us to a common conclusion.

This case—a proceeding under the Sherman Anti-Trust Law—is largely one of business facts. The construction of that statute has been settled by the Supreme Court. Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663. That construction has been applied in this circuit in the Keystone Watch Case (D. C.) 218 Fed. 502, and the Powder Trust Case (C. C.) 188 Fed. 127. It follows, therefore, that our duty is largely one of finding the facts and to those facts applying settled law. The act in question provides:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract, or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." Comp. St. 1913, § 8820.

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce among the several states or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction, thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." Section 8821.

"Sec. 4. The several Circuit Courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition, the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises." Section 8823.

"Sec. 7. Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any Circuit Court of the United

States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee." Section 8829.

When the Constitution of the United States conferred on Congress the right "to regulate commerce with foreign nations and among the several states," its purpose was not to fetter, but to further and foster, trade. This constitutional purpose to promote lawful trade by protecting it from unlawful restraint is avowed in the title of the act, viz., "An act to *protect* trade and commerce *against* unlawful restraints and monopolies," and, as held by the Supreme Court (Standard Oil Case, supra), "one of the fundamental purposes of the statute is to protect, not to destroy, rights of property."

[1] Now unlawful restraints of trade are of three kinds, past, present, and future. As to present and future restraints, Congress by section 4 empowered "the Attorney General to institute proceedings in equity to prevent and restrain such violations," and to that end invested the courts "with jurisdiction to prevent and restrain violations of this act." The jurisdiction here conferred is the chancery power of injunction, a power which is used to restrain present wrongs or prevent threatened ones. This is shown by the act providing even for temporary preliminary restraining orders while the case is being heard. "The function of an injunction is to afford preventive relief, not to redress alleged wrongs which have been committed already." Lacassagne v. Chapuis, 144 U. S. 119, 12 Sup. Ct. 659, 36 L. Ed. 368, cited in Black v. Jackson, 177 U. S. 360, 20 Sup. Ct. 648, 44 L. Ed. 801. Applying that general principle, the Supreme Court of the United States, in the Standard Oil Case, supra, citing Swift v. United States, 196 U. S. 375, on page 377, 25 Sup. Ct. 276, 49 L. Ed. 518, said:

"It may be conceded that ordinarily, where it was found that acts had been done in violation of the statute, adequate measure of relief would result from restraining the doing of such acts in the future."

In view of what was held by this court in the Powder Case, supra, it scarcely need be again said by us that where the evil effects of past undue restraint or monopoly continue to be effective and harmful when the proceeding is begun—that is, where "the inherent nature of the contemplated acts" is such as to bring about their continuance and repetition, or where, to use the expressive language of the Supreme Court in the Standard Oil Case, 221 U. S. 75, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, a "perennial violation" of the act exists—the jurisdiction to restrain present and prevent future violations vests under this section, and if, to prevent continuance of such continuing wrongs a dissolution of the unlawful combination is necessary to make the relief effective, the original combination will be dissolved. That power was exercised by this court in the Powder Case, supra, and by the Supreme Court in the Standard Oil Case, supra, and the Tobacco Case, supra. In the Keystone Watch Case, supra, this power to dissolve was not exercised, the court there saying at page 519 of 218 Fed.:

"But we see no sufficient evidence that the public interest requires us to break up the existing corporate entity. United States v. Great Lakes Towing

Co. (D. C.) 208 Fed. 746. The record satisfies us that the watch case business is not suffering from the absence of live and healthy competition, and except in the directions already mentioned—namely, the retail sales of the Howard watch, and the policy of boycotting—we think the court is not called upon to interfere."

The reason why the power to dissolve was exercised in the Standard Oil Case, namely, that it was a violation continuing up to the filing of the petition, is pointed out by the Supreme Court in these words:

"But in a case like this, where the condition which has been brought about in violation of the statute *in, and of itself*, is not only a *continued* attempt to monopolize, but also a monopolization, the duty to enforce the statute requires the application of broader and more controlling remedies," and is justified because "the acts and dealings established by the proof operated to destroy *the 'potentiality of competition*,' * * * but also to be an attempt to monopolize and a monopolization bringing about a *perennial violation* of the second section."

To this we may add that, while the power to dissolve was for the same reason exercised by us in the Powder Case, yet it will be observed there was in that case a refusal to enjoin as to certain defendants, the court saying:

"As the only relief we can grant in this proceeding is injunctive, the petition must be dismissed as to any defendant who was not violating the law, or threatening to violate it, when the suit was commenced."

Indeed in each of the cases, the injunction was granted, not to enjoin past violations, or because there had been violations in the past, but because such violations were continuing when the bill was filed. It will therefore appear that by this act a comprehensive plan of relief was mapped out, "to *protect* trade and commerce *against* unlawful restraints and monopolies": First, a criminal prosecution by the government under sections 1 and 2 for all violations, past and present; second, an injunction in equity, on complaint of the Attorney General, under section 4, against all present or threatened violations of the act; and, third, a civil suit under section 7 by any one injured against any violator of this act.

In pursuance of the power vested in him by section 4 above quoted, George W. Wickersham, then Attorney General of the United States, on October 26, 1911, filed this petition. Without entering into detail, we may say it prays that the Federal Steel Company, organized in 1898; the Carnegie Steel Company, organized in 1900; the Carnegie Company of New Jersey, organized in 1900, which held the stock of the Carnegie Steel Company of Pennsylvania; the American Steel & Wire Company, organized in 1899; the National Tube Company, organized in 1899; the National Steel Company, organized in 1899; the American Tin Plate Company, organized in 1898; the American Steel Hoop Company, organized in 1899; the American Sheet Steel Company, organized in 1900; and the United States Steel Corporation, which acquired the stocks of said companies—be held unlawful monopolies, and that the United States Steel Corporation, and each and all the said units composing it, be decreed to be illegal and be dissolved, and that their officers and stockholders be perpetually enjoined.

Seeing, then, that the remedy here sought is that of both dissolution

and injunction, we turn to the statute to ascertain on what state of facts dissolution should be decreed or injunction awarded.

The words of the statute are few and clear. Manifestly the trade which it seeks to protect is the natural and normal buying and selling of property, and the protection it gives is by preserving to all engaged in such trade this trade right of natural and normal buying and selling, free from unlawful restraints and monopolies. For it will be observed the statute is not directed against all restraints and monopolies, but "against unlawful restraints and monopolies." This naturally raises the practical question: What are the lawful restraints and monopolies which the statute impliedly does not forbid, and what are the unlawful restraints and monopolies which it not only expressly forbids, but enjoins and indeed makes criminal? In the late case of Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 781, 57 L. Ed. 1232, the Supreme Court, referring to its former decisions, clearly defines what the statute forbids and does not forbid as follows:

"Those cases may be taken to have established that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade."

The present case involves the legality, not of a contract, but of a combination; that is, the legality of the United States Steel Corporation, which the petition asks to have dissolved. Therefore, applying the foregoing definition of the Supreme Court to the case in hand, the basic question for us to decide is one of fact, namely, whether the union of the several defendant companies in the United States Steel Corporation "prejudices the public interests by unduly restricting competition or unduly obstructing the course of trade." The public interests thus prejudiced consist of—First, competitors in trade; second, the purchasing public; and, third, the general public. For example, if this Steel Company was in any way guilty of unfair business competition, if it was guilty of such conduct as to unfairly force a competitor out of the steel business, or if it unfairly prevented those who wanted to go into the steel business from doing so, then the Steel Company was, in the judgment of the Supreme Court, prejudicing the public interests by unfairly driving individuals out of business or preventing them from entering it, and it was also injuring the public by unduly restraining trade. So, also, if this Steel Company was restricting output in order to exact unfair prices; if it was buying up competing plants and dismantling them to needlessly restrict output; if it was by reason of its controlling power furnishing the public with inferior goods; if it was using its power to needlessly and unfairly reduce wages; if it was seeking to deceive purchasers by a false appearance of competition, when in fact it owned or controlled such seeming competition— then it was prejudicing, not only that portion of the public which desired to buy steel, but the public interests generally by unduly obstructing the course of trade and thereby preventing the steel business from moving in its natural and normal channel.

A study of the various anti-trust cases shows that such unfair, prejudicial acts as we have thus instanced have been found where the Sher-

man Law has been held to have been violated. Thus, in the Standard Oil Case, supra, 221 U. S. at page 76, 31 Sup. Ct. at page 521 ('55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734), the Supreme Court, referring to the conduct of that company toward its competitors, says:

"We think no disinterested mind can survey the period in question without being irresistibly driven to the conclusion that the very genius for commercial development and organization which it would seem was manifested from the beginning soon begot *an intent and purpose to exclude others*, which was frequently manifested by acts and dealings wholly inconsistent with the theory that they were made with the single conception of advancing the development of business power by usual methods, but which, on the contrary, necessarily involved the intent to *drive others from the field* and *to exclude them from their right to trade*, and thus accomplish the mastery which was the end in view. * * * The exercise of the power which resulted from that organization fortifies the foregoing conclusions, since the development which came, the acquisition here and there which ensued of every efficient means by which competition could have been asserted, the slow, but resistless, methods which followed, by which *means of transportation were absorbed* and brought under control, the system of marketing which was adopted by which the country was divided into districts and the trade in each district in oil was turned over to a designated corporation within the combination, and *all others were excluded*, all lead the mind up to a conviction of a purpose and intent which we think is so certain as practically to cause the subject not to be within the domain of reasonable contention."

Like unfair conduct toward competitors marked the Tobacco Case, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663. It was there said:

"The history of the combination is so replete with the doing of acts which it was the obvious purpose of the statute to forbid, so demonstrative of the existence from the beginning of a purpose to acquire dominion and control of the tobacco trade, not by the mere exertion of the ordinary right to contract and to trade, but by methods devised in order to monopolize the trade *by driving competitors out of business*, which were ruthlessly carried out upon the assumption that to work upon the fears or play upon the cupidity of competitors would make success possible. We say these conclusions are inevitable, not because of the vast amount of property aggregated by the combination, not because alone of the many corporations which the proofs show were united by resort to one device or another. Again, not alone because of the dominion and control over the tobacco trade which actually exists, but because we think the conclusion of wrongful purpose and illegal combination is overwhelmingly established by the following considerations: (a) By the fact that the very first organization or combination was impelled by *a previously existing fierce trade war, evidently inspired by one or more of the minds which brought about and became parties to that combination*. (b) Because, immediately after that combination and the increase of capital which followed, the acts which ensued justify the inference that the intention existed to use the power of the combination as a vantage ground to further monopolize the trade in tobacco *by means of trade conflicts designed to injure others, either by driving competitors out of the business or compelling them to become parties to a combination*."

It will also be seen the evidence of intended monopoly and throttling of competition was found in the buying up of plants not commercially needed and then dismantling them. Thus in the Tobacco Case, supra, 221 U. S. at pages 182, 183, 31 Sup. Ct. at page 649 (55 L. Ed. 663), it was said:

"We think the conclusion of wrongful purpose and illegal combination is overwhelmingly established by the following considerations: * * * By

persistent expenditure of millions upon millions of dollars *in buying our plants, not for the purpose of utilizing them, but in order to close them up* and render them useless for the purposes of trade."

Taking steps to keep others from entering the business is also re- cited as a violation of the act:

"The conclusion of wrongful purpose and illegal combination is over- whelmingly established by the following considerations: * * * By the gradual absorption of control over all the elements essential to the success- ful manufacture of tobacco products, and placing such control in the hands of seemingly independent corporations *serving as perpetual barriers to the entry of others into the tobacco trade.*"

So, also, in the Keystone Watch Case, supra, pages 510 to 512 of 218 Fed., unfair conduct toward competitors constituted the violation of the statute. Speaking for this court Judge McPherson there said:

"Beginning in 1904, or thereabouts, it made several attempts—perhaps not very numerous, but numerous enough—that showed a definite purpose to restrain trade by attempting to fix and maintain prices, and by using a species of boycott or blacklisting in order to lessen the trade of its rivals. We shall not stop to detail the attempts of this character that were made during the period from 1904 to 1910, because the policy and system to which we refer were manifested with unmistakable distinctness in the latter year, and were carried on with vigor and persistence. * * * Now, what the defendant company did was either to close these already existing and already utilized outlets, or to narrow them materially, so far as the [watch] cases of its competitors were concerned; and we think the proposition need not be discussed that this was pro tanto a direct and unlawful restraint of trade."

So, also, amongst other factors which tended to show a violation of the statute, reference was made in the Tobacco Case, 221 U. S. at page 174, 31 Sup. Ct. at page 646 (55 L. Ed. 663), to the maintenance of a false appearance of competition:

"The record indisputably discloses that after this merger the same methods which were used from the beginning continued to be employed. Thus, it is beyond dispute * * * that the new company has besides acquired control of eight additional concerns, the business of such concerns being now carried on by four separate corporations, all absolutely controlled by the American Tobacco Company, although the connection as to two of these companies with that corporation was long and persistently denied."

In the Powder Case, oppression of competitors existed and was thus referred to at page 140 of 188 Fed.; Judge Lanning speaking for this court:

"The association of manufacturers of powder and other explosives had probably never been stronger than it was in February, 1902, when the change in the management of the Dupont works took place. It had for years arbi- trarily fixed prices in the different parts of the United States, waging a dis- astrous warfare against competitors until they were coerced into terms satis- factory to the association or brought into the association. * * * Measures were often devised to limit the output of the members of the association and to crush competition by manufacturers not members of the association."

[2] The tests of the violation of this statute having then, as we have seen, been adjudged by the Supreme Court (Nash v. United States, supra), namely, whether the acts in question "prejudice the public in- terests by unduly restricting competition or unduly obstructing the course of trade," it would appear the questions of fact for us to de- termine from the evidence are these:

First. Was the Steel Corporation, when this bill was filed in 1911, prejudicing the public interests by unduly restricting competition, or unduly obstructing the course of the steel and iron trade, between the states, or with foreign nations? If this question be answered "Yes," the law was then being violated, and an injunction should issue to restrain present and future violations.

Second. Did the Steel Corporation, when it was formed in 1901, either by the intent of those forming it, or by the inherent nature of that company's contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of the steel and iron trade, interstate or foreign? If this question be answered "Yes," then the law was violated, and the Steel Corporation must be adjudged originally illegal. If illegal, it must be dissolved, because only thus can its inherent nature be prevented from continuing to work further violations of the statute. On the other hand, if these questions are negatived, then the Steel Corporation should not be dissolved, but permitted to pursue that usual course of trade, which it was the purpose, as we have seen, of this statute to protect. It will thus be seen that, as stated at the outset, this case is practically one of business facts.

Turning, then, to the first question, let us address ourselves, first, to the iron and steel trade here in the United States, and inquire whether the evidence satisfies us that the Steel Corporation, when this bill was filed in 1911, was then prejudicing the public interests by unduly restricting or unduly obstructing the steel and iron business of the United States. In considering that question, a number of fields of inquiry naturally suggest themselves. Had this company in 1911 a monopoly of the steel and iron trade of the country? What had been and was then its business conduct towards its competitors? Was it fair or unfair? Had it forced or was it forcing others out of the steel trade by unfair conduct? Had it prevented others from entering it? Was it then exacting or had it exacted from the public undue prices for its products? Had it lowered the character of its product? Had it cut down or was it cutting down, its output so as to restrict proper supply? Had it taken advantage of its power to unduly reduce wages? All these, as we have seen from the Standard Oil, the Tobacco, the Powder, and Keystone Watch Cases, were inquiries by which the question could be determined whether the Steel Corporation was acting, as the Supreme Court said in the Standard Oil Case, 221 U. S. at page 58, 31 Sup. Ct. at page 515 (55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734), with "the legitimate purpose of reasonably forwarding personal interest and developing trade," or, on the other hand, "with the intent to do wrong to the general public and to limit the right of individuals."

Now as trade is a contest for it between different persons, and the gain of that trade by one means the loss of it to another, it follows that the person who best knows whether the man who gained it, gained it fairly, is the man who lost it. If there is monopoly, if unfair business methods exist, if the course of trade and fair trading is throttled, we can find proof of it from business competitors. Trade competitors are the first to feel the pinch of unequal, unfair, and undue restraint of the

natural and normal course of trade. Being the first to suffer, they are the keenest to condemn. Turning, then, to this Steel Corporation's competitors, let us decide from the proofs whether the Steel Corporation had, when this bill was filed, a monopoly of the iron and steel business of the United States.

We turn, first, to finished rolled products, because they are the basic supply to the vast number of varied industries throughout the country dependent thereon. If all these minor industries are dependent on a monopolized source of an indispensable base, we can say, without going further, that not only such industries, but the general public, are prejudiced; for, as said and held by the Supreme Court in the Tobacco Case, wrongful purpose and illegal combination are established "by the gradual absorption of control over all the elements essential to the successful manufacture of tobacco (steel) products." Indeed, the importance of such basic supply in the dependent steel trade is shown by the fact that in the congressional investigation of the Steel Corporation, made by Congress by resolution of January 28, 1905, hereafter referred to, the second inquiry there ordered was:

"To what extent said corporation and its associates control the output and prices of the finished products made by independent companies, dependent upon it for their raw materials?"

What, then, are the facts in reference to finished rolled products? In that regard, the evidence (see summary in Statement of Case, page 412) is that in 1911 the finished rolled product—which excludes pig iron, steel castings, and ingots—of the United States (using in this opinion, when quoting figures, round numbers, and by the term "Steel Company," or "Steel Corporation," meaning the United States Steel Corporation) was 19,000,000 tons. Of this tonnage the competitors of the Steel Corporation produced 54 per cent., or 10,300,000 tons, while the Steel Corporation made 8,700,000 tons; but not only did its competitors produce in 1911 the major part of the country's finished rolled product, as above, but judging from the past, the present proportionate lead of the competitors bids fair to increase. In 1901, when the Steel Company was formed, the total finished roll product of the United States was 13,000,000 tons. This was substantially divided between 49.9 per cent. made by its competitors, and 50.1 per cent. by the Steel Company. While both together have since increased the nation's product from 13,-000,000 to 19,000,000 tons, yet of this 6,000,000 increase its competitors produced 3,400,000 tons to the Steel Company's 2,600,000 tons.

Taking steel ingots, another basic supply on which great numbers of finishing industries are ultimately dependent, we find (Statement of Case, page 406) that while in 1901, of the 13,000,000 tons of the total American ingot production, the competitors of the Steel Company only made 4,500,000 tons, as against the Steel Company's 8,500,000, yet by 1911, in the country's vast increase from 13,000,000 to 24,000,000 tons, the competitors had increased their production by 6,500,000 tons, while the Steel Company had only increased 4,500,000. In other words, while the Steel Company produced in 1901, 66 per cent. of the country's ingot production, it was producing but 54 per cent. in 1911.

In pig iron, the basic supply of foundries, finishing mills, and other

dependent industries, the relations were slightly the other way. In 1911, out of a total cast of 22,000,000 tons of pig iron (S. C. page 405), only 12,000,000, or 54.8 per cent., were made by competitors of the Steel Company, as against 9,000,000, or 56.8 per cent., made by such competitors in 1901, out of a total of 16,000,000—a decrease of 2 per cent.

These facts and figures bearing on basic supplies of the country's dependent iron and steel industries satisfy us that there is no monopolistic control anywhere of such basic factors as ingots, pig iron, and finished rolled products, and the testimony hereafter referred to satisfies us that any substantial producer of such basic articles can, by selling such products at such lower price as he sees fit, compel all producers of such supplies, including the Steel Corporation, to also lower their prices. So, also, monopolistic control of finished steel articles in wide use would be a matter of grave public prejudice. Taking, for example, wire production, in which, through fencing, nails, and the great range of articles made from wire products, so many people are interested. When the Steel Corporation was formed in 1901, of the 9,000,000 kegs of wire nails then made in the United States, the competitors of the Steel Corporation made 3,000,000 kegs, and the Steel Corporation 6,000,000. By 1911, the country's production had grown to 13,000,000, but of the 3,500,000 of increase the Steel Corporation made 1,000,000 as against its competitors making 2,500,000. The net result was that, when this bill was filed, the Steel Corporation's competitors had 6,500,000 and the Steel Corporation 7,000,000 of the country's total production of 13,500,000 kegs. So of wire netting, fencing, and other wire products in general use. The general average of the nation's total production made by competitors when this bill was filed was 78 per cent. It will be seen that in this particular respect, due, no doubt, as we shall see, to the growth of its foreign trade in wire products, the Steel Corporation had slightly increased its proportion from 20 per cent. of the total product in 1901 to 22 per cent. in 1911. But at the same time it will be noted that, as the very large part of the Steel Corporation's increase in wire products was made in foreign trade—the proofs (volume 10, p. 3902) show that only 42 per cent. of the Steel Corporation's wire product of 1911 was sold in the United States—it was in 1911 making relatively much less of the wire products consumed in the United States than it was in 1901.

In the important item of structural steel, used in bridges, steel framed buildings, steel car frames, etc., the steel corporation's competitors produced about 67 per cent., and the Steel Corporation 33 per cent. And for the same reason as shown above, in the growth of the foreign trade, it will be seen by an analysis of Defendant's Exhibit (volume 3, page 317, and volume 2, page 204) that in structural shapes, as in wire products, the Steel Company was in 1911 making relatively less structural articles of this country's consumption than it was in 1901.

So, also, in steel rails. In 1901, the competitors of the Steel Company made 1,100,000 tons of steel rails, and the Steel Company 1,700,000. In 1911, its competitors made 1,200,000 tons, an increase of 100,000 tons, while the Steel Company made 1,600,000 tons, a decrease of 100,000 tons.

Summarizing our study of the proofs of this general subject, of the relative part of the Steel Company and its competitors in the total iron and steel production of the country, and their relative part in the home market, we find that, taking the ten years from 1901, when the Steel Company was formed, until 1911, when the Attorney General filed this bill to dissolve it, its competitors, starting in 1901, with making 49.9 per cent. of the nation's production of finished rolled product, including structural materials, rails, sheets, rods, and bars, had by 1911 so increased their relative proportion that they were then producing 54.3 per cent. of the nation's iron and steel output. And confining ourselves for the present to the production of 1911, used in the trade of the United States, which alone we are now considering, we find that, of the total amount of such iron and steel products in the whole market in that year, nearly 60 per cent. was produced by the competitors of the Steel Company. These conclusions, based as they are on proven, practical business facts and figures, show a strong trend away from any monopolistic absorption or trade-restraining control of iron and steel manufacture or markets of the United States by the Steel Corporation. On the contrary, these figures show a strong trend in that manufacture and market toward an even greater absorption thereof by the virile and growing competitors of the Steel Company. And this leads us, in an adequate discussion of the case, to at this point take up the character of the competition in the steel and iron business in this country; for we may rest assured of the practical fact that where in any business there exists a healthy, normal, unrestrained, and virile competition, which all are free to enter, the individual has full freedom of business opportunity and the public is in no danger of prejudice from monopoly or trade restraint.

When the steel business of the United States is referred to, one thinks of it as practically being in the hands of the United States Steel Corporation. Circumstances have made this natural. The manufacture of iron and steel in their basic form is confined to local districts. Outside of these localities and outside of those engaged in the steel business, there was, prior to 1901, but little general knowledge or appreciation of its magnitude and its basic relation to the general business of the country. When, therefore, this great steel company was quickly formed in that year and became at once the largest corporate capitalization known, it naturally and at once became associated in the general mind with absolute monopolistic control. But the fact that the Steel Corporation after due selection by it of such lines of finishing mills as were deemed necessary to carry out its plans left outside of it a most strenuous body of strong competitors was not then generally recognized. The names, location, and resources of those competitors were not then, and indeed are not now, known to those outside the steel and iron business. Nor was the significance of the anti-monopoly competitive powers and policies of such competitors appreciated. Indeed, the business fact above found, namely, that in 1911, when this bill was filed, the competitors of the Steel Company were making and marketing nearly 60 per cent. of the steel and iron produced in the United States, would surprise many. Since therefore

the gist of monopoly is the suppression of competition, we deem it pertinent to ascertain from the proofs the character and steady increase of competition in the iron and steel business since the Steel Corporation was, formed. In doing this, we here note of its great competitors such only as have, in the ten years of competition between them and the Steel Corporation, made a higher proportionate gain of business than the Steel Corporation itself.

Taking the Steel Corporation as the basis of comparison, we may say that while the proofs show a very material increase of 40-odd per cent. in the Steel Corporation's business from 1901 to 1911, yet this very substantial increased percentage of the Steel Corporation's own business was less than that made by each of eight of its great competitors as follows:

| Company. | Location. | Increase of Production from | Percentage of Increase. |
|---|---|---|---|
| Bethlehem Steel Co. | So. Bethlehem, Pa. | 1901 to 1913 | 3779.7 |
| Inland Steel Co. | Indiana Harbor, Ind. | 1901 to 1913 | 1495.9 |
| La Belle | Wheeling, W. Va. | 1901 to 1913 | 463.4 |
| Jones & Laughlin | Pittsburgh, Pa. | 1901 to 1912 | 206.7 |
| Cambria Steel | Johnstown, Pa. | 1901 to 1913 | 155.5 |
| Colorado Co. | Pueblo, Colo. | 1901 to 1912 | 152.8 |
| Republic Iron & Steel Co. | Youngstown, Ohio | 1901 to 1912 | 90.8 |
| Lackawanna Steel Co. | Buffalo, N. Y. | 1901 to 1911 | 63.2 |

Taking up these companies one by one, it will be seen that in location, facilities, capital, and basic supplies, they show such strong past, present, and prospective competition as affords just ground for concluding that the steel and iron business of this country is not being, and indeed cannot be, monopolized by the Steel Corporation. For the real test of monopoly is not the size of that which is acquired, but the trade power of that which is not acquired.

Turning, first, to the Atlantic seaboard, we find there is a competitive group composed of the Bethlehem Steel Company, the Pennsylvania Steel Company and its subsidiary, the Maryland Steel Company. The two latter companies are additional to the above list, and are here referred to only to note their tidewater location as an advantage which the Steel Corporation with its inwardly located works does not possess. The works of the Pennsylvania Steel Company are near Harrisburg, Pa., and those of the Maryland Steel Company at Sparrows Point near Baltimore. These two companies have a combined capital and surplus of some $66,000,000 and with large extensions (volume 20, p. 7978) in view. Their ore supplies are drawn from the great Cornwall ore beds of Eastern Pennsylvania, and from Cuba, where they have inexhaustible supplies of Bessemer ore, which can be worked by steam shovels and are close to tidewater. Three matters have impressed us in reference to this seaboard competition: First, that the eastern seaboard iron and steel competition of the Steel Corporation has an ore supply wholly independent of Lake Superior; second, that their location near the seaboard gives in many cases substantial freight advantage over the Steel Corporation; and, thirdly, that the greatest advance in ore and steel production in the past ten years has been made by a seaboard competitor of the Steel Corporation, the Bethlehem

Steel Company. And as bearing on the question of the alleged object of those who originally formed the Steel Corporation to monopolize and unduly restrain competition and obstruct trade, it is to be noted that the striking growth and development of the Bethlehem Company was undertaken by one who helped form the Steel Corporation, who served as its first president, and who, if the object for which the Steel Corporation was formed was to monopolize the iron and steel business or to restrain trade, was warned of that intent. That such a man should attempt to build up a competitive business and succeed in expanding it as has been done shows that he at least was convinced that the field of fair, free, and full competition was open to him and others who desired to enter the steel business, and that the Steel Corporation had neither the business purpose nor the business power to monopolize the steel business or to throttle the growth of competition.

As we shall see later, the market reach of basic iron and steel plants is measurably restricted to its own district by freight limitations. Stevenson, volume 3, p. 1084; Gary, volume 12, p. 4834; King, volume 6, p. 2076; Thompson, volume 22, p. 9141. The supplies from which steel is made and the basic articles into which it is turned are of such bulk and weight as to thus localize or restrict their markets. Freight forbids such heavy product being hauled to far-removed markets. The existence and maintenance of strong competitive steel production on the seaboard is therefore a matter of grave import to the great section of the United States immediately tributary to the Atlantic Coast. Into this seaboard region the Steel Corporation enters under freight burden, its bulk mills being substantially in the Chicago and Pittsburgh districts. The proofs show that its seaboard competitors named have, as noted, abundant ore supplies, cheap water freights, and a great accessible surrounding market. Without entering into detail, we refer to some suggestive facts in the proofs. For example, the proofs (volume 10, p. 4028) show that the Maryland Steel Company, through its coast line water freight of $2.50 per ton, so covers the territory supplied by Mobile, Galveston, and other Gulf of Mexico distributing points as to exclude from that territory even the product of the Tennessee Coal & Iron Company, now owned by the Steel Corporation, which pays a railroad freight of $3.40 per ton. The proofs (volume 18, p. 7248) further show that, with the enlargement of the Erie Canal system, Lake Superior ore will be canal freighted from Buffalo to New York Harbor at 28 cents a ton less than the same ore is rail freighted from Lake Erie Ports to the Pittsburgh district. With the enlargement of that canal, the proofs are (volume 18, p. 7283) that blast furnaces are now planned for location on seaboard waters in New York Harbor limits. And it should be here noted that the proof is (volume 11, p. 4182) that the whole steel industry of the United States could be duplicated on the Atlantic seaboard and inland (volume 11, p. 4178) as far as Pittsburgh, and could be run on ores brought from Chili and Brazil alone. Lake Superior ores of the same metallic unit grade as the Brazilian would, in the view of the Michigan Tax Commission (Government Exhibits, volume 10, p. 2435), cost $7 a ton delivered at the Atlantic seaboard, as against ore of $3 from Brazil, which the report

states has "a tremendous field of high grade Bessemer iron ores running 65 to 68 per cent. metallic iron." As to the Cuban ore, the proof (volume 17, p. 6862) is:

"The total cost will not in any case exceed $2.25 per ton, and in ordinary shipping seasons will probably not exceed $2.10 per ton. This means that the ore reaches Philadelphia at a net cost of 4 cents per unit of iron. It is the cheapest ore supply in the world delivered at eastern Atlantic ports or in German or English ports. * * * In normal years, Lake Superior ores at the extreme eastern point at which they could possibly be shipped to meet eastern or foreign ores would have to get a price of 9 cents a unit in order to compete."

These facts and figures show that there is no basis on which to attempt ore monopoly. The proofs further show that, to adequately enter this seaboard territory and meet the competition of those located on the seaboard, the Steel Corporation was forced to establish large local distributing warehouses on the seaboard. For example (volume 10, p. 4060), the Corporation had established, amongst several others, warehouses on the Atlantic Coast near New York carrying $2,000,000, and one at San Francisco carrying $4,000,000 of diversified steel products.

Proof of the strength and growth of this seaboard competition is found in the record of the Bethlehem Steel Company. That company in 1901, its first year of competition with the Steel Corporation, made 18,000 tons of finished steel product, which was largely confined to rails. By 1913, it had increased its product to 700,000 tons. During that time it had also (King, vol. 6, p. 2120) entered into competition in structural steel, armor plate, and varied steel products. Indeed, its chief products, structural steel (volume 11, p. 4149), and open-hearth rails (volume 11, p. 4150), of which it is making 200,000 tons, have been developed since 1908. From 4,000 employés it has grown to 15,000; it has in view (volume 11, p. 4336) further integration to the extent of making all the finished products made by the Steel Corporation. Its ore supply of a million and a half tons a year comes from Sweden, from the Adirondack regions in New York, from Chili, and from Cuba, where it has practically inexhaustible reserves. The proofs as to these Chilean ore fields show that this corporation and other tidewater steel plants are wholly independent of Lake Superior reserves. The Chilean beds outcrop; they are stripped instead of mined; they are within a short distance of the coast to which they are gravity dropped. They are magnetic, hematite, and dry—a great saving in transportation, as will be appreciated by those familiar with the wetness of Lake Superior ores which necessitate the carrying of thousands of tons of water. The proofs show the substantial character of this competitor with a surplus and capital of $55,000,000 and further integration in view.

Referring at this point to the existence of a fair and open competitive field, as sensed by practical men in the iron and steel industry, we gain light from the proofs in reference to the Youngstown Sheet & Tube Company of Youngstown, Ohio. That company does not appear in the foregoing list because it came into existence after the Steel Corporation was formed. It is an inland company. Its ore supply is from Lake Superior. It started the year after the Steel

Corporation was formed. It purchased its reserve ore supply in 1903. It began with an investment of $600,000, which in the succeeding years has been increased to over $29,000,000. By 1913, it had an annual capacity of 1,000,000 tons of ingots and sold that year over 800,000 tons. This company is cited as evidencing three things: First, that the men in the steel and iron trade immediately after the Steel Corporation was formed felt they had an opportunity to enter and prosper in the steel and iron business, both in the home and (Manning, volume 19, p. 7968) foreign markets; second, they felt secure about their basic ore supply; and, third, they were free to and did build up a great business in making steel ingots, one of the primary products or bases.

Coming next to the Pittsburgh district, we find a strong competitor of the Steel Corporation in the Jones & Laughlin Company, which, at the time of the Steel Company's formation, the proofs show (Government Exhibit, volume 4, p. 1513) was then so integrated as to make "a greater variety of product than any other steel or iron company in the country." In 1901, its finished product alone was nearly one-half million tons. By 1912, it had increased that production to one and a half million tons. During that time it had integrated still further by building large additional works and had (King, volume 6, p. 2120) entered into competition with the Steel Company and others in the manufacture of tin plate and wire rods. Like all these other competitors mentioned, the Jones & Laughlin Company is thoroughly "integrated"; that is, it has its own basic supplies and carries on its work in continuous process from ore to diversified finished steel products. It has large reserve holdings of ore in the Lake Superior region and an ore fleet on the Great Lakes with a carrying capacity of 40,000 tons. It has over $50,000,000 capital and a large surplus.

Going east, we find at Johnstown, Pa., the Cambria Steel Company, a strong company also thoroughly integrated, and with an investment of nearly $70,000,000. From 400,000 tons finished product in 1901, the Cambria increased to nearly 1,200,000 tons in 1913, and it has (volume 6, p. 2199) further improvements in view looking to a large increase in its output. It has a 50-years' supply of Lake Superior ore and a Lake fleet of a capacity of 50,000 tons. At this point, the president of this company might be quoted. He was called as a witness both by the government and the Steel Company. His testimony is enlightening, as showing that his and other companies in the steel business feel the Steel Corporation has no power, even if so disposed, to monopolize, restrict, or stop their business. We quote (volume 28, p. 12034) from his testimony:

"Q. Have or not the leading competitors of the Steel Corporation, since 1901, increased their capacity or further integrated or added to their holdings of ore or coke?

"A. Oh, yes, sir; there have been a great many new properties secured by the other companies, and a large number of developments in both the coking regions and the ore regions.

"Q. And what would you say as to their progress, if they have made any, in the matter of integration and diversification of products?

"A. I think all of the companies have expanded and improved their plants and strengthened their holdings of raw material.

"Q. In your testimony for the government, referring to Jones & Laughlin, the Lackawanna, Cambria, the Republic, and perhaps others, you stated as follows: 'I do not think that there is any one of those companies that could not compete with the United States Steel Corporation and compete successfully.' You were not then asked to give your reasons for that opinion; be good enough to give them now.

"A. It is a very simple proposition to build a furnace and steel plant, or finishing mills fully the equal of the Steel Corporation's and labor can be employed at exactly the same price, and there is absolutely no difficulty in producing the various products at practically the same cost.

"Q. Has the Steel Corporation any such advantage owing either to its size, the extent of its integration, or any other circumstance, as would enable it to put its competitors out of business, did it choose to do so?

"A. No, sir. It would be impossible for it to do so without committing suicide.

"Q. Why?

"A. Well, their product is practically sold in this country. Of course, they do a small export business, but they sell to the same people that we do, and we sell to the same people that they do; and, if they would make prices so low that we could make no profit on it, there would be nothing left for the Steel Corporation; and, if they would undertake to put us out of business by selling below our cost, they would be selling below their cost, so that I cannot see how it would be possible for them to put a well-managed concern out of business.

"Q. Could the Steel Corporation confine any destructive warfare which it might undertake to any one competitor? In other words, could they wage a warfare against the Cambria or Jones & Laughlin, or any of the other considerable concerns, without involving the rest of their competitors?

"A. No, sir; that would be impossible.

"Q. Could they confine any warfare that they might undertake either against a single competitor or against all other competitors to any particular locality?

"A. No, sir; because the markets are all affected in sympathy, and, if the price was made below cost in one market only, we would go to the other; we would seek other markets.

"Q. Why do you say that the Steel Corporation could not make war against one competitor only without involving the rest of them?

"A. Because, for instance, we all sell to practically the same class of trade, to the same customers. We sell to many people who buy from Jones & Laughlin and the Steel Corporation and the Republic and the Inland Steel Company, and various other companies, so that it would be impossible to pick out the customers of any one manufacturer, and you cannot affect the price in one market without affecting it in all the other markets in the country.

"Q. Has the ability of the Steel Corporation to resist any such warfare increased since 1901? Are they any better able to take care of themselves in such a warfare now than they were in 1901?

"A. No, sir; I would say that they are not. I do not fear the Steel Corporation as much as I fear other competition."

Without going into detail as to other companies in the foregoing list, we may refer to the Colorado Company, whose market, the proofs show (volume 26, p. 10935), covers the United States west of the Mississippi. This company is integrated, is independent of the Lake Superior ore, has more than 60 years' supply of its own ores in Wyoming, New Mexico, and Utah, and has largely expanded its plant since 1901. It has resources of $80,000,000, and its finished product has increased from 200,000 tons in 1901 to about 500,000 tons in 1912. This company has by its western location (volume 26, p. 10937) a freight advantage over the United States Steel Corporation and all other eastern

competitors in selling rails to most of the railroads west of the Mississippi.

The history of the next company is illustrative of the feeling of confidence and security among practical steel men, which warranted them in making since the Steel Corporation was formed large expenditures and entering into competition in the steel business. The Republic Iron & Steel Company of Youngstown, Ohio, was in 1901, engaged principally in making iron. Its finished product that year was some 500,000 tons. It has since expended $25,000,000 in changing its business from iron to an exclusively steel one. Like all other steel makers, the Republic Company's policy has been one of simply following the progressive and universal practice of integration incident to the development of the use of steel. The Republic Company's process of integration its president (volume 2, p. 731) well describes:

"We have practically eliminated all our scattered iron mills, have concentrated them in the operation at a few points of production. So, to-day we produce practically but little iron and are manufacturing about 1,000,000 tons of steel per annum. This is what we call an integrating process; that was part of it, the addition of the mineral and coke and blast furnaces, and balancing up operations generally, completing the integrating process. * * * This integrating process that I speak of attended our development of the steel end of our business. We did not need it so much when we were simply manufacturing iron. It was done for economic and trade reasons, on account of the increased demand for steel and the decreased demand for iron."

The Republic has increased the range of its product and production until it is now a million and a quarter tons and extends (volume 28, p. 11999), all over the United States and Canada. It has gone into the Birmingham, Ala., field, where it has plants, as well as in Pennsylvania, Missouri, Illinois, Indiana, Iowa, and Michigan. It has acquired 40,000,000 tons of Lake Superior ore reserve and 80,000,000 in the Birmingham district, and has a lake fleet of 18,000 tons. Its growth during this time was such (Topping, volume 2, p. 735), that it is producing one twenty-fifth of all the steel produced in the United States and one thirtieth of all the iron. From a study of the testimony there is no doubt that the men who made these large expenditures in 1906 were satisfied that the field of fair business competition in the iron and steel business was open to them. These expenditures were made in completely integrating its manufacturing facilities. This integration consisted (volume 22, p. 9131) in increasing its blast and open hearth furnaces and ore supply and carrying their basic product forward to completion by additional plants which included finishing mills for merchant bar, for sheet bar, for billets, and for plate in addition to galvanizing works, rivet, spike, bolt, and nut departments, and by-product coke works. They have no more to fear from the competition of the Steel Corporation than they have from that of any other of their other competitors. The testimony of this company's president, who like the Cambria's president, was called as a witness both by the government and the Steel Company, is instructive, on that point. It is:

"Q. Where is the market for your product?
"A. All over the United States and Canada.
"Q. Has the Steel Corporation in your opinion power to put the Republic out of business?

"A. I. think not.

"Q. Has it the power to put its competitors generally, or any of its principal competitors, out of business?

"A. I would say not.

"Q. What is your reason for thinking that they have not that power?

"A. I would have two reasons: One, that they have not the physical ability to do it; and, secondly, if they attempted it, they would involve their own market to such an extent that they would suffer equally with us. What I mean by physical is this: Their principal competition, companies like ourselves and others as strong as we are, are properly integrated; in other words, being self-contained on raw material, well equipped, and at least fairly well managed and properly financed, so that a combination of that kind would give us as much power to produce within somewhere a close approximation of their cost; at least their difference would not be so great that they could put us out of business. They have some advantages, and so have we.

"Q. Now, as to your second reason, that it would involve them in loss as well as you, what do you mean by that?

"A. Well, to illustrate, we might have a customer, we will say, in Michigan, engaged in the manufacture of agricultural implements, and another one in Illinois or Indiana. If we should sell in Michigan steel bars and plates that enter into the cost of production of a machine at a less price to A. in Michigan than we do to B. in Illinois, we would probably soon hear from B. in Illinois, because those two men would naturally compete in the general market of the United States with their machinery. So it would be with all other fabricated products made from steel, the markets are inter-related and inter-laced to such an extent that you cannot reduce prices, in my judgment, in one market, without affecting in a short time the market elsewhere for the same commodity.

"Q. Could the Steel Corporation localize a destructive warfare against its competitors?

"A. Not in my opinion.

"Q. Why not, if there is any other reason than you have already indicated?

"A. I should say that the reason I have already indicated would be a complete answer to that thought. There is a sympathetic relationship existing between all markets that is so close that my experience would compel me to say that you could not affect the price in Chicago without affecting the price in New York. As a matter of fact, that is the experience that we have had.

"Q. And could the Steel Corporation wage a destructive warfare against any one of its competitors without involving all of them?

"A. No; I would say not."

The same confidence to enter into competition thus evidenced in the Republic Company was also shown by the Inland Steel Company of Indiana. That company had expanded its investment from some $4,000,000 to $20,000,000. It has acquired Lake Superior ores and a lake fleet of considerable capacity. Asked the question (volume 22, p. 9144):

"From your knowledge of the iron and steel business, the relative capacities of those engaged in it, the capitalization of the United States Steel Corporation, its ownership of railroads, its connection with financial interests, state whether or not in your judgment, it has the potentiality, if it uses it, to destroy its competitors?"

—its president testified:

"A. No; that is absurd. They cannot do it. I think it is a physical impossibility. I cannot imagine how they could do it.

"Q. Is there any possible doubt in your mind of the ability of the Inland Steel Company to maintain itself in any kind of competition?

"A. Well, that is what we are aiming to do. We think so. We think we are getting as well prepared as most of our competitors by the money that we have

spent there; and I believe it has been spent on the right lines. I know that we would not change any of it if we had it to do over again, as far as we have gone.

"Q. And you are very well integrated, as you have stated?

"A. Yes; we did the best that it was possible to do.

"Q. Mr. Thompson, you stated in answer to my question a short time ago, that the competition between the Inland Steel Company and these other companies had been active in the territory that you serve?

"A. Yes, sir.

"Q. What do you mean by 'active'?

"A. Always at it. We were always trying to get business. I don't know how to express it any stronger than to say that we were all looking for trade in an active way, all the time, keeping ourselves posted on conditions and soliciting business from just such men as the witness who was examined here this morning and from other railroads; I say it is active because we are always at it—all of us."

We have referred above to competitive steel conditions on the Atlantic seaboard as shown by the proofs. Those proofs also show (Pigott, vol. 26, p. 11066) how competition to the Cambria, Jones & Laughlin and the Steel Corporation has grown on the Pacific Coast. This competition has increased since the Steel Corporation was formed. Mr. Pigott testifies his company has built at San Francisco open hearth furnaces with a capacity of 30,000 tons; bar mills, with 30,000 tons capacity; and at Seattle a rail re-rolling mill with a capacity of 30,000 tons. For its basic supply this company is wholly independent of the Steel Company, Jones & Laughlin, the Cambria Steel and all eastern companies doing business on the Pacific Coast. This is clearly shown by the proofs. This company gets one-half of its pig iron from China and the balance from the Republic Company and the Tennessee Coal & Iron Company. The proof is (volume 10, p. 3887) that the freight paid to deliver the Tennessee Company pig iron from Birmingham, Ala., to San Francisco is $10.08 per ton. The proofs further show (page 3889) that the Chinese pig iron is delivered at Pacific points at a freight rate of $3.70 per ton. If to this $3.70 be added the price of the pig iron, $6.20 per ton, it will be seen that the Chinese pig iron at $6.20, plus freight $3.70, $9.90, can be paid for and delivered on the Pacific Coast for about the amount, $10.08, the Republic and the Tennessee Company pay for freight alone. As the proofs (page 3887) further show the pig iron from India is being delivered in San Francisco from Calcutta at an expense of $12.38 per ton, namely, price of pig iron $5.40 plus freight $6.98, it will be seen that the future basic supply of this and other companies that may spring up on the Pacific Coast can be had of Asiatic pig metal wholly independent of the Steel Corporation and other eastern competitors. In view of the further proof (volume 11, p. 4182), that the ores on the western coast of Mexico, and necessarily those of Chili, are also available, and that the improved practice in steel making (volume 3, p. 992) makes ores now usable which were formerly not so, the conclusion is warranted that the field for all possible development on the Pacific Coast in the steel business is wholly free from any monopolistic control whatever. It will thus be seen that a substantial steel industry in rails, bars, and open hearth steel has in fact grown up on the Pacific Coast, while in competition with the Steel Company, a competition which Mr. Pigott (volume

11, p. 11074) describes, "from the standpoint both of a customer and a competitor," "has been beneficial."

As we have said, we have, as throwing light on the substantial character of the strong and increasing competitive forces in the steel business, referred only to those above named. It is proper, however, to add that the proofs in the case (Defendant's Exhibits, volume 1, p. 137; volume 2, pp. 209, 210; and volume 3, p. 374) show the Steel Company has eight competitors in rolling structural shapes, that is, beams, etc., for bridges, skyscrapers, etc., and in the fabrication of such structural material over 300 competitors. In the rolling of merchant bars it has very considerably over a hundred competitive mills.

Later, we shall note the testimony of competitors as to their relation to the Steel Corporation, but before referring to individual relations, we deem it proper to here refer to some general phases of monopoly which affect all competitors. One of these was the practice by large companies of exacting freight rebates from railroads under threat of diverting shipments elsewhere. These practices were common up to the time of the ending of the old era of freights unregulated by the government (Government Exhibit, volume 3, p. 1120; volume 2, p. 441; volume 3, p. 1031; volume 3, p. 1035, and the discussion in volume 3, pp. 956, 957). In Swift & Co. v. United States, 196 U. S. 402, 25 Sup. Ct. 276, 49 L. Ed. 518, the Supreme Court said:

"It is obvious that no more powerful instrument of monopoly could be used than an advantage in the cost of transportation."

And in the Standard Oil Case, supra, this subject was again referred to as—

"the acquisition here and there which ensued of every efficient means by which competition could have been asserted, the slow, but resistless, methods which followed, by which means of transportation were absorbed and brought under control * * * all lead the mind up to a conviction of a purpose and intent which we think is so certain as practically to cause the subject not to be within the domain of reasonable contention."

On January 28, 1905, Congress directed (Government Exhibit No. 206, volume 5, p. 1615) the Secretary of Commerce and Labor to investigate the steel and iron industry of the country with a view to ascertaining to what extent the United States Steel Corporation controlled the output and prices of finished product made by independent companies dependent upon it for their raw material and to report any restraints by it of commerce, foreign or domestic. James R. Garfield, who as Secretary of Commerce and Labor, made this examination, was called as a witness. He testifies (volume 14, p. 6190) he had made an investigation and examination of the railways in a similar manner to that made in the Standard Oil, and found no rebating whatever by the railroads to the Steel Corporation. That he was justified in his conclusion is strengthened by the fact that at a meeting of the Steel Corporation's executive committee in 1901, called to consider the policy of the company towards railroads, the minutes (Government Exhibit, volume 3, p. 957) show the position taken the first year of the corporation's formation by its chairman and there recorded, was "that we cannot afford to

take the position of asking any railroad, directly or indirectly, to discriminate in our favor." This policy was later emphasized (volume 12, p. 4790) in a letter sent to the presidents of the railroads (Defendant's Exhibit, volume 3, p. 295), handling the Steel Corporation's freight, as follows:

"Personal.                                                                    Sept. 20, 1905.

"Dear Sir: As you know, this corporation long since adopted the unalterable policy of recommending to subsidiary companies in which it is interested, that under no circumstances should rebates be solicited or received contrary to law. This policy will be strictly adhered to and it is hoped and expected your subordinates will be advised and instructed accordingly. If any one should at any time violate his instructions in this respect, notice of the same should be promptly given to the president of the subsidiary company interested and also to the undersigned.

"Yours very truly,                                        W. E. Corey, President."

In view of this announced policy of the Corporation of the investigation made by the Department of Commerce and Labor, of the absence of any complaints by any competitor, and of no proof of any freight rebate being given, we are justified in concluding that the Steel Corporation has not used, or sought to use, freight rebates as a means of undermining its competitors, or of monopolizing business.

We next turn to ruinous trade wars against competitors which, as we have seen, was one of the features of attempted monopoly denounced by the Supreme Court. In that connection it is to be noted that under conditions incident to the steel trade the power of a large steel company to carry on a ruinous trade war against any particular competitor does not exist in the iron and steel industry. The customers of the great steel companies are large jobbers and the purchasing agents of other companies, who are in the closest touch with every fluctuation of the steel market. The result is that any effort on the part of any one of these great steel companies to inaugurate a trade war by ruinously underselling a competitor would at once, owing to the sensitiveness and inter-related character of the steel market, result in forcing the company that was thus ruinously selling in any particular market or locality to in the same way ruinously lower its prices in every other community. In that respect, the president of the Youngstown Sheet & Tube Company, a competitor, testified (volume 22, p. 9144) that, if the steel corporation attempted such a course, "they would involve their own market to such an extent that they would suffer equally with us." The testimony of the president of the Cambria Steel Company, already quoted (volume 28, p. 12036), is to the same effect, as well as that of the president of the Republic Iron & Steel Company (volume 28, p. 11999). And the practical impossibility of such a course is shown by Judge Gary (volume 14, p. 5378), where he testifies:

"I feel certain that by reason of our integrated proposition we had the advantage in cost of production over our competitors generally. If any one having advantage in any business is willing to sell down to his cost price, of course he would live while his competitors would starve; but that is a most unnatural position for any producer to take and long continue."

In view, therefore, of the uncontradicted proof of those familiar with the steel business that no such ruinous trade war could with profit to itself be carried on by the Steel Company against a competitor, and in the absence of proof of any effort by it to harass them by such conduct, we are warranted in concluding there has been no attempt by the Steel Corporation to monopolize or restrain trade through ruinous trade wars against its competitors. For of the conduct of the Steel Corporation, the views of its competitors is the best gauge. Monopoly and unreasonable restraint of trade are, after all, not questions of law, but questions of hard-headed business rivalry, and whether there is monopoly of an industry, whether trade is subjected to unreasonable restraint, whether there is unfair competition, are facts about which business competitors best know and are best qualified to speak. And it may be accepted as a fact that where no competitor complains, and much more so, where they unite in testifying (Campbell, volume 5, p. 1857; Smith, volume 19, p. 7942; King, volume 6, p. 2121; Bowron, volume 25, p. 10247; Pigott, volume 26, p. 11075; Manning, volume 19, p. 7701) that the business conduct of the Steel Corporation has been fair, we can rest assured there has been neither monopoly nor restraint. Indeed, the significant fact should be noted that no such testimony of acts of oppression is found in this record as was given by the competitors of the Tobacco or Standard Companies in the suits against those companies. We have carefully examined all the evidence given by competitors of the Steel Corporation. We have read the testimony of customers who purchased both from it and from its competitors. Its length precludes its recital here, but we may say its volume, the wide range of location from which such witnesses came, and their evidently substantial character in their several communities make an inevitable conclusion that the field of business enterprise in the steel business is as open to, and is being as fully filled by the competitors of the Steel Corporation as it is by that company.

Taking as fair samples of the views of the competitors, we note, first, the testimony of James Bowron, president of the Gulf States Steel Company, who says: "Their competition is strictly fair." Herbert S. Smith, vice-president of the Standard Steel Company of Alabama, and formerly general sales agent of the Lackawanna Steel Company of Buffalo, who says: "I have always regarded the competition of the Steel Company's subsidiaries as the fairest competition that we have." Of western manufacturers, we note that of William Pigou, president of the Pacific Coast Steel Company, who says:

"I have always found the competition of the United States Steel Company and its subsidiaries fair; its existence has been beneficial to the steel and iron trade of the country."

We have noted above the remarkable growth of the Youngstown Sheet & Tube Company, which came into existence in 1905, and in the meantime has grown to be a very important competitor of the Steel Company. The testimony of James A. Campbell, its present president, who was called as a witness by the government (volume

5, p. 1857), so fully covers the subject of the attitude of the corporation toward its competitors and the purchasing public that we quote it at length:

"A. My experience is that it is the best competition we have; that they are open and above board in all of their dealings. Their prices are either published, or we get direct information from them or through our customers as to what their price is, and we find that their price is practically the same to everybody. With other competition that we have, with the independents, for instance, the independents vary more in their prices, and we never quite know what their price is. It may be one thing to-day and another to-morrow, and they do not conduct their business in the same way, because it is a smaller business and more of an individual business; and they will make prices according to the class of material pretty largely and the class of orders. So we were not as capable of guaging how they are conducting their business as we are in regard to the subsidiary companies of the Steel Corporation.

"Q. Is your competition with these subsidiary companies of the United States Steel Corporation active and energetic and vigorous competition?

"A. It is—very, at times. We sell to many of the same people that they do, the same class of material.

"Q. Have you ever known of their having made low prices in a limited section of the country for the sake of attempting to put a competitor out of business?

"A. I think not. I do not recall any time, with any company.

"Q. Have they, in your experience, been guilty of any unfair methods to suppress competition?

"A. I think in the early days—I did think in the first two or three years we were in business that there were some things done, and I think done without the knowledge of the higher officials, that were unfair; but those disappeared promptly, and there has been nothing of that kind, nothing but the fairest competition in every respect for the last seven or eight years.

"Q. When the market has been falling, what has been your experience as to the prices which they have maintained as compared with those of the independents?

"A. In depressed times, when there is not nearly enough business to keep all of the mills operating to their full capacity, their prices are usually higher than the independents. In good times, when the mills are all working to capacity, their prices are usually lower than the independents. The independents will accept bonuses and do things of that kind that I do not think the corporation will do. So that I think the general effect is for the steadying of prices and making them better for the country at large, and of course in dull times, it is a great protection to the smaller manufacturers to have them keep their prices up, when business is slack, than it would be if they went out like the Carnegie Steel Company did in the early days and took all the business and shut the other people down."

To this may be added the testimony of Charles M. Schwab, who knew the conduct of the company as one of its original officers and later, as one of its competitors, felt the effects of its policy. We quote from his testimony (volume 11, pp. 4154, 4155) at length:

"A. In the beginning of the Steel Corporation, during my presidency, the policy of the corporation towards its competitors was not one of endeavoring to hurt, not one of endeavoring to stifle, or to destroy, but the policy of naming a price for our products, not only to our customers, but openly through the trade journals, if you will, because I used to give it to the Iron Age and the Iron Trade Review each week, and the sticking to these prices throughout the trade; there probably were exceptions of a minor character to very large consumers, but as a rule, during my presidency of the corporation, the prices of its products were fixed and published, and they were what were charged the customers. Is that clear?

"Q. You say you gave these prices to the public, as a rule, once a week?

"A. I did.

"Q. To the trade journals?
"A. To the Iron Trade Review and the Iron Age.
"Q. Are they the principal trade journals in the steel industry?
"A. They are the principal trade journals.
"Q. What has been the practice of the corporation in those respects or along those lines since you left the presidency, as you have observed it, from the point of view of a competitor?
"A. So far as I know, from the point of view of a competitor, they have adopted since that time practically the same policy.
"Q. Have you ever known of the Steel Corporation to have a published price and a secret price differing from the public one?   .
"A. So far as I am concerned personally, I do not know of any.
"Q. Have you ever known or heard of a case where the corporation has sold at a less price in a particular market to drive out a competitor?
"A. Never.
"Q. Or has sought to obtain a customer of a competitor by secret rebates or departures from these open published prices?
"A. I have never heard of such a thing.
"Q. Either while you were president or since you have been a competitor?
"A. Never."

We next turn to that most injurious feature of monopoly's wrong to the public, to wit, increase in the price of its product or a deterioration in quality. Turning, first, to the basic question of quality, no dispute arises under the proofs. They are simply uniform that both with independents and the Steel Corporation, there has been a steady bettering of quality in steel products. This factor of improving its product has been recognized by the Steel Corporation, and a study of the testimony of its buyers satisfies us that this progressive growth in quality by the Steel Corporation has been the principal means by which it has acquired and held its business.

Turning next to the increase in price, we are met by two aspects of the case. Two learned experts have been called, one by the government, and one by the Steel Corporation, who draw different conclusions as to whether there was an increase or decrease in the price of iron and steel products. The deductions of both are supported by weighty contentions and numerous enlightening charts. The able reasoning of both has had the thoughtful consideration the standing of the two men challenges. We may note that the different ranges of time they have taken, as the basis of their reasoning really makes them reason about two different things, but apart from that, we think whatever may have been the range of iron and steel prices during the periods of consideration selected by each, the proof is (volume 28, p. 12000) that in these days of quick communication the general price of steel and iron products cannot be localized, but is interdependent in this country and, indeed (volume 28, p. 12013), internationally so. That proof is that when there is an oversupply, even in the European steel and iron market, that market tends to unload on the American steel market, and on the other hand, when there is an oversupply here, this country seeks to dump on their markets at any price. Without citing the proof in that regard, we may refer to Corrigan, volume 26, pp. 11096, 11102; Moller, volume 19, p. 7666; Topping, volume 28, p. 12013; Kahn, volume 23, p. 9483. It will also be observed that so sensitive and inter-related is the price of steel and iron that a drop in price of any particular branch of steel leads to a drop in all other branches. King, volume 6,

p. 2114; Schwab, volume 11, p. 4387; Kennedy, volume 5, p. 1873; Topping, volume 2, p. 682.

No evidence is produced showing that there has been at any time an arbitrary or unreasonable increase in price of any of the numerous products of the Steel Corporation. On the contrary, the proofs (Government Exhibit, vol. 14, pp. 2912–2922) show decreases in important steel products, among which we may refer to wire nails which from selling in 1901 at $51, when the Steel Corporation was formed, were, in 1911, when this petition was filed, selling at $36. During the same time, steel bars receded in price from $33 to $25. Steel beams dropped from $36 to $27; billets from $27 to $24; and a statement taken from the Steel Corporation's accounts (Defendant's Exhibit, volume 2, p. 203) shows there was between 1904—a date when the Steel Corporation may be said to have been fairly systematized and under way—and 1912, a decrease in fabricated prices received by the company of 19 per cent., and of all other products, of 11 per cent. Summing up the business result, the president of the corporation (volume 10, p. 3854) testified the Steel Corporation was in 1912 getting about $8 a ton less for materials in the domestic market than they were receiving in 1904. Moreover, it should not be overlooked that during these years there were substantial factors of increased expense in the cost of manufacture. The freight on coke (volume 10, p. 3781), of which the corporation uses some forty thousand tons a day, has increased 12 per cent. since 1901; the freight on limestone, which constitutes one-third of a furnace's burden, has increased 10 per cent. since 1901; and iron and steel wages (volume 10, p. 3895) have increased 28½ per cent.

Standing aside for later discussion the matter of the Gary dinners and the meetings following them, through which it is alleged the Steel Corporation in co-operation with its competitors unduly restrained and obstructed the normal course of the steel trade, and confining ourselves to the fixation or control of prices by the Steel Corporation itself, or its subsidiaries, we may say we have found in this record no proof by any witness showing any instance in which the Steel Corporation or its subsidiary companies has set either an arbitrary, exorbitant, unfair, or controlling price on any one of its numerous products. It is a mere truism to say that the fixing and maintaining by a manufacturer of a fair price above cost is not only a right but a commercial necessity, and any other course, must end in his bankruptcy. When such fair prices are deported from and they are unreasonably raised and exacted from the purchasing public, the public is prejudiced thereby. On the other hand, when that price is so unreasonably lowered as to drive others out of business, with a view of stifling competition, not only is that wronged competitor individually injured, but the public is prejudiced by the stifling of competition. Between these two price extremes, there must, in the nature of things, be a considerable zone of reasonable price variation, and what is a fair price is a question which can only be determined by a careful ascertainment from cost sheets and other data of such fair price. In the present case neither side has furnished this court with proof from which we could intelligently determine whether the prices charged by the Steel Corporation for any

223 F.—6

of the numerous articles here involved, beginning for example with pig iron and ending with rails, was unfair, exorbitant, or unreasonable. In the absence of such testimony, it is manifest that for this court to assume that the prices at which any of these articles were sold by the Steel Corporation and its competitors were unfair would be. to base such conclusion on surmise instead of proof. But there is not only this absence of testimony in regard to the prices received being unfair and exorbitant, but there is, on the other hand, affirmative testimony, which we cannot disregard, and which, as it seems to us, constrains us to conclude that the prices of the product sold by the Steel Corporation have been the result of the joint action of the law of supply and demand and of that vigorous rivalry which has at all times existed between the. Steel Corporation and its competitors. In that respect we have the testimony of the Steel Corporation's great competitors, of large and small manufacturers, over the whole country who purchased basic steel products and put them through other stages in their mills and factories; of jobbers and warehousemen who buy and hold for sale large stocks of steel products. The testimony of these men—and there is no testimony to the contrary—is that the iron and steel trade in the various products of the Steel Corporation is and has been open, competitive, and uncontrolled, and that all engaged therein have free will control in selling at their own prices. This important fact we shall not leave to here stand as a statement of a conclusion reached by us from a study of the testimony in volumes 18 to 28 inclusive; but, at the risk of unduly prolonging this opinion, we shall here spread of record the testimony of a few witnesses on that subject so that he who runs may read.

In taking up that question, we have, in the first place, the proof that so far as the prices charged by the Steel Company are concerned its practice has uniformly been to give the utmost publicity to such prices. In that regard, Charles M. Schwab, a former president, testified (volume 11, p. 4154), as already noted above:

"In the beginning of the Steel Corporation, during my presidency, the policy of the corporation (was) * * * of naming a price for our product not only to our customers, but openly through the trade journals, if you will, because I used to give it to the Iron Age and the Iron Trade Review each week, and the sticking to these prices throughout the trade; there probably were exceptions of a minor character to very large consumers, but as a rule, during my presidency of the corporation, the prices of its product were fixed and published and they were what were charged the customers. * * * So far as I know, from the point of view of a competitor (the witness is now president of the Bethlehem Steel Company) they have adopted since that time practically the same policy."

That these published prices are met in vigorous competition the proofs show. President Campbell of the Youngstown Company, speaking of his company, says, in substance, that their (volume 5, p. 1857) competition with the subsidiary companies of the United States Steel Corporation is active and energetic and vigorous, very at times. We sell to many of the same people that they do—the same class of material.

The sales manager of that company (volume 19, p. 7701) testified that the subsidiaries of the United States Steel Corporation have been

our competitors in these various lines of production and sales in every line we manufacture and throughout the country. The competition has been very severe.

The president of the Colorado Company (volume 26, p. 10940) says that, in the bar mill products, they meet Jones & Laughlin, the plants of the Steel Corporation that make these products, the Cambria Steel Company in some of them. The competition has been vigorous and independent and unrestricted, so far as it affected them. He thinks the competition has increased in extent. There are two or three new elements in the field and that has made all the old ones a little more active, including themselves.

The testimony of the sales manager of the La Belle Iron Works of Wheeling, W. Va., may be taken as typical of the existence of an open steel market in competition with the Steel Corporation. That company had, during the ten years following the organization of the Steel Corporation, increased its finished product of billets, sheet bars, nails, tubes, plates, skelp, and sheets largely over 400 per cent., and its market covered the entire country, Mexico and Canada. Its sales manager (volume 19, p. 7876) said that their competitors are all the leading steel companies, pretty near, take the Lackawanna, Cambria, Republic, the Youngstown Sheet and Tube, the Wheeling Steel & Iron, and the various constituents of the Steel Corporation. The prices which they obtain for their steel products are not fixed in agreement with their competitors. That is true of each and every year of the ten years that he had been general manager of sales. It is true of each and every article they have produced and sold in the market. There has been no time during the ten years when the price of any article they have produced and sold has been fixed by agreement with any competitor. He is able to say that because the chances are that if it had been done in his company he would have known it. That is his business. The prices have sometimes been fixed in a general way in consultation with their president. *No price has ever been suggested by the president or anybody else in any of these conferences, as a price agreed upon by any competitor.* The considerations that controlled him in these conferences, or when he acted independently of them in fixing prices, were competitive conditions and cost of manufacture. The state of their order book affects the question of prices. When the order book is lean, they probably make lower prices. When full of orders the chances are they will advance prices. That is always the case. It is observable that competition is keener and competitors more active when times are dull and order books are lean. Prices usually rule higher when business is active, and when business is dull they rule lower. The prices obtained by them have fluctuated. He would say the prices obtained by their competitors have fluctuated. The trade or competition in these various articles manufactured has been nearly always active during the period he has had charge of the sales. The competition has been what you would term keen. They met three or four or more competitors in every article they manufacture. The competitors are numerous. They have grown in numbers and output.

The testimony of the chairman of the Republic Iron & Steel (volume

26, p. 12019) shows how that large company arrives at its prices; they do not have uniform prices. They sell to some customers at one price and to other customers at another, varying with the size of the order, the quality and the character of the service they are expected to render naturally. They have traveling men and their own branch sales offices. As a general rule, they send out to them prices at various times at which they are to sell their various products. They give minimum prices below which they shall not go, and allow them to use their intelligence in getting all above they can. That minimum would naturally be the same for all of them. Generally speaking, it would be the same based on cost. They give them the same latitude; in other words, the same general base, which represents a minimum below which they must not go as it might involve a loss.

The general sales agent of the Lackawanna from 1905 to 1910 testifies (volume 19, p. 7905) as to the competitive prices of that company other than rails, to which special subject we refer later. He says: That he had entire charge of the sale of the output of that company, making prices. Their market covered practically the entire United States. Their product was always sold in competition with the product of other manufacturers of steel. The competition was always keen and a great many times aggressive. The leading competitors were the mills of the Steel Corporation, the Carnegie Steel Company, the Jones & Laughlin Steel Company, the Inland Steel Company, the Cambria Steel Company, the Pennsylvania Steel Company, the Eastern Steel Company, the Carbon Steel Company, the Maryland Steel Company; there were some others that he does not remember for the moment. In general, and in almost every case, he had the fixing of the prices. The prices were not fixed in agreement with competitors, always independently. That holds for the whole period of five years that he managed the sales. There was no time during that period when the prices he either quoted or fixed were quoted or fixed in agreement with any of their competitors as to any article that they sold. The prices were both uniform and variant. They might have been uniform on steel rails in some cases, and they might have been uniform on steel plates and shapes in some cases; but not necessarily so. They were following (referring to the uniformity on plates) at that time what they called the market price, and as a rule they tried to obtain the so-called market price. It was a matter of pride with a steel manufacturer to sell his goods at as high a price as that of any other manufacturer, and, if the leading makers were getting $1.60, they felt it was up to them to get the same price; hence the uniformity of price. They were not always able to get the price they tried to get. They found some means of shading it. The extent of their order book or list was a great factor in making prices, the terms of payment and delivery. If the mill was short of orders in any one line, special efforts were made to get business in that particular line, and in such cases the seller is inclined to be rather more moderate in his demands as to price, terms of payment, and all that. The prices varied considerably both ways during the period mentioned. That is true of everything except rails. When he went with the Lackawanna Steel Com-

pany, he found that the price of standard Bessemer steel rails was $28 a ton at the mill. It had been fixed for some time. He did not know how long a time. That price he adopted and never varied from it. It was tacitly understood that that was the price of their steel rails as fixed by the Lackawanna Company. He testified that no statement (referring to conferences with the president on the prices of other products) was ever made in any of these conferences by the president of a price agreed on with competitors which would be adopted or maintained by the Lackawanna. He did not recall any instance in which he was ever interfered with by an officer of the Lackawanna during the time he was there in quoting such price as seemed best in his judgment to be warranted by business conditions. He does not recall any price ever named by him based on any other consideration than competitive business conditions.

As to the Jones & Laughlin competition, the testimony of the man in charge of the sales (volume 20, p. 8029) is that Jones & Laughlin make steel billets, slabs, and blooms, and convert these into finished products, principally structural material, plates, bars, shafting, chains, spikes, wire, wire nails, tin plate, and black sheets in tin mill sizes. These different products that they have are sold in competition with other makers of similar products. The competition is unlimited. He means unlimited by agreements as to prices. That is true of everything he has mentioned. *He says that this has been so to his knowledge for about nine years.* The competition has been keen. It extends to competition in the matter of prices.

Turning from fellow competitive makers of the same general products as the Steel Corporation, we naturally turn to the testimony of millowners who use as their basic supplies the products made by these large companies and inquire whether, as buyers, they have found any price fixation by these basic manufacturers. As a type of that character, we note the testimony of the president of such a company (volume 20, p. 8050), who, in substance, says:

I should say we were using about 25,000 to 30,000 tons a year in 1901. It has been growing each year. I think last year we purchased something in the neighborhood of 100,000 tons. I know of no other single customer for bar mill products in the United States that buys as much as 100,000 tons. We buy from the Carnegie Steel, the Cambria Steel, the Republic Iron & Steel, the Youngstown Sheet & Tube, and others. We have always found competition for our purchases of bars. Very keen most generally. Of course, there are times in normal business when it is not so keen, times when the consumers of bars are competing to get them. We can generally purchase at a less price than the quotation. That is, the quotations published in the Iron Age or the Iron Trade Review. *I have never observed any indication of a combination or agreement among bar makers to fix prices.* We have always been able to buy on fair competition. I think we have always been able to get the benefit of fair competition.

The general manager of the next largest company of this character in the country (volume 20, p. 7999), speaking of the purchases of his company, in substance, says:

The competition is mainly between the Carnegie and the Republic. Price is one kind of that competition; the ability to handle our particular class of business and sufficient capacity on account of our enormous consumption of bars. We generally contract for our tonnage, and we take bids on that con-

tract. There is competition in the matter of price; in the matter of delivery; and, to some extent, in quality. So far as we know or can find, there is no evidence of price fixing between the companies. We believe there is genuine competition for our business.

The president of a large boiler works and a purchaser of both plates and tubes (volume 20, p. 8015), in substance, says:

We receive quotations on plates from Lukens Iron & Steel Company, Worth Bros., Carnegie Steel Company, Cambria, Carbon, and occasionally Allegheny Steel. They vary. There is a difference in the quotations from the different concerns. There is a range from one to three dollars a ton. We have never observed any evidence of a combination to fix prices among the different concerns that make quotations to us. We feel we get the benefit of a genuine and unrestricted competition for our purchases.

The president of a large bolt and nut industry, the basis of which is rod and bar steel (volume 20, p. 8042), says:

We have been buying from the Carnegie Steel Company, Jones & Laughlin, and the Republic Steel & Iron Company. Before buying bars and rods it is our custom to ask quotations from different makers. We buy two or three times in a year. The quotations on rods vary somewhat in price, about 50 cents a ton. They have been varying in that way to my knowledge since 1904. I never saw any evidence since 1904 of any combination to fix prices on our purchases. We have always got the benefit of competition on both of them.

The manager, since 1901, of the largest single gas company in the country (volume 20, p. 8085), says in substance:

I am familiar with the purchases of iron and steel pipe made by that company since 1901. I decide which bidder shall be awarded the contract. During that period we have got quotations from 13 different companies—there are 11 at the present time we get them from. We let our contracts and award our orders on the competitive basis all the time. The quotations vary, and have done so ever since I have been connected with the company.

The president of a considerable tank manufacturing company (volume 20, p. 8127) testifies as to competition for his purchases, saying in substance:

We buy from the Carnegie Steel Company, Cambria Steel Company, Jones & Laughlin, and have bought some from the Eastern Steel Company, also from La Belle Iron Works. We find prices are nearly uniform from all companies in busy seasons when the mills are busy. When the mills are not busy, we get little concessions from most any of them, not to exceed $1.00 a ton, or something of that kind. I would consider it keen competition. I think we have had the benefit of the genuine, aggressive competition for our business. We have had a range of prices—take three years past, or for ten years—ranging from $1.10 to $1.50, and that I think is competition.

The same open competitive seeking after business of a steel spring company that buys for its basic supplies large quantities of steel bars and billets is shown. Referring to the period from 1902 to 1913, its purchasing agent, in substance, says:

We buy bars from the Carnegie Steel Company, the Inland Steel Company, the Cambria, and the Pennsylvania. The quotations vary. There has been competition ever since I have been connected with my business. We buy billets from most any one that sells—New York State Steel, Carnegie Steel, La Belle Iron Works, Portsmouth Steel, Inland Steel, the Bethlehem, the Pittsburgh Steel Company, and the Republic. The quotations we have received on billets vary very materially. That has been so ever since I was connected with it. So far as I have been able to tell, there has been competition

in the billet business both as to price and on our part as to delivery. I certainly do think we have had the benefit of competition.

The president of a large coal mining company, which uses light rails, testifies (volume 20, p. 8172) in substance:

As a rule we buy on a competitive basis. In Pennsylvania we get quotations from the Carnegie Company, Jones & Laughlin, Cambria Steel, Pennsylvania Steel, and Bethlehem. I should say that under normal conditions there is a range in the quotations all the way up to a dollar a ton. That is when business is normal. There are times when we cannot get quotations from many of those rail companies. That would be times of great prosperity in the steel business. The conditions have been such as I have described since 1901. So far as I know, we get the benefit of real and genuine competition in our purchases of light rails.

The president of a very large jobbing company in semi-finished steel products testified in substance (volume 20, p. 8176) as follows to its purchases being competitive:

"I have been familiar with the business since 1899. We deal in billets and slabs, steel bars, Bessemer iron, basic iron principally; malleable iron sometimes, some little foundry and coke. In the last ten years we have bought semi-finished steel from the Ashland Steel Company, the Portsmouth Steel, the Republic Iron & Steel Company, the Carnegie Steel Company, the Youngstown Sheet & Tube Company, the Allegheny Steel, the West Penn Steel Company, the Cambria, La Belle, Jones & Laughlin, Lackawanna, and Pittsburgh Steel Company. We buy on a competitive basis. It is competitive in a way. We know what the market is. We are not tied up to anybody. We buy outright and buy wherever we can buy the cheapest. There is a variation between the price as quoted at any particular time by the different manufacturers. It has always been so. There is competition in these products. It has always been so, as far as I know.

The manager since 1907, of a factory using various steel products, hoops, bands, angles, channels, sheets, wire goods, etc., which they bought from numerous companies, including the Carnegie Steel Company, shows that the competition and price ranges have been greater in steel than in other metal products. In substance he says (volume 20, p. 8190):

The bids have not been uniform. On the contrary, they have varied. Since we commenced buying in 1907, there was nothing in the bids or offers or the transactions between us and the sellers that indicated any combination or arrangement between the various producers or sellers of the different class of steel products I have testified as to bring about a uniformity of price. The variations in the prices of steel, as a rule, were greater than the variations in the prices quoted for us in copper, ingot copper, scrap copper, pig iron, scrap iron, tin, pig lead, and antimony.

The president of one of the large hardware jobbing concerns in the country, buying large quantities of sheets and plates from several companies, including the Steel Corporation's subsidiaries, in substance says (volume 20, p. 8229):

During the last ten years there seems to be a great deal of competition in sheets. There has not been so much in the sale of tin plate, of course, as in sheets, because there are not so many in the business. With regard to sheets, the competition has manifested itself by a sharp solicitation of our business; and we could always get very low prices from what we might term the independents. The quotations on sheets during the last ten years have been variant. Anywhere from $1 to $3 a ton. The quotations on tin plate have varied. The quotations on tubular goods are about the same as sheets, only

not so much so. The competition in the sale of tubular goods has been keen among the different manufacturers.

Without quoting him at length, we may say the purchasing agent of one of the great Eastern railway systems (volume 21, p. 8568) shows that all the varied steel requirements of the road from a great terminal building to the spikes (with the exception of rail purchases which were made by the president) were wholly in his control, and that there were constant variations in price and active competition for the railroad's purchases in all lines.

The purchasing agent for a Western system (volume 22, p. 9071) shows the same course of virile competition for its purchases.

A large jobber in tin plate, building sheets, and other metals (volume 22, p. 8943) shows that the jobbing trade is done on narrow margins and that active competition is vital. His purchases during the last ten years were from different concerns, including the American Sheet & Tin Plate Company. He says in substance: .

> There was, so far as I have seen, during the last ten years, competition. There has been competition in these products which I have purchased between manufacturers. It has been of a very active character. They changed their price quotations very frequent. It has been so during the whole period of ten years I spoke of. Sometimes a given concern would be higher and sometimes a given concern would be lower. Our purchases have been based on the lower quotations. The competition in our jobbing trade has been very keen. The margin has been very small. That necessitates our buying as close as possible. At the lowest quotation absolutely. We have done that. That explains our buying sometimes from one and sometimes from the other. That has been the case during the whole ten years.

Another jobber testifies (volume 21, p. 8979) as to competitive conditions in wire during the last ten years. His purchases included the American Steel & Wire and competing companies. He says in substance:

> There have been instances where the quotations we get from these concerns have agreed, but very rare. As a rule they vary. What would be termed appreciably; oftentimes to the extent of 50 cents to $3 a ton. I never recall a time when two quotations continued for any length of time to be the same. I am speaking now of the whole period of ten years. I never observed anything to indicate a combination between these manufacturers on prices. There was always competition. They had inducements of some kind to offer in the way of price or delivery.

We have carefully and patiently studied the voluminous testimony varying on the general course of all branches of the steel trade covering the whole time the Steel Corporation has been engaged in such trade. The testimony, as noted above, runs from volume 18 to volume 28, inclusive. It covers proofs by its manufacturing competitors in all branches, and also the different classes of customers whose trade it and its fellow competitors seek. It is apparent that among this latter class (that is, the consumers of its products) we would naturally find evidence of any throttling of competition, of any undue restraint of the steel trade. The typical extracts we have made above from varied sorts of buyers, of varied sorts of products, cover wide ranges of consumers. No one can read these volumes of testimony and fail to be satisfied that this great body of business men, scattered

over all parts of the country, in keen competition with each other in their several lines, is alert in seeing that competitive conditions exist between the manufacturers of basic steel products from whom they buy. And the sworn testimony of these men, who are vitally interested in the maintenance of real competition between the Steel Corporation and its manufacturing competitors that such real competition does exist and has existed during the past ten years, cannot but carry a conviction that such is the case. A study of the testimony of these men, who are close to and vitally interested observers of the prices of these products, shows that a single large concern, by lowering the price of any substantial steel product it sells, can depress the obtainable price. It further shows that the converse is the case—that no single large concern, by raising or even maintaining the price of any substantial steel product, can raise the obtainable price. It further shows that the prices at which actual sales were made during this time in the steel trade depends on whether the consumption of steel was such that the mills were crowded with orders from buyers, or whether buyers were crowded with offers from mills. In other words, if the mills were crowded with orders, there was an increase of competition between buyers and a corresponding decrease in competition between manufacturers. On the other hand, if the mills were lacking in orders, then there was a keen competition between millmen to get orders and corresponding decrease in competition among buyers to give them. The proofs further show that, when there is an increase of orders and a stiffening of prices, steel buyers are apt to buy at once, and this tends to further increase the price, but, on the other hand, buyers are not apt (volume 28, p. 11901) to buy at once when the price grows less, but wait until the bottom is reached, and this withholding of orders tends to accentuate the fall of prices. The proofs further show that in normal times, when ability to fill orders and ability to get orders are in fair balance, prices vary but little, but, as soon as that balance is disturbed, the tendency of prices up or down becomes accentuated, and increased competition follows between the mills, if prices go down, between buyers, if they go up. The study of these proofs, given by both mill owners and buyers of their product, satisfy us that this has been and is the course of the steel trade, and we are therefore justified from the proofs in concluding that the prices at which steel products have been bought from the Steel Company and its competitors have been fixed by business conditions—over demand or over supply. The proofs also show (volume 26, p. 11096) the same conditions and results prevail in the European steel market.

Assuming, then, that the iron and steel trade in the United States is and has been during the time here in question flowing in the natural and normal channel of demand and supply and of genuine competition, we next inquire as to what course the proofs show the Steel Company pursues in reference to such trade; in other words, is its course one of monopoly or in restraint of trade? Let us first ascertain what the practice of the Steel Corporation actually was and is as to prices. Whether that course be right or wrong, whether it be in violation of

the letter or spirit of the Sherman Law, there can be no uncertainty in three things: First, what its policy is; of its having been openly and publicly avowed; and, lastly, of its having been followed. Its avowed general practice in regard to prices is thus summarized (volume 12, p. 4771) by its chairman, Judge Gary, who says:

"The United States Steel Corporation has endeavored, so far as it could, to prevent the unreasonable increase of prices. It has been a decided factor from time to time in keeping prices down to a level which was believed to be fair and just. Prices generally are controlled very much by the business conditions of the country. The ordinary laws of trade and supply and demand fix the general prices of commodities, but the Steel Corporation has endeavored to prevent sudden and violent fluctuations downward by its advice, but more particularly by its own action in fixing its prices, and has endeavored to prevent the unreasonable increase in prices at times when the demand was greater than the supply and there was a general disposition in the trade to take advantage of these conditions and unduly increase prices."

That it has followed this policy is the testimony of both its competitors and customers. Thus a manufacturer of agricultural implements, buying bars and plates both, in Bessemer and open-hearth (volume 20, p. 8314), says:

"Our experience has been that, on advancing markets, the Carnegie Company were as low and frequently lower than competitors, while on declining markets they were generally a little higher."

Another manufacturer, a buyer of structural shapes and other products (volume 24, p. 9963), testifies that when prices are advancing the Carnegie Company is the last one to advance, and when they are declining it is the last one to decline. That this course has an absolute effect in steadying the market, and that every manufacturer buying plain material and fabricating it and being himself a bidder on the work prefers a steady market.

The president of the largest chain factory in the country (volume 21, p. 8763), and who was a large buyer of rods and bars, testifies that in his judgment the American Steel & Wire Company has, in several instances of boom times, prevented a runaway market; that many times manufacturers in that line have told him that, if it were not for the American Steel & Wire Company, the prices would advance, but that they could not get them to advance their prices.

A very considerable Southern hardware man (volume 25, p. 10373) testified that in dull times the Steel Company's prices were higher than its competitors, and that it did not go to the low quotations its competitors did; that this had an effect in steadying prices; that this is a benefit to buyers in that it removes the speculative feature.

Another large Southern hardware dealer (volume 25, p. 10720) and other buyers (volume 23, p. 9483) testify to the same effect. The testimony of competitors is to the same effect. Thus James A. Bowron, one of the leading Southern manufacturers (volume 25, p. 10427), testifies that they always knew what the prices of the Steel Company were; that they did not say their price was one thing and make it another; that their course was eminently conservative and the principal barrier against chaos. He testified that the Steel Company had stood

in its own light in refusing to advance prices when in his judgment the market justified advances. He adds:

"I think, if I had been a stockholder in the Steel Corporation, I would have felt several times that it was failing to earn the money for me that it ought to have done by advancing prices."

The fact of such policy and the reasons for it are thus summarized by Charles M. Schwab (volume 11, pp. 4157, 4158):

"While I was president of the Steel Corporation, I should say that our prices as a rule were somewhat above the other prices in depressed times and below the other prices in prosperous times. In other words, we endeavored to keep more uniform. * * * The theory was that many smaller dealers bought their steel from this corporation that we did not want them to be speculators, nor did they want to be speculators, as it were, in the price of steel; that as a rule they were caught with big stocks when prices were high, and made heavy losses by reason of rapid reductions and the inclination to over-buy when prices were low; and, if prices were kept nearly uniform. people buying steel would buy for their requirements and not specu latively."

The proofs also show (of which volume 26, pp. 11096, 11074, 11248, and 10928, may be cited as examples) that this policy, which is also followed by other large steel manufacturers, largely resulted in doing away with what are called delivery premiums; that is, of postponing deliveries of orders already taken at lower prices and giving the preference to orders taken later at higher prices, which higher prices were in effect obtained under the guise of so-called delivery premiums. The proofs likewise show that the lessening of extremes in the prices of basic steel products greatly benefits mills and factories that further fabricate such articles. Thus (volume 21, p. 8847) one such witness testified:

"Of course, I am only a small manufacturer and perhaps to a certain extent typical of the average small consumer of steel products, but the conditions in the present decade are far more stable and far more favorable to intelligent manufacturing than they were in the previous period. Of course, the fluctuations have been less, and you can calculate on your road which you have to go over with a good deal more certainty. * * * The sudden fluctuations, rising and falling in prices, were very unfavorable to the maintenance of contracts or to intelligent manufacturing. One could not buy and be sure that he could get out with a profit on account of the dips in the market."

The proofs show that the practical effects of this policy are that in prosperous times buyers are apt to buy from the Steel Corporation and in depressed times from its competitors. Whatever the wisdom or unwisdom of such a policy may be, we find no proof tending to show that it tends to monopolize the steel business or to unduly restrain trade or to prejudice the public. There is no proof that it in any way interferes with the right of any other person in the steel business to fix his own price on his own steel product. The proof shows that the Steel Corporation, in the exercise of its own business judgment, has elected to publicly announce its prices, to adhere to them with all buyers alike, and to give timely notice of its purpose to change them. It is neither the duty or the province of this court to express any opin· ion upon such policy, unless we are satisfied, as laid down by the Su-

preme Court, "that it prejudices the public by unduly restricting competition or unduly obstructing the course of trade," and of this we have no proof. For, as we have seen, the testimony of those engaged in the steel trade is that this policy of the Steel Corporation, in refusing to raise prices, has not restricted competition or obstructed the course of trade, but, on the contrary, has tended to prevent prices from rising to what was aptly termed a "runaway market." And in this connection it is just to note that if the Steel Corporation, in refusing to advance its own prices, prevented other manufacturers from advancing theirs, it was only exercising a veto power (volume 8, p. 3199; volume 6, p. 2144), which every one of many other competitors possessed, and was following a policy which was also followed by other large competitors (volume 6, p. 2108), who were also opposed to advancing prices. It is also just to say that in giving timely notice of its purpose to change them, and in giving publicity to its prices, in adhering to them, it will be seen on reflection that the Steel Corporation has adopted a policy of price publicity and adherence, somewhat analogous to the freight rate stability followed by the railroads under the directions of the Interstate Commerce Commission, which published their rates and only changed them on notice.

We now turn to the other phases of this policy, viz., the corporation refusing to sell at lower prices when prices dropped. That it did so, and that by reason thereof it lost business, which naturally went to those who did lower their prices, the proofs abundantly show. Of its right to refuse to sell at lower prices, provided it does not force others to do the same thing, there can be no question. This brings us to the question: What was the policy of the steel trade prior to 1901 under such conditions, what was its result, and what evils are avoided by this change of policy?

In that regard, the testimony leaves no doubt. We take the Carnegie Steel Company's course in the earlier steel period as illustrative, not only of its policy, but as fairly typifying that of its competitors as well. The cause of falling steel prices is, of course, that there are not enough orders to cover the production, and this leaves two courses open to the steel manufacturer: He must either shut down his mill or go after orders to keep it running. The policy of the Carnegie Company (and in that respect it was the same as others) was to try to keep the mills going, no matter what price they got for their product, or no matter whether their getting such orders meant the complete stoppage of their competitors' mills. Practically applied, this policy meant a fierce, ruthless price-cutting trade war, the practical results of which were that, if these low prices enabled one company's mills to get the orders to run its mills, the taking of these orders from other companies' mills and other sections of the country shut them down. Thus, in Government Exhibit (volume 11, p. 4279) we find a letter from Mr. Carnegie to the Carnegie Steel Company, embodied in its minutes, reciting such policy:

"In the former depressions we announced our policy, viz., take all orders going and run full. Our competitors believed we meant what we said, and this no doubt operated to clear the field. One after another dropped out; finally Pennsylvania Steel dropped out and only a few remained who could meet the lowest prices."

In volume 11, p. 4266, another letter of Mr. Carnegie to his company is given in evidence in which he says:

"My view is that sooner or later Harrisburg (Pennsylvania Steel Company), Sparrows Point (Maryland Steel Company), and Scranton (predecessor of Lackawanna Steel Company) will cease to make rails like Bethlehem (Bethlehem Steel Company). The autumn of last year seemed as good a time to force them out of business as any other. It did not prove so. The boom came and cost us a great deal of money."

The policy of taking orders, even without profit, was the destructive competition of that era. "To keep running [Government Exhibit, vol. 3, p. 1036], not to make profit, is the point we should steer to," was the direction to the Carnegie Steel Company. "Take every order, otherwise we come to a stop and only feed competitors who would close if we went to rock prices." Such being the policy, the proofs leave no doubt as to its effect. Mr. Schwab (volume 11, p. 4191) testified: That the destruction of the small and weak (competitors) was a practice not unknown in the old days. It was rather extensively carried on. It was at times with quite effective and marked results. That he did not know what percentage of them emerged from the steel wars in the old days. Not many. There were more gravestones than live competitors. That (page 4155) they did everything they could to secure all the business they could secure, regardless of the price at which they secured it. That it was pretty hard on the competitors at times, but that was their policy and one that it was very difficult to break away from.

Speaking of that policy, Judge Reed (volume 14, p. 5671) says:

"The policy of the Carnegie Company was to go out and get business, to take it wherever it could get it, and keep its mills running full, and run regardless of the feelings or prosperity of its competitors."

The result of the rail-cutting prices, as testified to by Walter Scranton of the Scranton Iron & Steel Company (volume 8, p. 3200), was that the price of rails was forced down to $14 a ton; that this was below the cost of manufacture; that, as a result of this war, his company was driven to abandon their mills at Scranton; and that wages were forced down to the lowest they had been for years. And as a practical example of this era of trade war competition and ruinous price-cutting, we have the testimony of Frank S. Witherbee, who, referring to the Troy Steel & Iron Company (volume 18, p. 7296), says:

"The Carnegie Steel Company drove that company out of business. It drove it out of existence, not by the use of the ores. I think the cost of pig iron was lower at Troy than it was at Pittsburgh. It drove it out of the business by its policy of going to our customers and telling them to get the best price they could from us and they would name 50 cents a ton lower."

Referring to one of these ruinous trade wars between two large steel companies, Powell Stackhouse, president of the Cambria Steel Company, which was not one of the participants, testified (volume 4, p. 1706):

"Q. How nearly can you fix the time of what you called the Gates and Carnegie row?
"A. That was somewhere in the '90's; in the latter part of the '90's.
"Q. About 1897, or somewhere along there?
"A. Somewhere along there; from 1895. I would not be sure of that.

"Q. And that was followed, I judge, from what you say, by rather a fierce trade war lasting a year or two?

"A. Yes; in all lines of steel.

"Q. In all lines of steel?

"A. Yes, everything. As a result of that, there was the keenest competition and steel was sold, bar steel, at, I think, less than nine-tenths of a cent.

"Q. And it cost more than that to make it?

"A. Yes; a good bit more.

"Q. And the consequence of this was very serious to the trade, was it not?

"A. It was serious to everybody in the trade. It was very serious, for instance, to the warehousemen, that had some thousand or more tons of steel, or whatever they might have on hand. Their stocks were probably reduced from one or two cents a pound way down.

"Q. That warfare left a trail of ruin?

"A. Yes; it did.

"Q. There were a great many failures on account of it?

"A. Yes.

"Q. And general business disaster?

"A. General depression.

"Q. And business disaster?

"A. Yes, sir.

"Q. And failure and bankruptcy?

"A. Yes, sir.

"Q. (continuing) —were the direct effect of it, were they not?

"A. Yes.

"Q. You had had trade wars before, I suppose, had you not?

"A. Yes.

"Q. But none so severe as that?

"A. None so severe as that.

"Q. But they were always attended with injury to the business, and especially to the warehousemen or middlemen, were they not?

"A. Yes, sir. The middleman had bought and had his material on hand, and, overnight, by the price falling a few dollars a ton—

"Q. (interposing) He was ruined?

"A. He was ruined in some cases. Some of them carry very large stocks.

"Q. The effect, I suppose, of such warfares, and particularly the Gates and Carnegie warfares, was felt mostly by the weaker concerns in the business?

"A. We all felt it.

"Q. You all felt it, but the stronger ones weathered it?

"A. Certainly.

"Q. And the weaker ones all went to the wall?

"A. They were weakened so that they gradually dropped out.

"Q. They gradually dropped out?

"A. Yes, sir.

"Q. So the effect of that was not confined to the manufacturers, but was felt even more by the warehousemen and jobbers, was it not?

"A. Yes. They could measure their loss at once. If they knew what their inventory was and the difference between what they paid and what prices had fallen to, they could measure their loss at once.

"Q. What about the retailers? What was the effect on them?

"A. The same thing. Anybody that carried a stock of steel or iron on hand, if the value of that stock was reduced $5 or $10 a ton, just simply had to write off that amount."

Indeed, the general competitive policies of the steel companies toward each other is well summarized (and this summary is justified by the proofs) by the chairman of the Steel Corporation, who (volume 12, p. 4777) says:

"On the other hand, in olden days, the rule in this country was different in this line of business. I have no doubt the suggestion of Mr. Carnegie, which was read in court a few days since when I was present, represented

not only his views, but the views of his associates, and the views generally held amongst those who were in charge of the iron and steel industry of this country. There was a competition that was bitter, fierce, destructive. If it did not absolutely drive competitors out of business, it so harassed and injured them as to prevent them from extending their business, or from taking advantage of their location, and at times compelled them to close their mills, discharge their employés, and disrupt their organization, and, in fact, was a competition that, in the opinion of those in charge of the United States Steel Corporation, I might say the opinion of those in control of the industry generally in this country at the present time, was calculated to destroy, to injure instead of build up, to prevent extensions of trade, to limit the capacity or the opportunity of many who were engaged in the trade."

In that connection, and in corroboration of what the chairman says, the testimony of others (Reed, volume 14, p. 5692; Roberts, volume 13, p. 4997; Farrell, volume 10, p. 4058) should be noted. This is summarized by Robert Bacon, who (volume 14, p. 5494) says:

"The facts are that the policy of the company from the beginning has been to change the old method of dealing with competitors. Judge Gary, who has done more for the United States Steel Corporation in its development and the benefits it has brought all hands than any one man since its formation, has made it a cardinal point of his policy, and has tried his best to inculcate it upon all the subcompanies that there was a new order of things, that there were new rules of the game in dealing with competitors, as well as in other human relations. Judge Gary has talked from the very first and has tried to compel the actions of all the others in the corporation toward dealing fairly and decently with competitors, as being the only way in which any kind of stability in prices or of conditions could be maintained. He has, from the beginning, preached and practiced the fairest kind of dealing with his competitors, keeping them informed, as far as he legitimately could, of all the conditions of the Steel Corporation, and by doing so has gradually acquired a degree of confidence that in my opinion has never existed before amongst competitors. The old conditions have changed; the old destructive and ruinous and ruthless warfare of the early days of the iron and steel industries has disappeared; by reason of the attitude of Judge Gary more than any one else, a condition has been produced among competitors in the iron and steel business, and, I believe, in many other industries, that never before existed."

And in that connection it should be noted that no testimony has been produced in this record that a return to the old trade war system of ruinous competition would, as a matter of fact, benefit the public interests. On the contrary, the proof is that present business methods and ethics are more to be desired. As expressive of the view of those in the steel business who are not connected with the Steel Corporation, we may note the testimony of the president of one of the largest steel castings companies in the country, who (volume 20, p. 8067) says:

"Before the formation of the Steel Corporation, business ethics, I might say, were in very bad shape; competitors had no confidence in each other; they resorted to subterfuges, misrepresentation, and false statements. That same lack of confidence existed between sellers and many purchasing agents. It was a very undesirable condition in which to do business. For the past seven or ten years (in later times, at any rate) all that misunderstanding or misgiving has been displaced by manly, straightforward dealing. I do not think it could have been brought about without the Steel Corporation's influence and example. The benefit of that example has extended into collateral industries like ours. I have noticed an improvement in the competition of our own business in an ethical way. We still have the competition, but we do not try to misrepresent or tell lies any more. We are honestly friends now. Then we pretended to be friends, but were the bitterest enemies. It appears to be an improvement that pervades the entire steel line, and being

the largest unit, the most influential unit, and setting a commendable example, has led us all to realize that it is a betterment."

A study of these proofs satisfies us that, apart from all ethical questions, the strong trend of the steel business at the close of the last century was toward driving competitors out of business by cutting prices, and that the business policy inaugurated by the Steel Corporation (volume 14, pp. 5670–5673; volume 13, p. 5218; volume 12, p. 4777; volume 14, p. 5717), and in which policy its competitors subsequently followed, has resulted, in the ten years of its existence: First in a more general division of business between all competitors in the steel business than under the older system; second, in tending to minimize the shutting down of its own and its competitors' plants in times of depression; third, it has made steel products nonspeculative, and has therefore benefited all dependent iron and steel manufacturers by enabling them to have a steady, nonspeculative supply of those basic steel products on which their plants depend for operation. The evidence on which these conclusions are based is corroborated by the business facts and business results in which we now summarize in the working out of this policy for ten years by the Steel Corporation and its competitors. During that time the business of both competitors and steel company has increased very largely, but it is highly suggestive, indeed, conclusive, proof that the Steel Company had neither monopolistic control or power to restrain trade, since the proportion of trade increase was very materially greater on the part of the Steel Corporation's competitors than its own. These significant figures prove that mere size, or bigness of business, is not necessarily a monopoly of business at the expense of all others engaged in it. And in that connection, and as aptly expressive of our views, we may quote with approval the language of Judge Hook of the Eighth Circuit, in his concurring opinion in the Standard Oil Case (C. C.) 173 Fed. 196:

"Success and magnitude of business, the rewards of fair and honorable endeavor, were not among the evils which threatened the public welfare and attracted the attention of Congress. But when they had been attained by wrongful or unlawful methods, and competition has been crippled or destroyed, the elements of monopoly are present."

In the most important element of steel rails, an item on which great stress has been laid as a most important factor of monopoly, and control of prices, we find that, in spite of the general increase of rail production, the Steel Corporation's relative proportion of rail business has fallen off nearly 8 per cent., while its competitors had increased correspondingly. In the great basic item of steel ingots, on which the great bulk of steel manufacturing rests, while the Steel Company's ingot business increased 44 per cent., its competitors ingot business grew nearly three times as fast, viz., 137 per cent. To say that any monopoly of ingots existed when this bill was filed, that it now exists, or that it can exist, is simply to run counter to the testimony of ten years' business experience and to the evidence in this record. In the great item of structural shapes, which enter into bridges, building, and other common uses, while the business of the Steel Company in these years increased nearly one-half, to be exact 42.7 per cent., its competitors have,

during these years, gone ahead nearly four times as fast, 164.4 per cent., and in that connection it will be observed, as heretofore shown, that a large part of the increase of the Steel Company's structural product was in the foreign, not in the home, market, in which latter market it has more than 300 fabricating competitors. Practically the same proportions exist in wire rods, the basic of wire fences, and other articles of wide-spread use. In wire rods, the Steel Corporation has increased its business 49.7 per cent.; its competitors 182.2 per cent., nearly four times as fast. So also a monopoly of the tin plate industry was feared, while the outcome shows the Steel Corporation has in tin plate and terne plate increased 63 per cent., its competitors have increased threefold as fast., viz., 186 per cent. So in the pipe industry. Instead of their being a monopolistic and exclusive growth, there has been a relative retrogression, for while the pipe business of the Steel Corporation has largely increased (in wrought pipe 36 per cent. and in seamless tubes 100 per cent.), its competitors have increased nearly six times as fast (in wrought pipe 209.9 per cent. and in seamless tubes over seven times as fast, 750 per cent.). In the item of pipe alone, it has already been noted in the testimony of the general manager of a great gas company that, as a buyer of pipe, it enjoys active competition between 13 concerns.

These facts and figures conclusively answer the charges of monopoly and restraint in the home market. We are therefore justified in answering in the negative the question to which the foregoing part of this opinion is addressed, namely, Was the United States Steel Corporation, at the time this bill was filed, then prejudicing the public interests by unduly obstructing the steel and iron business of the United States?

[3] We turn next to the steel and iron trade with foreign nations and address ourselves to the second question, namely, Was the United States Steel Corporation, at the time this bill was filed, then prejudicing the public interests by unduly restricting or unduly obstructing the steel and iron business with foreign nations?

In taking up that question, it is to be noted that the entire foreign business here in question is now carried on, not by the Steel Corporation, but by a subsidiary of the Federal Steel Company (volume 10, p. 3775), called the United States Steel Products Company. This company was formed in 1903, and the Federal Steel Company is the owner of its stock. This Products Company is not made a party to this bill, and there is no prayer for its dissolution. All other subsidiary companies of the Steel Corporation are made parties, and their dissolution in many cases prayed for. Whether the omission of the Products Company from the bill, and the absence of any prayer for its dissolution, was an omission, or was advisedly done, with the purpose of conserving its foreign trade, does not appear. But the absence of a formal prayer for the dissolution of the Products Company is, however, of no practical importance, for the continuance of such foreign trade of the Products Company is manifestly dependent on the manufacturing facilities, the product diversity, and the financial ability of the Steel Corporation. If, therefore, the Steel Corporation be dissolved by this court, the Products Company will be divested of the practical commercial

223 F.—7

power of continuing its foreign trade, since the proof is (volume 10, pp. 3844–3879) that 80 per cent. of the goods it sells necessarily (volume 6, p. 2215; volume 12, p. 4731) comes from the Pittsburgh District in which the Federal Company has but little production. If the Federal Company be also dissolved, then the Products Company will, of course, be left without any mills or plants which are so located (volume 10, p. 3829) as to do export business, but 2 per cent. of the Federal Steel Company's product now going (volume 10, p. 3829) into foreign trade. So that the foreign trade of the Products Company, if acquired and held in violation of the Sherman Law, can be as effectually ended by a dissolution of the Steel Corporation, or the Federal Steel Company, as though the Products Company had been made a party to this proceeding and its dissolution prayed for and decreed.

It is apparent that the monopolization and restriction of foreign trade must, in the nature of things, consist of either taking away from others a foreign trade which already existed, or if such foreign trade was not in existence, then in building up or maintaining such foreign trade by preventing or restraining others from entering it.

Now foreign trade is not a mere general, theoretical abstraction of selling abroad, but is a concrete, definite, commercial business proposition in iron and steel. We have our domestic trade, which consists in supplying domestic use or consumption. And such domestic use necessitates one having or taking to the market where his customer is located the articles the latter wants to buy. It goes without saying that if one man has a wire mill at Pittsburgh situate near another man's billet mill, and that billet mill has in its warehouse at all times an ample supply of billets to run the wire mill (the proofs, volume 10, p. 3773, show 18 different analyses of such billets are required), the wire mill owner will prefer to deal with, and will deal with, the billet mill in Pittsburgh in preference to dealing with one at Chicago. And this is so, because freights are eliminated (volume 10, p. 3987); uncertainties of railroad transportation are avoided; if materials prove faulty or not of the right metallic character (volume 10, p. 3773), the mischief can at once be remedied. Of course, if the Chicago mill, from any motive, chooses, either from overproduction, business needs, or other causes, to offer the wire mills at Pittsburgh billets at a lower price than the Pittsburgh mill, a sale might be made; but this occasional purchase could and would result in no established, normal trade between the Chicago billet mill and the Pennsylvania wire mill. The only way such normal trade relation could be established would be by the Chicago manufacturer locating a permanent stocked warehouse near the Pittsburgh wire mill. If its cost of production was so low and it could pay the freight from Chicago to Pennsylvania, and could furnish in quality, quantity, and price the same product as the Pittsburgh mill, then, and then only, could it hope to have normal, continuous trade with the Pittsburgh wire mill. We take this homely but suggestive illustration to emphasize what the proofs show are the demands and requirements in foreign iron and steel markets which confront an attempt to enter them, and that such market is not to be held by the mere occasional shipping of goods to foreign countries. Moreover, in considering the possible range of for-

eign iron and steel markets for American iron and steel, there must first be excluded from that market, Germany, France, Austria, Italy, and Russia. The proof is (volume 10, pp. 3846, 3847) that the tariffs of each of those countries prevent the sale there of American iron and steel. The proofs also show (volume 10, pp. 3827–3849) that the attitude of the English public and the hostility of English labor organizations toward American iron and steel likewise prevent American iron and steel products entering England, save wire fences, the manufacture of which is only now being taken up there. It follows, therefore, that the iron and steel trade of the United States with foreign nations must be largely built up in other parts of the world, and such has been the outcome of the efforts of this company as shown by the proofs. Referring to trade in such nations as are not closed to the iron and steel business by their tariffs, these in a general way are the steel markets of Asia, Africa, the British Colonies, all South America, Cuba, and Mexico. But while these markets are open, they were, when the Steel Corporation was formed (volume 10, p. 4125)—

"practically pre-empted by foreign manufacturers and foreign merchants; that is, principally continental concerns, English concerns, as well as having branch offices and warehouses in all of the consuming markets of the world. It was a very difficult thing to enter those markets. The European manufacturers had been established in the markets of South America, Asia, Africa, and the Orient, some of them over 50 years. There was not only a prejudice, but a hostility, in most cases against newcomers in the trade. In order to get a foothold in these markets, we usually had to sell below the prices of the concerns that were established there, and who had their customers and native salesmen, and all the advantages that go with a long occupation of a business in any foreign country. It is more the custom in foreign countries than it is here for people to attach to themselves customers that buy from them regularly."

Moreover, the proofs (volume 10, p. 3842) show, and such would seem to be the manifest commercial fact that:

"It is impossible to develop a foreign business unless it is done continuously. Buyers will not patronize people who are not in a position to give them a continuous source of supply."

Without entering upon a discussion of other matters, it suffices to say that, not only were these foreign markets pre-empted and tenaciously held by foreign manufacturers, foreign merchants, and foreign bankers who refused to finance importing enterprises there unless there was (volume 10, p. 3833) a stipulation that all materials should be brought in such bank's own country, but the markets required the maintenance of varied lines of products, the only way to supply which varied lines was by maintaining varied lines of finishing mills at home and the maintenance of large warehouses (volume 13, p. 4974; vol. 11, p. 4139) abroad. The proofs in the case show that in 1901, when the Steel Company was formed, with the exception of wire exportations—which for various reasons (volume 10, pp. 3792–3790–3791) was not broadly successful—there was no iron and steel trade of an established or continuous character between American iron and steel manufacturers and foreign nations. It is true there were spasmodic exports which at times amounted to considerable volume, but they were not continuous or sustained, and they resulted in no established trade or dealing. · In-

deed, in many cases the nature of this spasmodic trade (volume 10, p. 3842) was such as to create a hostile feeling toward any subsequent effort on the part of American iron and steel trade to enter the same foreign market. The proofs show that at that time and for many years previous, so long as the demand of the home market was sufficient to absorb their product, our iron and steel manufacturers made no effort to sell their output abroad. When, however, the reverse was the case, and they had on hand a surplus product for which there was no domestic trade, they went into the foreign market and tried to get rid of such surplus product there. The European and American steel and iron market being inter-related (volume 28, p. 12013), the proof is that, in addition to paying the freight to get his goods to the foreign market, the American manufacturer had, in order to get customers away from the foreign manufacturers who were already in possession of such trade, to cut the price when they sold in the foreign market. This spasmodic course grew to be known in the steel business as "dumping" (volume 10, pp. 3843, 3846, 3993), and may be well likened to the bargain sales by which a merchant seeks to dispose of a surplus stock which he cannot sell at normal prices. It will, of course, be obvious that a manufacturer could not continue such low-price dumping any more than a merchant could dispose of all of his stock—instead of his surplus stock—at bargain prices. The proofs (volume 26, p. 11096) show the same course of dumping abroad in times of depressed markets was followed by European steel manufacturers in our market. The then status of American steel manufacturers is shown by the proven experience of the Carnegie Steel Company. It was the most aggressive of any of the steel companies to enter foreign trade, exporting 70 per cent. of the then steel exports (volume 11, p. 4345). The Carnegie Company's location, facilities, and freight rates enabled it better than most other companies to enter foreign trade, and from its works, as the foreign trade of the Steel Corporation developed, such trade to the extent of (volume 10, p. 3845) 24 per cent. of the entire product of the Carnegie Company goes into such export trade. It will therefore appear that the Carnegie Company can be fairly regarded as the best fitted of American steel companies to compete for export trade. Referring to that time, the president of that company (volume 11, p. 4139) testified:

"We had made spasmodic attempts at it. In dull times when business could not be secured at home, we would make attempts at foreign business by going in and making an unusual price, which was the only way that any foreign business could be secured then, inasmuch as we had not an established business or business connection, and therefore customers were not inclined to buy from a firm who could only furnish them occasionally."

The relation of the Carnegie Company to foreign trade is shown by its minutes, etc., as they appear in Gov't Exhibit, vol. 3, p. 1134. From the proofs in the case three things seem settled, namely: That when the Steel Corporation was formed American steel manufacturers had no real dependable export trade abroad; that such sales as they made were spasmodic, made with a view to dumping surplus product; and such sales were secured by underselling the European market when they had no home market. It will also appear that being ex-

cluded by the steel tariffs of Germany, France, Russia, Austria, and Italy, and by other causes from England, such dependable foreign markets as were open for them to build up, as will be seen later, had to be found in other parts of the world. This summary of the situation is warranted by the study of the proofs.[1]

Seeing, then, that when the Steel Corporation was formed, no such volume of foreign trade in steel existed; that the acquisition of any part, or indeed the whole of it, could constitute a restraint of trade with other countries; and seeing that the foreign trade which the Steel Corporation had during its earlier years had increased from approximately $31,000,000 to $91,000,000—we turn to the next question, Did the Steel Company acquire this original or additional trade by monopolizing or restraining foreign trade, or attempting to do so; or, on the other hand, was its acquisition the natural and normal growth of fair business effort? We have said the foreign trade of the Steel Company in 1911 was $91,000,000, but of that amount some $30,000,000 is really not solely its own, but was shared by it with other American steel manufacturers. To explain, it will hereafter appear that in the develop-

---

[1] We may add that, wholly apart from the record, a reading by us of books, articles, and addresses on the subject of foreign trade satisfies us that the evidence of those who have in this record testified on the subject are in harmony with the views expressed in current literature of the steel trade. From that reading we have selected, as expressive of the then attitude of the American steel trade toward the foreign market, an article by James M. Swank (whose reports of statistics, Defendant's Exhibit, vol. 3, p. 145) have been received by all parties to this record as reliable). In an article on the Future of the American Iron Trade, in the Engineering Magazine of 1895 (volume 10, p. 613), Mr. Swank says:

"Except in periods of excitement, like that which prevailed last summer, our capacity for the production of iron and steel will be greater than the home demand. This fact, joined to the cheapening of all iron and steel products through competition, has led many of our manufacturers to look to foreign markets to absorb our surplus products or to employ our surplus capacity. An examination of our export statistics for many years shows that this is a delusive hope."

Mr. Swank then takes up our iron and steel exports for many years. He shows that during the 15 years following 1870 there was no progress whatever; that during the next six years it increased rapidly when a decline began, followed the next year by a slight increase. He called attention to the fact that, included in our iron and steel exports have been a number of things, such as machinery, boilers, hardware, sewing machines, saws, tools, locomotives, etc., which formed the principal part of our iron and steel exports; that out of $30,000,000 in the aggregate of such exports, less than $400,000 was pig iron; that plates and sheets were less than $200,000; that nails only amounted to $500,000, and iron and steel rails about the same amount, ending with this statement: "The other products of our rolling mills and steel works forming an infinitesimal part." He then says:

"It is evident that our iron and steel manufacturers as contradistinguished from the manufacturers of machinery, hardware, saws, tools, sewing machines, locomotives, and other finished articles have little to hope for in foreign markets under present conditions or those which have recently prevailed."

The conclusion of his whole article is this: "It follows from what has been said that American iron and steel manufacturers must look almost entirely to their own country for the employment of the productive capacity of their iron and steel works, and that, if this capacity cannot be properly utilized, some of it, as in the past, must stand idle or be abandoned. The fittest works will survive. For these there will be sufficient employment."

ment of a foreign steel trade, the Steel Corporation has established agencies, warehouses, freight communications, and other exporting agencies in many of the markets of the world. As we read the testimony (volume 11, pp. 4471, 4472), in reference to this $30,000,000 of foreign trade, it seems that if an American manufacturer of steel finished products, for example, locomotives, oil tanks, gas tanks, cars, etc., had an inquiry, or desired to make a bid to furnish such goods in some foreign country, where such manufacturer did not have, but the Steel Corporation did have, a representative, the Steel Corporation would, on request, ascertain and report to the American tank manufacturer what price he would have to put on his tanks, etc., to get into the desired foreign market. The ability of the tankmaker to meet such foreign competitive price in the prospective buyer's market depended, amongst other things, on two items—the cost of the sheets from which his tank was made, and the freight cost of delivering the tank. In case the current prices of such sheets in the American steel market were such that the tankmaker could not sell his tank low enough to compete with the foreign bidder the Steel Corporation would agree to furnish the plates at such lower price as would enable the tankmaker to underbid his foreign competitor. This price reduction, coupled with the fact that the Steel Corporation would forward the tanks with its own freight, enabled the tankmaker and the Steel Corporation to thus jointly sell the tank, which neither could do alone. By such operations, where it made the basic material, but did not make the finished article, the Steel Corporation, in 1911, thus did $30,000,000 in trade abroad in finished steel products in co-operation with other American manufacturers. The proofs show that this course of price reduction was followed in order to induce American manufacturers of finished steel products to co-operate with the Steel Corporation in extending the latter's foreign trade. The uncontradicted proof in that regard is that these foreign reduction prices thus given to American manufacturers to enable them to compete in the foreign markets were open (volume 11, p. 4472)—

"to all comers; anybody that wanted to develop a foreign business received our assistance, not only in the way of special prices, but we would lend him a salesman in a foreign country and place our office at his disposal and help him in every way to build up a foreign business * * * (volume 10, p. 3835). Our office is an encyclopædia for the manufacturers of the United States, particularly in iron and steel and those collateral lines. We have never hesitated to give information with regard to conditions in countries, and the credit of people whom we may have been doing business with, and especially facilities and information generally with regard to tariffs in countries and railway facilities for internal distribution generally. * * * (volume 10, p. 3836). I had prepared under my direction a list, I think, of about 158 manufacturers to whom we have made a special allowance in order to enable them to develop a foreign business."

The proofs show (volume 10, p. 3848) that this large volume of business, termed by the Steel Company "re-export" business, and amounting, as stated, to $30,000,000 in 1911, was shared in by 158 other firms or companies, and in making such re-export articles from 15,000 to 18,000 men were employed. The proof is (volume 10, p. 3885) that on ocean freights the Steel Corporation had no rebate or advantage over

its competitors. It will be observed that in thus reducing the price of basic steel materials to enable manufacturers to enter the foreign markets, the Steel Corporation has pursued the same helpful course of lower freights for exports which the Interstate Commerce Commission has, since 1903, approved of the railroads doing. In that regard the proofs show (volume 11, pp. 4474, 4475)—

"if a shipment is made from Pittsburgh to New York under a bill of lading beginning and ending with Pittsburgh and New York, that where it is known that it is going to be exported the rate is less than when it is known it is going to stop in New York; the tariffs are published. * * * There is an export rate and a domestic rate, and the government has encouraged the export business to the extent of permitting the Interstate Commerce Commission to make export rates. The export rates have been in effect since 1903."

And we may add the proofs (volume 10, p. 3933) show that the Interstate Commerce Commission has gone to the extent of differentiating among different articles for export, making freights on export rails lower than on other export articles. We may here say that the Interstate Commerce Commission and the railroads in thus co-operating with the Steel Corporation, and these other manufacturers in allowing lower freights from interior points to the seaboard on goods intended for export, has followed the policy adopted in European countries. In that regard the proofs (volume 28, p. 12037) show:

"The German government and the German railroads help for the export of finished products, but they charge the full domestic rate for any finished product that is imported."

Passing on, then, from this $30,000,000 of the foreign trade which the Steel Company has created for itself by inducing domestic consumers of its basic products to jointly enter into a foreign trade, and considering the other foreign trade, $60,000,000, which is its own, we examine the evidence as to whether the creation and building up of this, its own foreign trade, involves monopoly or restraint of trade. This becomes all-important, because the Steel Corporation contends that the creation and building up of a foreign steel and iron trade was one of the controlling reasons that led to its formation, and not a purpose to restrain or monopolize interstate home trade. In that regard the contention of the Steel Corporation is that no such foreign steel and iron trade could be built up without the large resources of the Steel Company (volume 10, pp. 3790, 3791), and the varied products which the integration and combination of its units alone made possible. The mere statement of this contention shows its importance, for if the twofold purpose of this statute is to foster and protect trade, both foreign and interstate, and if foreign trade cannot be increased without some such mechanically varied and financially strong agency as this Steel Corporation, then manifestly such agency is not a violation of a statute whose purpose was to permit—not to prevent—the normal, natural and to be desired development of unrestrained, unmonopolized trade, both foreign and domestic. In taking up this question, we dismiss once and for all the question of mere volume or bigness of business. The question before us is not how much business was done, or how large the company that did it—the vital question is, how was the business, whether big or little, done—was it, in the test

of the Supreme Court, done by prejudicing the public interests, by unduly restricting or unduly obstructing trade? The question is one of undue restriction or obstruction of trade, and not of undue volume of trade. If mere size were the test of monopoly and trade restraint, we have not one, but a half dozen unlawful monopolies in the large department stores of a single city. If a manufacturing and selling business, fully equipped for its local market, extends its operations to cover a state, its business, its facilities, its capital, must grow larger. If it is to cover nations, it must be larger still. These plain facts simply buttress the holdings by courts that the normal and necessary expansion of business to any size is not forbidden by the Sherman Law, unless such expansion is accompanied or accomplished by an undue retrain or obstruction of trade. For, as said by Mr. Justice Day in Flint v. Stone Tracy Co., 220 U. S. 166, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312:

"The possession of large assets is a business advantage of great value; it may give credit which will result in more economical business method; it may give a standing which shall facilitate purchases; it may enable the corporation to enlarge the field of its activities and in many ways give it business standing and prestige."

Turning, then, to this foreign trade, we find that in 1901 the Steel Corporation did a foreign trade of $31,000,000, and in 1911 of $91,000,000. This (volume 10, p. 3847) was 90 per cent. of the foreign iron and steel trade of the country. On the one hand, it is charged that this foreign trade was acquired by violation of the Sherman Act; on the other, that it is the normal and natural result of lawful business, commercial foresight, and persistent effort. To determine these contentions from the evidence, we now address ourselves. Of the purpose of this corporation to create and possess this foreign trade, there can be no question. So that, if it was illegally done, the company cannot escape the legal consequences. Its avowed purpose to enter into and acquire foreign trade in iron and steel is shown by the corporation's own proofs. Gary, volume 12, p. 4733; Reed, volume 14, pp. 5658, 5562, 5563; Bacon, volume 14, p. 5476. Indeed, in outlining the plan and scope of the operations of the Steel Company, whose formation he was then advocating, its first president (Schwab, volume 11, p. 4139) says:

"I enlarged and perhaps made a more strenuous talk to Mr. Morgan upon the subject of export, and our ability to export, and foreign business in foreign markets, than any other, excepting only the economic advantages to be derived."

Indeed, that the Steel Corporation was largely formed, that its large financial resources were designed and the varied lines of its constituent manufacturing units were bought to enable it to successfully enter foreign trade, is shown by the proofs. Thus (volume 11, p. 4321), referring to his talk with Mr. Morgan, Mr. Schwab says:

"I expected, naturally, to increase the foreign trade very much. May I explain what I mean by my development of foreign trade? I said before that this business could only be practically and successfully developed by works having a complete line of steel products, and that was one of the things to be gained by this organization.

"Q. And in taking this up with Mr. Morgan you presented that?

"A. That was one of the things I urged."

The fact that the development of the foreign trade necessitated a wide diversity of products, that this product diversity was to be obtained by the Federal Steel Company acquiring a number of mills making such diversity of products and completely integrating itself, is shown by the proofs. Referring to carrying out the general plans which he and Mr. Morgan outlined for acquiring such properties, Judge Gary (volume 12, p. 4733) testified:

"Q. Now, what were the subjects considered by you gentlemen, directors of the Federal Company or owners of the Federal at that time, and on account of which, or after considering which, you reached the resolution you mention?

"A. The question of securing the Carnegie properties, with their ore reserves, which contained a class and character of ore in large quantities which the Federal or the Minnesota Iron did not have, particularly their mills for diversified product, their location and their organization, which was believed to be a very good one, and if possible, the acquisition of other companies owning finishing mills, in order to diversify the product, including the Wire Company, which had been offered to us a number of times, and for the purpose, as I have said, of completing a rounded out proposition, for the development of the business, extension of the business, manufacturing at lowest cost, and, particularly, increasing the extent of export business."

And that such foreign trade demanded such wide diversity of product as could only be supplied by a company which was broadly integrated to manufacture such diversified supplies is shown by the proofs. In that regard, a witness of long experience in foreign trade (Farrell, volume 10, p. 3790) says:

"Q. What is the nature of your customers in foreign countries? Do you sell merchants or directly to consumers, or both?

"A. We sell to merchants, consumers, and manufacturers.

"Q. Is there any advantage in selling to merchants to have a diversified line of product?

"A. A great advantage. That is the reason why we have been able to develop our business, because we could offer them a diversified line of products from one source.

"Q. From your knowledge of the business and of the way it is done, what would you say as to whether or not the different constituent members of the Steel Corporation could all together have developed such a foreign trade as has been developed by the corporation, if they had remained separate and distinct?

"A. It would have been utterly impracticable or impossible. We had had an exemplification of that at the Pittsburgh Wire Company, where we were obliged to confine our exports to two or three different products, because of the necessity of having facilities to deal with certain lines of business. * * *

"Q. Take, for instance, the American Steel & Wire Company, as an economic proposition, as a business proposition; will you state whether or not it would have been feasible, or possible, for the American Steel & Wire Company to maintain agencies in the various countries as stated on Exhibit 39?

"A. It would have been impossible owing to the cost.

"Q. What would be the fact as to the Carnegie Steel Company in all these countries?

"A. The same thing would apply to the Carnegie Steel Company, even to a greater extent because of the character of their product, which is not as widely consumed as wire products and sheet steel products, and some of those others except in the case of some coarse products.

"Q. What influence, if any, does the offering of one class of steel products have on the sale of another?

"A. In the export markets, we say that one product sells another; that is, by having the great range of products, the buyer has an opportunity to order practically all of his requirements. Frequently these people will charter their own sailing vessels and load them themselves. They want to buy everything they can."

That this is a correct business estimate of the demands of the foreign market is corroborated by the testimony of the president of probably the most widely diversified range of finished steel products company in this country, who (Simmons, volume 23, p. 9403) says:

"Q. In what way has your ability to carry on a foreign business been affected by the fact that you have a full line consisting of many kinds of edge tools and cutlery?

"A. Without that, we would have practically no business abroad.

"Q. Why is that?

"A. Because no one line or one item in the line would be sufficient to interest the foreign buyers. It is the completeness of the line under one brand and one uniform quality that they seem to take an interest in.

"Q. That is, they buy full lines of you, do they?

"A. Yes, sir."

Of the fact that this policy of foreign trade expansion was as such entered into by the company and has since been pursued, the proofs are full. Roberts, volume 13, p. 4969; vol. 11, pp. 4147, 4148. A most experienced man of one of its constituent companies, the American Steel & Wire Company, and who had developed its foreign wire business, was given absolute charge of the development, along the lines previously advocated (Schwab, volume 11, p. 4147; Farrell, volume 10, pp. 3774, 3775), of all the export business. In 1903, the Products Company, a subsidiary of the Federal Steel Company, was created for that express purpose. A systematic plan was pursued of establishing foreign distributing warehouses and of building up new freight lines and shipping facilities. It will thus appear that, whatever may be the legal consequences of the acquisition of this great volume of foreign trade, there can be no doubt of the fact that it was acquired by this company in pursuance of a well-understood purpose. The proofs also show that the diversified products of the Steel Corporation, the location of its plants for export manufacture, and its facilities generally, are the means by which this trade has been supplied and built up. And they also disclose the fact that the different subsidiary finishing companies of the Steel Corporation were, among other things, chosen and acquired by that company with a view to developing the very foreign trade, which has since been acquired. Such being the case, it logically follows that, if the possession of this great volume of foreign trade is illegal as a monopoly or restraint of trade, the Steel Corporation, of which the Products Company is the mere agent, is also a violator of the Sherman Law. Was then this foreign business acquired, on the one hand, through illegal methods by the Steel Corporation monopolizing or attempting to monopolize, or to restrain foreign trade? Or was it, on the other hand, the result of lawful and fair means to expand and increase American foreign steel and iron trade without driving out those who were in such foreign steel trade, or without preventing those who wanted to enter it from doing so?

We have already seen that when the Steel Corporation entered this field there practically was no existing foreign steel trade held by American steel manufacturers. We have seen the opposition existing in such foreign markets to the building up of such trade by a newcomer; we have seen that the markets of practically all the principal nations of Europe were tariff closed to American steel, and that the spasmodic dumping policy theretofore pursued by American steel manufacturers had created (volume 10, pp. 4126, 4127) a prejudice against American trade which had to be overcome. In that regard, the proof by a witness of long practical experience, broad grasp, and commercial success in building up a discredited foreign steel trade, gives weight to his evidence. It is (volume 10, p. 3842):

"It is impossible to develop a foreign business unless it is done continuously. Buyers will not patronize people who are not in a position to give them a continuous source of supply. We had, in the early stages of the corporation, to live down the dumping business, which was quite prevalent with some of the companies prior to the formation of the Steel Corporation. * * * Prior to the formation of the United States Steel Corporation, some manufacturers in this country at times during depressions here would ship large quantities of materials to markets, principally to producing markets, such as Great Britain. The result was that prices were broken down, and in many instances the material was never delivered because the customers, after the prices had been disturbed, could buy material in their own country, and in some instances the customer has paid compensation to sellers to cancel the contract." [2]

He further says, in substance:

Dumping is an uneconomic practice, and one that does not develop a continuous business. It was a sporadic business and was indulged in owing to the exigency of manufacturing at the time. The export business of the corporation has been prosecuted continuously. It has been built up from two hundred and ninety thousand tons in 1903, I think, to two million two hundred and forty-six thousand tons in 1912.

Speaking of the efforts of American steel manufacturers endeavoring from 1895 to 1901 to dump materials abroad, the same witness (volume 12, p. 4629) says:

"They were endeavoring to dispose of large quantities of material, and in doing so they dislocated those markets, and as a consequence of that the prices were greatly demoralized, and the manufacturers in those markets not only met the prices made by the Carnegie Steel Company, but made lower prices; and the result was that thousands of tons of material were not delivered by the Carnegie Steel Company, and it was an actual fact that the buyers of their products paid them a compensation to let them out of the contracts after the market had been demoralized. The records of our office in London show, and I have examined them myself at times when I have been over—I was interested in looking it up—show that over $100,000 was paid to the Carnegie Steel Company by buyers for canceling contracts after they had thrown this material on the market there to shipbuilders and all sorts of people."

It took the Steel Company (Schwab, volume 11, p. 4148) one or two years to get the foreign business started. It was necessary to establish and maintain a series of large warehouses all over the commercial world. Space forbids details, but the proof (Farrell, volume 10, p.

---

[2] Indeed, the long time required to get foreign shipments of steel to their ultimate destination, and the changes in price meanwhile, makes even a regular, sustained foreign steel business (volume 10, p. 4126) a hazardous one.

3785; Defendant's Exhibit, vol. 2, pp. 179–189) shows that nearly 300 places of business have been established in 60 different countries and in all parts of the world, and that great warehouses or distributing stations have been opened at strategic distributing steamship centers. Taking Belgium, for example: It was a great manufacturing country; it had a tariff and 90 per cent. of its manufactured product (volume 10, pp. 3786, 3849) was exported. Consequently, there was no market for the Steel Company there, except street car rails. But notwithstanding there was practically no Belgian market for foreign steel, the Steel Company located a large warehouse at Antwerp in which it stored 10,000 tons of steel products, principally pipe. It was compelled to do this, because from Antwerp it was able to reach trading centers it could not reach direct from the United States. In that regard, the proof is (volume 10, p. 3786):

"We have shipping opportunities at Antwerp that do not exist in this country. Antwerp is a great distributing point; a large number of sailing vessels go to ports in the world that are not reached by steamers."

In the same way, while the Austrian tariff (volume 10, p. 3847) shut the Steel Corporation out of that country, it established a warehouse at Trieste, Austria, by reason of the fact that wire products and pipe can be trans-shipped at Trieste to ports on the Adriatic, Syria, and the Mediterranean. In the same way, the Steel Company established a warehouse depot at Vancouver, British Columbia, through which it furnished (volume 10, p. 3805), light rails for lumber camps, sheet iron, wire goods, and pipe. The building up of trade with British Columbia exemplifies that the steel trade acquired there was not by the Steel Company restraining or monopolizing an existing foreign trade, but was, by its creating a new and nonexistent foreign trade, in the face of serious obstacles. To reach Vancouver, the Steel Corporation was confronted by a railroad freight rate from Pittsburgh to Vancouver of $18 per ton, while the English steel manufacturer could reach Vancouver on already established lines of steamers from Liverpool to Vancouver at $7 per ton (volume 10, p. 3805). When his steel reached Vancouver, the English manufacturer paid one-third less of the preferential Canadian tariff than the American manufacturer (volume 10, p. 3799). The result of these adverse conditions was that, after the Steel Company opened its warehouse at Vancouver, it found (volume 10, p. 3805) that it was impossible to do much business unless the Steel Company itself established a line of its own steamers from New York to Vancouver, through the Straits of Magellan. The Products Company itself, accordingly, started such a line, which is the only one from New York to Vancouver. It has four steamers of its own in service and two chartered vessels. These vessels call en route at many ports on the west coast of South America and Mexico, at some ports which have no regular steamship line. In addition to carrying the products of the Steel Corporation, they (volume 10, p. 3806) have "been carrying considerable quantities of material for other manufacturers in this country who had been unable to develop a business because of the lack of facilities." In order to obtain return freight for their steamers, the Products Company have

to load them at Vancouver with lumber or coal for the Gulf of California (volume 10, p. 3807); there they reload with copper matte for Dunkirk, France; and in France they take on chalk for New York. The whole triangular trip occupies from seven to eight months and shows the hitherto unused methods and the continuous sustained effort that must be made to get and hold foreign trade. By like effort trade suited to the varied needs of various countries has been built up. Thus (volume 10, p. 3787) distributing warehouses have been established at Johannesburg, South Africa, at Sydney, Australia, in New South Wales, Copenhagen, Denmark, Barcelona, Spain, Singapore, Straits Settlements, Valparaiso, Callao, Buenos Ayres, Rio Janeiro, and other parts of the world to the number of 40. These warehouses (volume 10, p. 3787) are stocked with light rails for mines, corrugated iron for building, tin plate, wire products, pipe, and pretty nearly everything the Steel Company makes, except railroad rails. The steel for South America is carried by ship loads in chartered vessels; the Products Company having under charter, when this testimony was taken in 1913, some thirty-five vessels carrying cargoes to all parts of the world. Permanent and extensive bureaus are maintained at London and at Paris (volume 10, pp. 3789–3815), in order to sell from there to the English and French Colonial possessions, buyers for which possessions gather at the two cities named. The necessity for sustained continuous effort is shown by the proofs (volume 20, p. 7959). For example, the Products Company has a general steel trade in the Argentine Republic of six millions a year (volume 10, p. 3794), consisting of wire products, sheet steel, tin plate, rails, structural material, street railway material, etc. Taking the item of structural steel, the proofs show the continuous means by which such trade is obtained and held. The company located a resident engineering force there, designed and built in Buenos Ayres the first steel structural building in South America (volume 10, p. 3794), and, as a result of the maintenance of such a permanent engineering force there, has built every steel structure in Buenos Ayres, and (volume 10, p. 3795) "we have maintained a very large office there. We are building a number of government buildings there. We built all the buildings of the Buenos Ayres Exposition. We built one for the Argentine government and one for the United States government for their exhibits there." The proofs (volume 10, p. 3795) show that the products sold in the Argentine to make up this six million aggregate are produced by the following subsidiary companies of the Steel Company, namely, the Carnegie Steel Company, the American Sheet & Tin Plate Company, the American Steel & Wire Company, the National Tube Company, and the Lorain Steel Company, and (volume 10, p. 3801) the American Bridge Company. It will be noted that these products, with the exception of the Lorain Steel Company, practically come from the Pittsburgh district, and thus substantiate the proof (volume 10, p. 3829) that the Federal Steel Company was driven to further expansion and integration in order to enter foreign trade.

A similar trade of diversified articles amounting to four millions (volume 10, p. 3802) has been built up through agencies in four principal commercial centers in China, and a trade (volume 10, p. 3812) of five millions in Cuba. As evidencing that the foreign trade was largely newly created instead of taken from others, reference may be made (volume 10, p. 3811) to the trade built up in Black Sea territory. The steel sheets, pipe, and wire products from the American Sheet & Tin Plate, the American Steel & Wire and the National Tube Companies were at first sent to Hamburg and there trans-shipped. The building up of that trade by the Steel Company has caused (volume 11, p. 3811) the establishment of a direct line sailing every six weeks from New York to the Mediterranean, for which the Products Company furnished the nucleus of each cargo, viz., from 3,000 to 5,000 tons, but which afford shipping facilities to American manufacturers of all kinds of products. In the same way, a sustained trade of six millions a year (volume 10, p. 3818) has been developed in Japan. This trade consists in pipe, railway material, structural bridge steel, light gauged steel, tin plate, and street railway material, in all (volume 10, p. 3819) to the extent of 25,000 tons per month. In addition to using the regular steamer line, three or four vessels chartered by the Steel Corporation carried out entire cargoes each month from New York to Japan of the varied products (page 3818) of the Carnegie Steel Company, American Steel & Wire, American Bridge, American Sheet & Tin Plate, National Tube, and Lorain Steel Companies, respectively.

We have cited the above comparatively few foregoing proofs as to illustrate the Steel Company's foreign trade to exemplify its own continuous and indefatigable efforts (volume 10, pp. 3844–3846), to build up this trade on legitimate, commercial lines, and not by trade restraint or monopoly at the expense of its competitors. It has been the creation of a new American foreign trade, and not the monopolistic seizure of a pre-existing American foreign trade. Space constrains us to go into the extent of territory and varying character of that trade, the varied and individual requirements that had to be met in different markets, all of which show conclusively that the dumping, spasmodic foreign trade practices in vogue in the steel trade at the close of the last century were at variance with the building up of dependable foreign trade, and that with the Steel Corporation has come the substitution of reasonable, sound, and successful commercial practices in which and by which, under the proofs in this record, a dependable foreign steel trade can alone be built up. All these proofs, facts, and results serve to justify our conclusion, which we find as a fact, that this foreign trade of the Steel Corporation has not been gained by monopoly and is not a monopoly; that it does not, and has not, restrained trade; but, on the contrary, others in the steel trade (Youngstown, volume 19, p. 7708; Maryland, volume 20, p. 7979) have been, at the same time, free to enter such foreign trade and have done so to the extent of their resources. From a business viewpoint, the matter is well summed up by an experienced business man, produced by the government, who, speaking of the wire and

nail business with which he was familiar, and of the export business of the Steel Company, says (volume 5, p. 2033):

"I would say that it is the magnificent organization of the export department of the Steel Corporation which accounts for their success to a large extent. In every country in the world they meet the conditions; for instance, they have to have different gauges in different countries and different size kegs. In Japan there is a unit there which is different from elsewhere. Ours is a keg of 100 pounds, but theirs is a keg of 133 pounds. Now, to know how to reach all the different countries and supply the needs according to the circumstances and give them prices, and so on, in their own money, or it may be in English money, it is their wonderful organization that enables them to reach out as they do.

"Q. So the organization of the United States Steel Products Company, which handles the foreign business, is a very valuable thing for the steel trade of this country, is it not?

"A. Absolutely so. It is a wonderful organization."

Bearing on the systematic organization thus referred to, the proof (volume 10, p. 3788) is, in substance, as follows:

"The managers of these large offices in foreign countries are almost entirely American, and nearly all of them have been trained in our offices here. We have a civil service system in our business, and our men are promoted from one office to another according to their aptitude for business in certain countries. One man might be a good business man in Brazil, and might be a total failure in Australia."

As showing that this foreign trade has been built up on business executive effort, we may here refer to the facts later noted, namely, the very material decrease in the cost of selling and the very material increase in the prices obtained. And in that connection, namely, the increase in price obtained for goods sold abroad, and the decrease of price for goods sold in the United States, the proof (defendant's Exhibit, vol. 2, p. 190) shows the important fact, namely, that this foreign trade has not been built up at the expense of the home market. Without entering into the details of that exhibit, it suffices to say that some 80 steel or wire products are there listed, all of which have been sold at materially higher prices in the foreign than the same articles were being sold for in the home market. We find in that list such important and widely used articles as tin plate, structural steel, blooms, billets, and slabs, axles and steel wheels, plates, bars, and hoops, T-rails, pig iron, black and galvanized pipe, seamless tubes, horseshoes, wires of all kinds, nails and spikes, fences, bale ties—for all of which higher prices were charged and obtained in the foreign market than those paid by the domestic consumer. In connection with that exhibit, we note the testimony of W. E. Corey (volume 8, p. 3042), who says that, during the time he was president of the corporation:

"The Products Company had become so well established and had worked up such a line of customers and trade conditions in the world were such that as high prices were netted to the mills on foreign business as on domestic, and on some occasions were higher on certain contracts."

To the same effect is the testimony of James A. Farrell (volume 10, p. 3853), who says:

"Q. According to this statement, Exhibit No. 43, the gross tonnage of the corporation increased between those years from 1,001,716, to 2,243,138 tons, that is, from 1904 to 1912, or 123.9 per cent.?

"A. Yes, sir.

"Q. While the selling value increased 181.7 per cent.?

"A. Yes, sir; 181.7.

"Q. Or an increase of the average per gross ton of 25.8 per cent.?

"A. Yes.

"Q. What occasioned that increase in the average price per ton received by you on these export sales?

"A. Because of the fact that we were constantly selling a higher-priced product; that is, we were selling the various commodities in highly finished lines and fewer of the products in semifinished and coarser lines.

"Q. How was it that you were able to increase the value or improve the kind of product you were selling in that way? Was it because you were becoming established, or why?

"A. It was a natural development due to the fact that we had established offices all over the world, and because of the fact that our mills were getting into a state of preparation to do this diversified business.

"Q. In addition to selling the higher grade of goods, more finished articles, how do the prices upon these specific commodities compare per ton in 1904 and 1912, as a rule?

"A. They show an increase of about 25 per cent.

"Q. Then your increase was caused by that also, that you were able to get better prices on a specific product?

"A. Yes, sir.

"Q. Or many of the specific products?

"A. Yes.

"Q. That is all detailed, is it not, in defendant's Exhibit 42?

"A. It is.

"Q. Year by year?

"A. Yes; 1904 to 1912.

"Q. Inclusive?

"A. Yes.

"Q. This Exhibit 43 shows an increase in the domestic business in tonnage from 1904 to 1912 of 87 per cent., or from 5,818,149 tons to 10,877,544 tons, and an increase in the selling value of 65.2 per cent., or a decrease in the average per gross ton on shipments to the domestic market of 11.6 per cent.?

"A. 11.6 per cent.

"Q. What was the occasion of that?

"A. Because of the fact that prices in the domestic department have constantly shown a decline. We were getting about $8 a ton less for materials in the domestic market than we were receiving in 1904.

"Q. You have stated that you are getting about $8 per ton less in the domestic market than you did in 1904, that is, you did in 1911?

"A. Yes.

"Q. Has the price in the domestic market fluctuated in that time more or less in different years?

"A. More or less, but it has gradually shown a lower return."

In this matter, we have not overlooked government Exhibit No. 205 (volume 4, p. 1614), which challenges some 11 articles of export. It will be observed, however, the exhibit itself concedes that the prices include "in the majority of cases the freight and insurance to destination." As we have no facts and figures as to the separate items of such "C. I. F." exports, we have no proof warranting our excepting them from the conclusions stated above; namely, that higher prices have usually been obtained in the foreign market than have been charged in the domestic.

It will thus be seen that the significant factor in the view of the experienced witness quoted above (volume 5, p. 2033) is in the Products Company ascertaining, meeting, and supplying the individual need of individual foreign markets. And, as emphasizing his illustration of a

different nail keg unit in Japan, as the basis of doing business, it might be added that to gain a foothold in the trade of India another unit was demanded, for the proofs show (volume 10, p. 3792) that in India the keg unit does not prevail at all; that there the nail unit is a seven-pound package of nails in paper packages, which are put up in such package at the nail mill at Allentown, Pa., a seaboard plant, which was acquired with the American Steel & Wire Company. In the same way the proofs show (volume 10, p. 3792) the markets of Australia demand an oval nail, while in Java a round one is required. Indeed, the absolute necessity of making different goods for the foreign markets from those made for home trade is illustrated by the proofs of the large expense necessarily incurred to meet these local foreign requirements. Thus the evidence (volume 10, p. 3881) is:

"The first rail order we executed at the Tennessee Works was for the Argentine government; for the Chumbicha Railway. We expended on the rolls in preparing the rails for that order something like $74,000. That was the first order."

And (volume 10, p. 3844):

"After the corporation acquired the American Steel & Wire Company they expended $800,000 on the Allentown mill in order to diversify its products, and increase its opportunity to do a wider range of foreign business than it was doing at the time."

A patient study of the proofs of actual business facts, difficulties, and efforts shown in the testimony of experienced business men leads us to these conclusions:

First, that the foreign business in steel and iron done by the Steel Corporation has increased (volume 10, p. 3843) from 290,000 tons in 1903 to about 2,260,000 tons in 1912, and in value from $31,000,000 in 1904 to $91,000,000 in 1913 (volume 10, p. 3783).

Second, that the Steel Corporation normally does from 80 to 90 per cent. of the foreign iron and steel business of the United States (volume 10, p. 3897); that its exports of $91,000,000 in 1913 includes $30,-000,000 of "re-export" business, so called, which it does in connection with other American manufacturers using its basic products; that the "re-export" business in connection with other companies (volume 10, p. 3848) gave employment to from 15,000 to 18,000 men, and the foreign business of the Steel Corporation to 40,000 men.

Third, that its competitors in the iron and steel business, with some few exceptions (volume 19, p. 7709), do not seek to enter the foreign market, so long as they can get a market at home (volume 10, pp. 3845, 3847, 3697; volume 20, p. 7980; volume 28, p. 12039), and what foreign steel business there was prior to 1901 had been small, and generally not profitable, and was done at from 7 per cent. to 11 per cent. expense on invoice (Farrell, volume 10, p. 3791; Government Exhibits, volume 3, p. 1133; Painter, volume 5, p. 1974; Stevenson, volume 3, p. 1093; Benner, volume 6, p. 2499, in connection with Farrell, volume 12, p. 4628; Gary, volume 12, p. 4758; Defendant's Exhibit, volume 9, p. 731).

Fourth, that the success of the Steel Company in building up this continuous foreign trade primarily consisted in its mechanical ability

223 F.—8

to make the wide range and variety of product required by foreign markets and in its manufacture of such diversified products at plants properly located for export trade. Volume 10, pp. 3790, 3843, 3844, 4128; volume 11, p. 4320; volume 13, p. 5017; volume 23, p. 9403; volume 20, pp. 7978, 7979. In that connection reference might be made to the proof (volume 10, p. 4128), as showing how essential to the maintenance of foreign trade is the diversity of product which comes from broad integration (volume 10, p. 4128):

"Q. Can a manufacturer having a large line of products for sale afford to maintain such warehouses and conduct that business, when a person manufacturing only one line of goods could not afford to do it?

"A. It was tried by the National Tube Company before the formation of the Steel Corporation. They established a large warehouse at Johannesburg, South Africa, and were obliged to abandon it for two reasons, one because of the cost of doing business. It cost them over 8 per cent. to do the business, because they had one line of goods to sell only."

Fifth, in gradually reducing its own overhead cost of foreign selling (volume 10, p. 3791), from about 3½ per cent. in 1901 to 8 per cent. in 1911.

Sixth, in gradually increasing the price of such of its product as was sold in the foreign market from 1904, when the trade had gotten under way, to 1912, while it was at the same time gradually decreasing the price of such of its product as was sold to consumers in the home market. Volume 10, pp. 3853–3855. These relative changes are shown by defendant's Exhibit (volume 2, p. 203), as follows: In 1904 the Steel Corporation sold such of its product as it exported at an average price of $27.22 per gross ton; by 1912 it was able to market them at $34.24. During the same period it was in 1904 receiving for such of its product as was sold in the home market an average of $41.44 per gross ton; by 1912 this price was reduced to $36.53.

With these facts, figures, and results proved in this record, we are warranted in holding that the foreign trade of the Steel Corporation, its mode of building it up, and its retention when built up are not contrary to the Sherman Law. To hold otherwise would be, practically and commercially, to enjoin the steel trade of the United States from using the business methods which are necessary in order to build up and maintain a dependable business abroad, and if the Sherman Law were so construed, it would itself be a restraint of trade and unduly prejudice the public by restraining foreign trade. Happily, it is open to no such charge, for, as the Supreme Court in the Standard Oil Case said:

"One of the fundamental purposes of the statute is to protect, not to destroy, rights of property."

[4] Seeing, then, that the Steel Corporation, at the time this petition was filed, was engaged in the natural and normal conduct of business, both home and foreign, and that it was not then monopolizing, restraining, or attempting to monopolize or restrain, trade in iron and steel between the states or with foreign nations, we next turn to 1901, the year the corporation was formed, and address ourselves to the inquiry whether it was formed in order to so monopolize or restrain trade; or, to use the test fixed by the Supreme Court (Nash v. United States, supra),

was the Steel Company, when created, a combination which by its intent was meant to, or by the inherent nature of its contemplated acts would, "prejudice the public interests by unduly restricting competition or unduly restraining the course of trade"? Now, what is meant by the phrase "the inherent nature of its contemplated acts,". which violate the statute when an illegal combination is originally formed, and which, continuing, because inherent elements warrant its dissolution whenever questioned, is illustrated by what was found to be the fact in the Standard Oil Case. There the court based its right and duty to dissolve the Standard Oil Company on the two facts that: First, the Standard Oil Company (221 U. S. 74, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734) destroyed the *"potentiality of competition"*; and, second, that it was "a monopolization *bringing about a perennial violation* of the second section of the act." And that there was in the Standard Oil Company of New Jersey a destruction of the power to compete—the potentiality of competition— and a perennial, continuous and perpetual violation of the law was shown, in the court's estimate (221 U. S. 75, 31 Sup. Ct. 505, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734), by the following state of facts:

"(a) Because the unification of power and control over petroleum and its products which was the inevitable result of the combining in the New Jersey corporation by the increase of its stock and the transfer to it of the stocks of so many other corporations, aggregating so vast a capital, gives rise, in and of itself, in the absence of countervailing circumstances, to say the least, to the prima facie presumption of intent and purpose to maintain the dominancy over the oil industry, not as a result of normal methods of industrial development, but by new means of combination which were resorted to in order that greater power might be added than would otherwise have arisen had normal methods been followed, the whole with the purpose of excluding others from the trade, and thus centralizing in the combination a perpetual control of the movements of petroleum and its products in the channels of interstate commerce."

At this point we deem it proper to specially note these vitally important terms used by the Supreme Court, viz., the destruction of "the potentiality of competition," and the "perennial violation" of the statute. For, when it comes to the question of the dissolution of the combination, and that is the phase of this case we are now considering, a dissolution must be decreed whenever the inherent nature of its contemplated acts is such that from its very nature the combination was bound to destroy "the potentiality of competition," and these violations were, from its inherent nature, bound to be perennial. In other words, the Standard Oil Company had to be dissolved because its inherent nature was such that it was bound to destroy the power to compete in petroleum, and it would not be heard to say it had no intent to destroy competition when its inherent nature had made it do so. It therefore follows that, if such destruction of the power of competition and that by perennial violation thus evidenced the original inherent illegal nature of the combination, it would seem that if a long series of years had not resulted in a combination either destroying actual competition of others, or of their power to compete, or had not resulted in the long years of the combination's business in constant, perennial violations of law, it could not

reasonably be held that the inherent original nature of such combination was such as to make it unlawful when originally created and liable to dissolution whenever afterwards challenged. On the contrary, it would seem that the acts of a combination are fair tests of the real inherent nature of the combination, and that in such case the time-tried rule, "By their fruits ye shall know them," might well serve to best gauge the source or tree from or on which the fruit matured. But, passing by this time-tried rule, with its practical tests of what the Steel Company did in the ten years subsequent to its creation, let us address ourselves to the proofs of what was done at or about the time the Steel Corporation was formed, and from these proofs alone determine whether the object of those forming it was to prejudice the public by unduly restricting competition or unduly obstructing the course of trade, or, even if there was no such intent, was the inherent nature of the Steel Corporation's contemplated acts such as to prejudice the public by unduly restricting competition or unduly obstructing the course of trade?

A study of these proofs satisfies us that the United States Steel Corporation could not have been formed unless the minds of two men had previously united in a common purpose. Those two men were J. Pierpont Morgan and Andrew Carnegie. With them co-operated Charles M. Schwab, the president of the Carnegie Steel Company, Elbert H. Gary, president of the Federal Steel Company, and James H. Reed, the counsel of Mr. Carnegie and a director of the Carnegie Steel Company, all of whom, except Mr. Carnegie, became directors of the Steel Corporation. While the co-operation and participation of other persons and other companies subsequently aided and was necessary to the carrying out of the proposed formation of the Steel Company, yet, laying aside all mere incident, and going to the crux of the case, it is clear from the proofs that the Carnegie Steel Company held such a dominant relation to the steel and iron trade, and Mr. Morgan held such a dominant relation in finance, that unless Mr. Carnegie, who was the controlling shareholder of the Carnegie Steel Company, and Mr. Morgan, through his relation to the finances of the country and as a director of the Federal Company, could make possible a purchase of the Carnegie Company by the Federal Company, the United States Steel Corporation could not, and would not, have been formed. As Messrs. Schwab, Gary, and Reed all aided in bringing the two principals to an agreement, and as the result of such agreement was the formation of the Steel Company, we are justified in saying that, if there was intent to violate the Sherman Law, to be effected through the organization of the Steel Company, then such company was primarily the work of Messrs. Carnegie and Morgan, assisted, of course, by all those who participated in the furtherance of this primary purpose of bringing the principals together, as directors of the Federal Steel Company in agreeing to a purchase of, or in forming and taking part in, the management of the Steel Corporation itself.

Considering the magnitude of what was done, the mere sequence of events which resulted in the formation of the Steel Company had a directness, a simplicity, and a rapidity which is remarkable. On De-

cember 12, 1900, Charles M. Schwab made an address at a dinner given to him in New York in which, in substance, he gave a clear statement of the steel business, showing that the metallurgical method of making steel and the physical method of handling it were then fully developed, and he outlined his notions of wherein further advance was possible. His testimony as to his address is:

"I talked about the advantages that might be derived from doing a manufacturing business on a larger scale than had then been attempted and that we had undertaken in the manufacturing lines up to that time; all our endeavors up to that time had been to perfect methods of manufacture. By that I mean metallurgical and economical methods. By economies I mean that I believed that we had then reached the limit, or very nearly so, at which economies from a metallurgical or mechanical standpoint could be made effective, and I believed that the next great step in economical manufacture was to so regulate the business and plants of the business in manufacturing on a larger scale than had ever been attempted heretofore; that instead, as was then the practice, of having one mill to make 10 or 20 or 50 products, the greatest economy would result from having one mill make one product, and make that product continuously. The history of manufacture has shown that any line that specializes in any direction obtains the best economical results, and I believed that the various lines of steel should be so specialized, that it was not possible for any one company then to do that at once, but I also believed that great economies would result from locating mills at the point of consumption, by which the cost of transporting the finished material to the point of consumption would in many cases be reduced or saved. I also pointed out that I believed that great economic results would follow from our being able to manage these concerns in a manner that would stimulate the most effective effort in the management of the different concerns.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"I went on to say that one of the most effective things would be our ability, as I said before, to stimulate the various managements. Secondly, or thirdly, I felt that the great export business of this country in iron and steel could only be done in that way. I felt, furthermore, that great economies would result in all these general items of expense which are met in the manufacture of iron and steel, on account of selling, traveling, office expenses, and all the general items that each individual concern with an individual line had to cover with a full organization. That could be covered by one such organization, and I felt that much economy would result in that direction, and, indeed, the whole line of my talk that evening was intended to show that the next great economic step to be made in the manufacture of steel, or, indeed, any business in general—I did not confine myself entirely to the steel business—directly to the steel business, but, in general, that the great economic result to be next obtained in manufacture was by the adoption of these methods, and then I made that application generally to the steel industry. \*  \*  \* I pointed out, for example, the attempt that had been made to manufacure steel cars; that few companies throughout the United States who were engaged in the manufacture of bridges and other fabricated materials were attempting to manufacture steel cars; that that could never be successful; that the only way it could be successful was for some one works to devote itself exclusively to the manufacture of steel cars, and one kind of steel cars; that if different kinds of steel cars had to be made, like passenger cars, for example, as being different from freight cars, two separate works, as following out this general line of policy, would have to be built and so operated. I then pointed out, for example, structural steels. In those days a structural mill would probably make six different sizes of beams and channels and angles; by my plan a mill would be built that would roll on angles exclusively, and a mill would then be built that would roll on beams exclusively, and that the finished material, and so forth, of these mills, being adapted for that special thing, would be better and cheaper.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Well, Mr. Morgan listened with interest, and then asked me to sit down and talk with him a few minutes. The dinner was short and we sat in a corner and talked for some time at more length and with more amplification upon this subject."

Shortly afterwards Mr. Morgan sent for Schwab, who says:

"This whole subject was then gone into with much more detail, and the theories which I then advocated were amplified with reference to their application to the steel industry; and I pointed out at that interview to Mr. Morgan in great detail the economies and advantages that would result under those theories from their application to the steel industry.

"Q. Was there any suggestion then, or discussion, with regard to the advisability of a large corporation with facilities for manufacturing on all lines?

"A. There was; that was the chief discussion of the evening.

"Q. Can you go into that a little fuller?

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"I told Mr. Morgan that if the steel industry of this country were to start anew, that if there were no steel plants here, what I should advocate and build was such a plant as I have described heretofore, but that in view of the fact that the most of these things did exist, perhaps not in an ideal way or ideal location, that a new plant would be made possible, and that in view of the fact that they did exist, and that they could be made ultimately to conform to this theory, I believed that the then existing steel plants which I pointed out to him could be formed into one company, which would ultimately accomplish all the results which I had outlined. That was discussed at some length. The companies were mentioned that I thought would accomplish these results. They did not, by any means, embrace all the companies in the United States, but those which I thought would effectively make such an organization as was outlined.

"Q. Were they such as to cover all the branches of the industry?

"A. They were.

"Q. And what was your discussion with him with regard to the foreign situation?

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"With reference to the foreign situation, I pointed out to him that up to that time our business, the steel business in general, had been nominal with reference to export business; and that, in my opinion, it could only be made profitable and possible by such an organization; that no company selling an individual line, a single line, or one or two lines, could hope to successfully compete for foreign business where they were not prepared to furnish the customer every line that he might require for a structure or a business; and that half a dozen or a dozen individual companies could not afford the expense or the organization or secure the talent necessary to make a successful export business, while such a company as I outlined could.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Did you mention the facilities that such a corporation as you described would need to possess?

"A. I did; and I may say that I enlarged and perhaps made a more strenuous talk to Mr. Morgan upon the subject of export and our ability to export and foreign business in foreign markets than any other, excepting only the economic advantages to be derived.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"With reference to the ore, I pointed out to Mr. Morgan how advantageous it would be, for example, for one mine to mine all it could, regardless of what furnaces or products it was to go to, and have that ore then distributed by an expert between these 100 furnaces that would then operate, instead of 5 or 6 by which the mine could run continuously and run at a given amount and under the most economical conditions, regardless of how the ore was to be distributed; because, when a firm owned 5 or 6 furnaces, it was a question of how much of each kind of ore from each mine they could use, but, when a firm owned 100 furnaces, the question of distributing the ore from

each individual mine to that furnace became a simple and effective one; and that that would be of great advantage from a mining point of view. The fact that one mine contained ore of a high percentage of phosphorus might make it possible in an individual concern to only run it half the year; while, if the product from that mine was to be distributed to 100 furnaces, the additional amount of high phosphorus would be so little as to be no disadvantage, and therefore that mine could run continuously. With reference to the handling of the ore from the mines to the docks in the days of individual ownership, it was exceedingly difficult at the docks and on the railroad to keep the ores for the different firms and from the different mines separated and shipped as they desired to handle it upon their boat; whereas, with this large ownership of works, it was possible to ship the ore to the various docks as fast as it came down, without any of the expense from delay. The ships, instead of waiting at the docks until their special load of ore could come around and take the ore, they would come into port and depart ten hours later, instead of three or four days later, because the ore was always there ready to load on the ships. There is nothing in shipping that costs more than delay in discharge and loading; and therefore that very great economy was accomplished at once. I think the records of the ships will show to-day that a very small fraction of the time was consumed in handling the materials at terminals, as compared with what it was in times of individual ownership. So I went through from ore mines, railroads, and shipping, to the handling of material, right down to the finished material, which was the same thing as I have described before, with reference to individual efforts.

"Q. Did you or not speak of the advantage of a company owning its ore and its furnaces, and its rolling mills and finishing mills?

✻      ✻      ✻      ✻      ✻      ✻      ✻      ✻      ✻      ✻

"I told him—I will put it that way—that up to 1892 there was a very strong feeling that manufacturing companies should not own ore, but that had then changed. The Carnegie Company was gradually acquiring ore wherever it could, and, to my mind, the successful manufacture was only possible where every single step in the line of manufacture was carried out by some one concern, and that for the greatest economy, for the greatest development of the business, it was an absolute necessity."

The possibility and desirability of creating an American company capable of acquiring foreign trade should have been especially dwelt upon by one so thoroughly conversant with the steel business will be quite apparent when the significance of the proofs as to the relative relation of the export trade of the great commercial European countries is considered. The export steel trade of England is (volume 10, p. 3898) 65 per cent., as contrasted with 35 per cent. of home trade; Germany (volume 10, p. 3898) sends 60 per cent. of her steel abroad, as against 40 per cent. consumed at home; Belgium (volume 10, p. 3849) sends 90 per cent. of her product abroad.

The outcome of this second talk was that:

"Mr. Morgan was very much interested and said to me that if I could secure a price from Mr. Carnegie that he would undertake the formation of such a company; that he would undertake the business; that is the way he said it." Volume 11, p. 4141.

Within two or three days Mr. Schwab saw Mr. Carnegie, and, while the latter declined to give any written option, he expressed himself as willing to sell. Certain figures then jotted down by Mr. Schwab or Mr. Carnegie were carried by the former to Mr. Morgan, and were the basis on which Mr. Morgan proceeded in the formation of the Steel Company, although he had then no written agreement from Mr. Carnegie whatever. These facts are shown also by others. Volume 12, p.

4727. This situation continued until February 26, 1901, when Mr. Morgan obtained a formal letter from Mr. Carnegie through Judge James H. Reed. The latter's testimony (volume 14, p. 5660) is:

"He [Mr. Morgan] told us, in substance, that he had just awakened to the fact that he was making contracts here with stockholders of the Federal, the National, the National Tube, and so on, and he had not a scratch of the pen from Mr. Carnegie under which he could hold him or hold his estate if he died. He said, 'You men go up the street as fast as you can and get me something.' We took the Elevated and went up to Mr. Carnegie's house and explained what we were there for. * * * Mr. Stetson and I then, with occasional interruptions from Mr. Carnegie, dictated a letter to Mr. Morgan, or to J. P. Morgan & Co., which Mr. Carnegie signed, and we took the original down with us to Mr. Morgan, and he seemed quite relieved. * * * I don't think we left any (copy) with Mr. Carnegie."

By such letter (Exhibit 80, volume 3, p. 325, Defendant's Exhibit) Mr. Carnegie agreed to sell his mortgage bonds and stock in the Carnegie Steel Company, and agreed to receive in lieu thereof mortgage bonds of the United States Steel Company. The letter also provided that his sale was conditional on the Steel Company taking the holdings of the other shareholders in the Carnegie Steel Company at the same rate, but, instead of paying them in bonds as he was, they were to be paid in stock of the new company. The testimony (volume 14, p. 5656) shows that Mr. Carnegie was anxious to sell and retire from business. Indeed, several efforts had previously (volume 14, pp. 5474, 5475, 5513; volume 11, p. 4132; volume 12, pp. 4722, 4723, 4725) been made to sell the Carnegie Company. On the consummation of the sale, Mr. Carnegie took no stock in the new company, and had no part in its management. While, of course, he knew what companies the Steel Company was absorbing, and was keenly alive as to what properties his purchase-money bonds would cover, and, indeed, in respect to one company, the National Steel Company, which occupied a midway position between Chicago and Pittsburgh, insisted (volume 12, p. 4747) that it had to be taken in and his bonds cover their property, there is no proof whatever that he occupied any other relation than that of a seller of his stocks and bonds in his own company. Indeed, the dealings between the two men, the fact that they did not meet each other, their not even talking to each other about the plans, scope, and future of the new company, their allowing the intended sale to stand without any written evidence that it had been made, the inability or difficulty either of them would have had in its being carried out if either had died, conclusively show that the whole transaction between the two was that of a sale of Mr. Carnegie's personal holdings effected between them through the medium of third persons. We are therefore warranted in finding, as we do, that there is no evidence whatever to show that Mr. Carnegie united with any one to join in any violation of the Sherman Act, and that the statement in his answer filed in this case, to wit "that his sole motive in agreeing to the sale of the property of the Carnegie Company to the United States Steel Corporation was his desire to retire from the hazard and responsibilities of active business, and that since said sale was concluded he has had no connection with the business of the purchasing corporation," is true, and a conclusion which is supported by the evidence hereafter quoted at

length showing the reason which led Mr. Carnegie into being willing to sell.

We turn next to Mr. Morgan and such other persons as co-operated with him in forming the Steel Corporation and see what the proofs show. The vast size of the Steel Corporation they formed, the influence and control incident to such size, its seeming power to crush competition, its ability to absorb business through its systematized organization are all factors so associated with monopoly to restrain trade and crush out competition that we may say that, standing alone as a mere isolated fact, this great company gives one such an impression of monopoly that we feel we may in this inquiry place the burden upon it and its formers to satisfy us by affirmative proof that monopoly was not the purpose for which it was formed, but that it was the normal, regular, and natural outcome of the improvement in steel making, and its concentrated powers were only such as were deemed to be necessary to successful producing and marketing its product. To such inquiry and the proofs bearing thereon we now address ourselves.

The iron and steel trade of the United States has been a gradual sustained evolution. So far as the metallic base is concerned, such evolution may be broadly stated to have been from iron to steel, from steel to Bessemer steel, from Bessemer to open-hearth. It is interesting to note that the next development (volume 10, p. 4068; volume 26, p. 11066) bids fair to be from fuel smelting to electric smelting. These several stages of development have been accompanied by an abandonment and loss of equipment of great value (volume 2, p. 1167; volume 2, p. 732; volume 10, p. 3859; volume 10, p. 4077; volume 13, p. 4963), and have necessitated vast further expenditures for new appliances to make the new open-hearth steel product. To illustrate, referring to a single one of the rapid revolutions in steel making—the removal of phosphorus in pig iron in the Bessemer or open-hearth processes by the substitution in the lining of lime for a silicon base. This single chemical fact, made public in 1885 (volume 13, p. 4940), "practically revolutionized the iron industry, and by the year 1890 basic open-hearth steel had practically supplanted the use of wrought iron for all commercial purposes." Side by side with these rapid metallurgical changes of product there was at the same time going on radical changes in the mechanical handling of the product. To refer to but one of the many mechanical changes, "in the late 80's [volume 13, p. 4940] the introduction of electricity as a motive power also produced another revolution in the steel industry, so that practically all works had to be rebuilt if they desired to keep abreast of the recent developments of the art." But not only were metallurgical and mechanical changes taking place with regard to the different stages of metal production, but there developed at the same time a radical change, not of one product or one stage, but of all stages in the way of rounding up plants, or, as it is called, integration, so that continuous processes could be carried on. In the old method of wrought iron making there was no continuity of operation. Volume 12, p. 4934. The molten metal produced by a blast furnace was run into pig iron. This pig iron was transported to a rolling mill, where it was first puddled, and

then rolled into muck bar, which was again suffered to cool. The muck bar was again heated and rolled in finishing mills. As steel making progressed, its manufacture by various agencies (volume 13, p. 4944) not necessary here to detail, became a continuous fluid process. Instead of the metal being suffered to cool, it was continuously treated first as a fluid, and then as an ingot, but always without entirely losing its initial heat. But these steel plants, with their continuous processes and their increased capacity to produce, serve to confront the finishing plants with grave problems in reference to their basic supplies. This era of change and its new problems is testified to by Percival Roberts, Jr., whose experience and relation to the steel business give weight to his summary of the changing conditions and problems confronting that industry. He testified (volume 13, p. 4944):

"I think I had reached the situation existing as of the late 80's when basic open-hearth steel was gradually, or rapidly, I might say, supplanting wrought iron. The wrought iron plants that were of smaller capacity and had insufficient capital or lack of sufficient tonnage to dispose of the product of an economical steel plant commenced purchasing billets and blooms from those who had converted their plants into steel-manufacturing ones. This production of billets and blooms was practically a by-product with the finishing mills. In times of activity they had very little surplus product to spare. When not so pushed on finished material, they disposed of part of their steel-melting capacity in the shape of semifinished material. The iron plants purchasing this material found that the same could not be carried on successfully, due to the fact that it required an almost unlimited capital to be locked up in supplies of billets, as finished material required so many different weights of billets and blooms that the stock on hand had to be enormously large; also the chemical requirements of orders requires that different grades of steel should be used. This also required a vast amount of material to be carried at all times on hand. Another matter which occurred about that time changed very materially the situation, and that was the introduction of what was known as the Jones mixer. I might say that up to that time the production of all blast furnaces was run out from the furnace in the shape of liquid pig iron, and cast in the sand and allowed to become cool. The invention of the Jones mixer was for the purpose of carrying on the production of steel as one continuous operation from ore to the finished product, never permitting the material to become cold until it reached the final economic shape. I do not mean to say that this applies to all finished shapes, but to a cross-section of material at which it would be economical to let the material cool.

    *      *      *      *      *      *      *      *      *

"The Jones mixer is a large vessel placed between the blast furnace and the steel works in which the product of the blast-furnace is run in liquid form, making a large reservoir of fluid pig iron from which ladles are taken in liquid condition the contents in liquid condition and used in Bessemer converters or open-hearth furnaces. The advantage of this process was that it reduced the cost of manufacture in this one respect alone by about $1 a ton, which is the cost of remelting cold pig iron for steel production.

"The situation from 1890 on grew more and more acute. Those concerns which had become more or less integrated and had changed their methods from those of iron to steel were continuing their integration to even a greater extent than before, although I would like to say that even prior to the introduction of steel the matter of integration was one of varying degree, even in the manufacture of wrought iron, although there was not the same necessity for it. In those days one man mined ore; another man ran a blast furnace; another man operated rolling mills. The processes were all disconnected.

    *      *      *      *      *      *      *      *      *

"Coal and limestone were sometimes separate, sometimes controlled by one party, but even in those days there were certain establishments which controlled their material from the ore and limestone up to the finished wrought

iron product, so that even in those days iron manufacturers were not on the same basis as regards competition. Those concerns whose output—I speak now as of about the year 1890—those concerns whose output was of a character and of sufficient tonnage, and who controlled sufficient capital to enable them to convert their works from iron to steel, did so, but there were a vast number of those whose character of product was of a less heavy nature, such as sheets, small bars, light plates, etc., who neither had the capital nor the output to warrant them in making, or rendered it possible for them to make, this change. There was also another class of establishments, namely, the blast furnaces who had heretofore supplied the puddling furnaces or the rolling mills with their pig iron for making bars. Those concerns found themselves without customers and they in turn were forced to develop a product which would take the place of their former ones. These smaller concerns were buying, as I say, to the best of their ability, their billets, blooms, and slabs from the larger concerns, who were making them in a certain sense as a by-product during the years from about 1890 to 1896.

"These revolutions which I have spoken of, due to the introduction of basic, open-hearth steel in place of wrought iron, were the fundamental reasons for all the earlier aggregations of work which took place about the year 1898, and through that year down to, say, 1900. Certain of them were integrated like the Federal Steel and the Carnegie Steel Company backward to their supplies of raw material, and to the extent which they had formerly been consumers, they to that extent became producers. The other concerns, like the National Steel, were composed largely of blast furnaces that had lost their custom for pig iron, and who found themselves compelled to produce, instead of pig iron, billets and blooms for sale to those who had formerly used wrought iron. The Tin Plate, the Sheet Steel, the Hoop, the American Steel & Wire were composed of concerns who individually were neither able, for want of capital or amount of output, to change from wrought iron or to manufacture steel in sufficient quantities to make it commercially profitable to do so.

＊　＊　＊　＊　＊　＊　＊　＊　＊　＊

"The Tin Plate Company had been a consumer, and not a producer, of wrought iron product, and, in fact, the manufacture of tin plate had not taken place in this country until after the introduction of the use of open-hearth steel. So far as I included them in my answer, I meant to state that they individually were unable to produce the raw material from which their finished product was made, but by combining these individual units they would be enabled to do so economically."

The tendency of the steel business during these years towards concentration, combination, rounding up, or continuity of operation is reflected in the census figures. On the one hand is an unprecedented growth in the volume of the steel and iron business done and of the increase of capital; on the other hand is a striking decrease in the number of establishments doing it. Thus Bulletin No. 78, Census of Manufacturers, 1905, Iron and Steel and Tin and Terne Plate issued 1907, by the Department of Commerce and Labor (volume 13, pp. 4948, 4950), says:

"The growth of steel production has been the heaviest of any portion of the iron and steel industry. The product for 1900 shows a gain over that of 1890 of 6,510,348 tons, or 155.9%, or an average increase of about 650,000 tons per year. The product of 1890 shows a gain over that of 1880 of 3,147,271 tons, or 306.3%, an average increase of nearly 315,000 tons."

Whether the cause of this enormous increase of production on the one hand was due to the rounding up process, of decreasing the number of plants, and further expanding those that remained, the bulletin in question is, of course, speculative, but does show that decrease in the number of corporate plants with increase of capital in

those remaining was the actual fact in the iron and steel business. In that regard the same bulletin showed that there were in 1880 in the United States substantially 1,000 of such establishments with a capital of $230,000,000. By 1890 these 1,000 had decreased to 838, but the capital of those that remained was increased to $425,000,000. By 1900 the 1,000 establishments of 1880 had again decreased to 763, but the capital of those that remained had grown to over $600,000,000. During the same period the separate blast furnace establishments had also decreased. In 1880 they were 483; in 1890, 377; and in 1900, 273. This census evidence of widespread general change, readjustment, and concentration by practical men in the iron and steel business would seem necessarily to have had some impelling cause—economic, mechanical, metallurgical, or administrative—back of it. And, in the absence of proof to the contrary, the conclusion of Mr. Roberts would seem reasonable that "these revolutions which I have spoken of, due to the introduction of basic, open-hearth steel in place of wrought iron, were the fundamental reasons for the earlier aggregation of works which took place about the year 1898, and through that year down to say 1900," and that the business reasons which induced practical steel men to so act was the fact that, unless they did so, the changed conditions of the steel business might force them out of business. In that regard the testimony of Mr. Roberts (volume 13, p. 4951) is:

"Coming down to the year 1900, very many, if not the majority, of those concerns who did not integrate sufficiently to control their supply of raw material failed in business or were abandoned by their owners. * * * There are successful concerns to-day [page 4953] who have not integrated in the manufacture of their own steel, but those are of a character where tonnage plays no part. Where you come to a large tonnage, however, or a comparatively large tonnage, I know of no successful concern to-day which has not integrated. * * * There never [page 4956] was a year during that ten-year period that there were not numerous failures in the iron and steel trade with considerable aggregations of capital. I will say they were very numerous; so numerous that probably in some years it would amount to more than 100 failures in that period."

Light is thrown on some phases of this integrating process by the testimony of the president of the Republic Company, whose development and expansion has been heretofore noted. He says (volume 2, p. 732):

"We have practically eliminated all of our scattered iron mills, have concentrated them in the operation at a few points of production, so to-day we produce practically but little iron, and are manufacturing about a million tons of steel per annum. Q. This, I take it, is what you call an integrating process, was it not? A. Yes, sir; that was part of it; the addition of the mineral and coke and blast furnaces and balancing up operations generally completed the integrating process. Q. So that you were able to handle every feature of the process from the mining of the ore to the putting on the market of the finished product? A. Everything, except transportation. Q. And so far as transportation is concerned, I understand you owned a fleet of vessels on the Lakes to bring your ores? A. We have three vessels we own and have an interest or a part interest in some others. * * * Q. You are adequately supplied with lake facilities? A. No; not quite, not balanced up. We are large carriers on the Lakes in addition to our own fleet. * * * Q. I judge from your testimony that this integrating process that you spoke of attended your development of the steel

end of your business; am I right? A. You are. Q. You did not need that so much, or at all, when you were simply manufacturing iron? A. No; it was done for economic reasons and also for trade reasons."

This testimony serves to show how radical, extensive, and enforced was the steel integration, which, summed up in a few terse words of this business man, really meant a rounding up and readjusting of everything, as the witness says, "from the mining of the ore to putting on the market of the finished product," and an increase in that company's case of resources (volume 5, p. 1856) from $600,000 to over $23,000,000. From these figures the insistent necessity of integration in the steel business will be seen.

Coincident with these mechanical and metallurgical changes another basic change of peculiar and dominating importance in the steel business was also taking place. This was in freight and transportation. This change, it will be seen, not only restricted the range of a plant's market, but by doing so necessitated what might be termed locality integration. The chief factor in the manufacture of steel (volume 13, p. 4953) is labor, and the next is the locality where it is produced (volume 10, pp. 3961, 3987, 3988, 4059, 4060, 4061); being of great bulk, the transportation of the raw material to where it is made and the freight to where it is used (volume 11, p. 4344) are the factors decisive of its being profitably made and sold. As illustrative of the vital character of freight as a factor, the proof (volume 12, p. 4815) is that the Steel Corporation uses 45,000 tons of ore alone a day, not to mention coke or limestone. The delivery of the steel to the user, and the net gain over cost received from him, is, of course, the practical test of steel making. From these self-evident business truisms, it follows that the tonnage of bulky steel products restricts its steady, natural, and sustaining market to the consumption of the territory near its place of production; for example, great as is the consumption of steel in the New York district, and ample as is the productive capacity of the United States Steel Corporation to supply it, yet the proof (volume 10, p. 3782) is that the Steel Corporation does "very little business here (New York) compared with that done by the mills in Bethlehem, Phœnixville, and mills located near here." Prior to the regulation of freight rates by the government through the Interstate Commerce Commission, freight stability was unknown. Special rates to large shippers, cuts in freight rates, and secret rebates were common practices between the steel producers and the railroads, and these enabled steel manufacturers to ship bulky products into territory naturally supplied by other manufacturers, and by these cuts, special rates, or rebates to dump their surplus product in districts which they could not enter if they paid proper freight charges. Thus, at one time, the Illinois Steel Company, by virtue of getting a 45-cent rate from Chicago to Yokohama on export business, was able to ship rails to Japan. This freight rate (volume 10, p. 3882) could not be had now that freight rates are regulated. The pinch and prohibition of freights in narrowing markets may be best illustrated in a letter found in volume 11, p. 4286, where a great steel maker in 1899 said:

"The greatest blow we have received is in the rise of railway rates, and we should address ourselves to rendering these impossible. There is no reason why we cannot ship to Conneaut and to Western points by boat from Conneaut, and I would spend a good deal of money and a good deal of attention upon this. The mere fact that you begin shipping in that way by boat will bring railroads to their sense. I also think that something can be done shipping by Erie Canal from Conneaut. I think the Lorain or somebody else put a line of boats upon the Erie, and I know that a paper manufacturer of. Erie does all his transportation by line of boats, which he tells me costs him about 75 cents per ton. One shipment to New York by canal would give your railroad friends much anxiety."

When, however, under the regulating power of the government, freight stability was enforced, the steel maker's market was at once locally restricted, and his only way of overcoming the regular, stable, adverse freight rate was to integrate locally; that is, to erect or acquire other mills in the market locality from which freight forbade his heavy product entering. The embargo laid by freight on distant markets is simply a business fact, and it suffices to say that, while the government by this enforced transition of the steel shipper from the era of unstable freight cuts and rebates to an era of freight stability in the end contributed to corresponding benefit and stability in the steel maker's business, yet it must not be overlooked that, in thus narrowing his market, the steel maker was compelled to broaden his market by expanding his operations so as to manufacture in additional localities. Coincident with this tendency to integration and to the consequent widening of variety of product and to the entry of steel into new fields, a radical change in the variety of ore supply was necessitated. In thinking of iron ore, we are apt to regard it as simply ore, and overlook the fact that there is a radical difference in different ores. In the earlier manufacture of iron, practically any ore could be used, but as the steel era came along with its chemical tests (volume 11, pp. 4334, 4141, 4375; volume 13, p. 4997), and the specified requirements incident to its use in varieties of articles, the particular character of the ore base became more and more a matter of importance. The practical proof of this wide range of various ores required is illustrated in the proofs, which is that, even with the wide range of ores owned by the Steel Company, it is at times unable to meet the requirements of purchasers. In that regard the proof is (volume 10, p. 3835):

"We (the Steel Company) purchase a great many rails from our competitors; occasionally our people in some country will take an order for a specification which it may not be possible for us to fill. At times we have bought rails which called for Cuban ores to be used as a basis for manufacture, and we bought those rails from the Maryland Steel Company."

We noted above (volume 10, p. 3733) where 18 different kinds of billets were required in a wire mill alone. The proof is (volume 11, p. 4375; volume 13, p. 4977; volume 12, pp. 4813, 4821) that it is only by a scientific mixture of different sorts of ores that steel of the large range of specified steel requirements can be made. This simple statement of a few lines, when carried into practical business operations, means the furnishing of many varieties of ores that may be as far away from a blast furnace as Minnesota, Chili, or Cuba. These must

be bought, mined, transported, fluxed, and treated in order to meet, for example, the exacting structural requirements of a steel rail. To successfully produce that rail in great tonnage, which, under the proofs, is a business necessity, every step in that long spread from the ore in the ground to the finished rail must be under the integrated control of that agency which is ultimately held responsible by the railroad for the rail. In that regard, we quote from the proofs:

"Starting from the ore fields. Individual concerns owned individual mines. No concern was sufficiently large to own groups of mines of different characteristics and qualities. All metallurgical people know that the best results are obtained by scientific mixtures of different sorts of ores, and, by consolidating the ore interests of all these companies, we were able to give each individual company the ideal mixtures in order to produce the most economical and best results. * * * To one familiar with the steel and iron-making industries the advantages of so doing are enormous. The transportation of material affords equal opportunities to economize. Ships do not need to wait until each particular cargo can be loaded for each particular works, but can be kept moving steadily, and assigned to various works while in transit. Mills that formerly had to make a great variety of articles, by reason of consolidation, are enabled to run steadily on one line, producing far greater tonnage and at very much less cost."

The result of these radical and forced changes in steel making evidenced itself in the rapid and widespread fever of integration by consolidation that took place toward the close of the century. Whether, from such consolidations, monopoly, rise in prices, and restraints of trade were hoped by many of their promoters to be obtained, it is certain that the deep-lying motive which led practical steel men to put their plants into such consolidation was the recognition of the absolute business necessity of integration as a condition of staying in the steel business. Thus the Carnegie Steel Company, occupying, as it did, the commanding position in the steel trade, varied, as were its products, having fully 70 per cent. of what foreign trade there was, and having the foremost place in the home markets, itself felt the necessity of and was preparing to enter on further integration by widening the variety of its product. While leading in some lines, it was deficient in others, notably pipe and wire (volume 11, p. 4143), which consumed much of its basic products. In the minutes of that company of July, 1900 (Government Exhibit, volume 6, p. 1881, and also volume 11, pp. 4281, 4282), its president stated:

"I have already expressed my views on the matter of rails referred to by Mr. Carnegie. For myself I do not see that there is anything left for us to do but to build a hoop and a wire mill. The American Steel & Wire Company have served notice on us for cancellation of their contract with us. The American Steel Hoop Company are buying but little from us. With the loss of customers that we have sustained, it will leave us in the position to have no four-inch billets to make. There does not seem to be any other place at present to place them. The contract with the Union Steel Company would not prevent us from going into the wire business. It is very doubtful, indeed, whether they would take a full tonnage from us. It looks very much as though we would have to put our steel into the finished article. We formerly sold to the constituent companies of the American Steel & Wire Company and the American Steel Hoop Company from 30,000 to 35,000 tons of billets per month. We have done all that we can to endeavor to get them to take their tonnage from us, but so far we have been able to accomplish nothing. I do

not see how we can stop at wire rods. I think we shall have to finish the wire and nails, because there are no customers for wire rods at the present time. We have figured that a hoop mill will cost about $800,000, a rod mill about the same amount, and a mill to make barbed wire and nails would cost about $1,000,000, or a total expenditure to go into the hoop and wire and nail business about $2,500,000."

In a letter embodied in such minute, Mr. Carnegie said:

"I do not think that there are many customers for rods remaining, and believe that, if there are, they will not exist for a long time. We should not go into rods, as I see it, unles we also go into wire. No use going halfway across the stream. Should aim at finished, articles only. It is coming to this in all branches."

That these minutes represented the then purpose of the company was stated by its president, who testified (volume 11, p. 4282):

"We adopted .the plan at that time of building mills to finish our own steel that we had formerly sold to those companies."

So also had the Carnegie Company determined to integrate by adding the important items of pipes to its finished product. The purpose of this was to create for itself- and in itself a customer that would use part of its product by making it into pipe. This item of steel consumption, embracing oil, gas, water, irrigation, and kindred fields, the Carnegie Company, as we have seen, did not make. That this vast field of basic steel consumption was not sufficiently filled is shown by the fact that they planned to spend in additions for such pipe making mills, excluding land, $12,000,000. The plans for this enterprise were entered upon in 1897 or 1898 (volume 11, p. 4295). It will also be seen, in discussing later the acquisition by the Steel Corporation of the Seamless Tube Company, that the Carnegie people were carrying on substantial experimental work at the Seamless Company's plant with a view to itself entering the tube field (volume 13, pp. 4198, 4199). Efforts had been made to get a site near Pittsburgh, but sufficient acreage for the large works in view could not be found. Meanwhile, a site of 5,000 acres was secured at Conneaut, on Lake Erie, where the company's ore steamers coming from Lake Superior delivered the ore to the company's railroad for transit to Pittsburgh. From this point (volume 11, p. 4297; volume 11, p. 4286), water transportation for pipe was available to seaboard and to the entire territory tributary to the Great Lakes. The testimony (volume 11, p. 4297) is that this proposed widening of the Carnegie Steel Company's product variety to include pipe and wire products was absolutely "in good faith as indicative of the intention and purposes of the Carnegie Steel Company." In that regard the president of the company (volume 11, p. 4390) testified:

"Q. Speaking about the purpose of the Carnegie Company to go into other lines of business and the finishing of its semifinished product, do you remember whether the scheme talked of in the middle of 1900, as Judge Dickinson brought out from you, of building your wire mills, was persisted in to the end of that year?

"A. The scheme to ultimately do so was. My recollection is that the operations were deferred owing to financial conditions at·that time in our company; but the idea of ultimately extending our lines into all these finished products was not conceived in that year. It had been discussed for some years before, and plans made, and a general policy outlined for ultimately doing it.".

As evidencing not only that fact, but that it was a necessary and far-sighted integration (one called for by the legitimate future of the business), will appear from the fact that, after the Steel Company was formed and its comprehensive plan of complete integration was carried out, that company expended $13,000,000 (volume 10, p. 4076) in building the pipe plant which the Carnegie Company in 1900 planned to build, and it will be noted further that it built it in the immediate Pittsburgh district, on ground near the National Tube Works, where the Carnegie Company was not able to get the required site. All of which seems to strengthen and confirm the conclusion of the insistent requirement of integration in the steel trade at the close of the century. The like compulsory integrating influence thus shown in the Pittsburgh district evidenced itself also in the great Chicago steel district. In that district the Illinois Steel Company held the same commanding local position as the Carnegie Company in the Pittsburgh. Its natural market was the Chicago district (volume 6, p. 2215; volume 12, p. 4734). It had a rail market in Canada at times which could not be reached by the Carnegie. In spite of the allegations of foreign trade made by its then management, it really had little or none and really could have (volume 6, p. 2215; volume 10, p. 3829) no profitable foreign trade. Such foreign trade as it had to Canada was of the spasmodic character heretofore referred to. It had large plants at Chicago and Joliet, Ill., and at Milwaukee, and had railroad properties, but its product of basic open-hearth steel was, even in 1890, only 190,000 tons, as compared with the Carnegie Company's 1,250,000 tons. It (volume 14, p. 5505) lacked the finishing units of sheet steel, steel hoop, and tin plate mills (volume 12, p. 4735), that were afterwards acquired in pursuance of the integrating policy which the plans of the United States Steel Corporation contemplated. Practically it had no substantial wire (volume 12, p. 4734) or structural output and no tube or pipe output at all (volume 12, p. 4735). In 1898 the Illinois Steel Company entered on an effort to integrate by consolidation and with foreign trade in view (volume 18, p. 4718; volume 14, p. 5472). In pursuance of its integrating policy, the Illinois Company formed the Federal Steel Company, which took over the Minnesota Iron Company. This gave the Federal a Lake Superior ore reserve, its own railroad transportation to Lake Superior, its ore fleets to Chicago and lake ports. It also took over the Lorain Steel Company, which gave it mills in the Cleveland district, and at Johnstown, Pa., in the Pittsburgh district, and a relative approach to the seaboard. These mills were then regarded (volume 12, p. 4714) as enabling the Federal Company to supply foreign trade from those districts. This expectation was to that extent justified, for the proofs show (volume 10, p. 3813) that, so far as their individual products are concerned, the Lorain and Johnstown mills are now very substantial factors in the foreign trade developed by the Products Company. But apart from these mills the Federal Steel had no facilities for entering into foreign trade, and the proof is that, even with all the facilities for entering such trade possessed by the Steel Company (volume 10, pp. 3828, 3829), but 2 per cent. of the product of the Illinois Steel Company now goes into for-

eign trade, and that part goes, not into such general trade, but only into such Canadian markets as its location permits. The integrating steps thus mapped out are recited in the proofs (volume 12, p. 4695), but these partial efforts at complete integration proved disappointing in that it was not complete enough. In that respect the proofs are (volume 12, p. 4718):

"The plan and organization were good so far as they went, but the organization was too small; the capital employed was too small; the facilities for finishing steel were not sufficiently diversified. We lacked finishing mills, and our locations were not the best or good enough to extend foreign trade as we had hoped."

Realizing these limitations, and that the Federal Steel Company's operations were not rounded to a successful manufacturing future, the proofs (volume 12, p. 4721; volume 14, p. 5473) show that steps had been taken just before the United States Steel Corporation was formed to raise from $40,000,000 to $45,000,000 in further integrating the Federal Company. That such steps by the Federal Company had as their real basis the bona fide commercial and industrial requirement of further integration is, just as we have shown in the case of the Carnegie Steel Company, also shown in the Federal's case by after events in connection with later events in the Chicago district. The record (volume 11, p. 4143; volume 6, p. 2418) shows that the Federal Company was not equipped to make pipe and sheets at all, and plates only to a relatively small extent, and had no complete line of finishing mills. It further shows (volume 8, p. 2978) it lacked adequate open-hearth capacity, did not have the money (volume 12, p. 4762) to extend it, had (volume 11, p. 4226) very limited structural product facilities, and even with its ore supplies it had (volume 11, p. 4384) to buy other ores to get the proper mixtures. After the Steel Company was formed, in order to supply the needed rounding-up equipment of the Chicago district, which the Federal lacked, the Steel Corporation made large additions in that district at Gary, in the center, and at Duluth on the northern limit, with a view to reaching from Duluth the western Canadian market. In that regard the proofs (volume 10, p. 4074) show that some $80,000,000 were spent in building at Gary open-hearth plants, a rail mill, structural steel plants, bar mills, sheet mills, and plants of the American Bridge Company and the American Sheet & Tin Plate Company, in all of which facilities the Illinois and Federal Companies were deficient. Along the same line the proofs (volume 10, p. 4075) show that $10,000,000 are being expended at Duluth to erect blast furnaces, open-hearth furnaces, and bar and merchant mills with which to supply the American and Canadian Northwest. As evidencing this trend to further integration, the desirability of the Federal Steel Company acquiring the Carnegie Company and thus integrating eastward was, in 1899 (volume 12, p. 4722), brought to the attention of the Federal Steel Company by a representative of the Carnegie Steel Company, who then suggested:

"That it would be a good thing for the Federal Steel interests to purchase the Carnegie property and perhaps with them some other properties, which included finishing mills of various kinds, suggesting companies, the Wire Company, and the Tin Plate Company, and some other companies."

The matter was actively taken up by the Federal Company, but eventually fell through (volume 12, p. 4723), because "Mr. Frick was not willing to agree that the whole Carnegie organization, including himself, would remain in the company and assist in carrying on the business." The proofs further show that early in 1900 Mr. Schwab, the president of the Carnegie Company (volume 12, pp. 4724, 4725), urged the buying of that company by the Federal, and efforts were again made to have Mr. Morgan, who was a member of the board of the Federal Steel Company take it up, which he declined to do (volume 12, p. 4723).

This demand for integration which thus evidenced itself in these two leading companies, each attempting to integrate back to the base of supply and also into more extended and diversified finished product, also evidenced itself in other branches of the steel trade. This was the integration of mills which were large consumers of plates, ingots, billets, sheets, rods, structural iron, and other semibasic products. Without specifying all, we may refer to the steady integration of these various subdivisions of the steel trade. This began in December, 1898, when the principal tin plate manufactories integrated by consolidation into the American Tin Plate Company. In January, 1899, the American Steel & Wire was formed by a consolidation of all the leading wire product manufacturers. This was followed in February, 1899, by the consolidation into the National Steel Company of 12 per cent. of the ingot production of the country, which was located on the eastern side of Chicago and the western side of the Pittsburgh district. The same month saw the National Tube Company formed by great concerns making various kinds of tubes and pipes. In March of the same year, sheet steelmakers in large tonnage combined to form the American Sheet Steel Company, and in April of the same year, the American Steel Hoop Company was formed by the leading makers of hoops, bands, and cotton ties. While the American Sheet, the American Hoop, and the National Steel were separate companies, yet for integrated, continuous working, they were in effect (Topping, volume 2, pp. 636, 684, also volume 12, p. 4764) necessary to each other, Mr. Topping testifying:

"You will remember there was formed the Steel Hoop and the American Sheet Steel. The formation of those companies, as I understood at the time intended, was to balance up National Steel so as to make it more nearly self-sustaining. In other words, the National Steel was the raw producing steel company to supply the crude material to the Sheet Steel and Steel Hoop and Tin Plate Companies."

This integrated relation is no doubt the manufacturing feature on which it was (volume 12, p. 4747) insisted that the finishing companies would not sell to the Steel Corporation unless the National was also purchased, as Mr. Carnegie (volume 12, p. 4747) insisted should be done. In the same month we find the principal structural and bridge erectors and producers forming the American Bridge Company. In connection with this consolidating and integration of structural manufacturers and fabricators, it is but just to note, as illustrative of compelling forces outside that industry, the demands which the business world was making upon the structural steel industry. Thus in re-

ferring to the American Bridge Company, and its carrying forward at a later date this policy of expansion and local integrating of its works, the proofs (volume 10, p. 3961) show that such great operations as the tall buildings of recent origin, such railroad work as the Hell Gate Bridge, and such national work as the Panama Canal, practically necessitate the existence of such companies. In that respect the proof is railroad bridges are—

"confined to those companies having the largest plants and those equipped for that sort of work. There are very few companies, for example, that could build a bridge like the Hell Gate Bridge, involving 40,000 tons of material and an incidental expense of perhaps $300,000 to get the falsework together. When we secured that contract we had to expend immediately $160,000 for tools. While we were a very large concern and had a very well-equipped plant, we were obliged to buy $160,000 worth of tools for that particular work.
* * *

"Q. Has there been any change in the style and size of the structures in the last 12 or 15 years which affected the size of the plants that are necessary in order to execute the contracts?

"A. Yes. * * * Since that time buildings ranging from 18 and 20 stories up to 36 stories have been built. * * * We fabricate the steel and deliver it to the site and erect it."

The proofs also show it is necessary to have structural plants in different localities. In that regard (page 3961), and referring only to the Middle West equipment, the proof is that the American Bridge Company has in the West—

"a plant at Toledo, one at Ambridge (Pittsburgh), one at Gary, Ind., a large plant and a comparatively new plant; one at Chicago, one in Minneapolis, one in St. Louis, and one in Detroit. * * * It is a zone business more or less." A zone business is a "business within 300 or 400 miles of where the plant is located. It is a question of freight rates.

"Q. You mean by that, bridge business or structural business for buildings?

"A. Both."

They further show that it requires a large plant to deliver such contract requirements so as to co-ordinate with other parts of the work. The proof is (page 3961), referring to the work done by the American Bridge Company along the Panama Canal:

"We have done about $8,000,000 worth of work there for the government so far. * * * We are building the emergency dams, building the transmission towers and the administration building and the machine shops, involving about 6,000 tons, and we have been doing a great deal of work outside of the lock gates which were furnished by McClintic-Marshall Company. I think we have done the major portion of the work, and it has always been work that we had to get out pretty promptly, and sometimes have to set aside other work to accomplish the deliveries required."

It will thus be seen that these large modern operations practically necessitate correspondingly large manufacturing facilities and financial resources to adequately and successfully meet such product demands. These rapid, widespread, and isolated integrations of different subdivisions of the steel trade cannot be reasonably explained on the sole theory of a widespread, dominating purpose in each of these aggregations to monopolize or restrain trade. In the first place, the proof is simply one-sided that they did not control trade, and that in spite of their size and large proportions of then existing trade, their competitors, as we have already seen, have increased more

rapidly than they.  So that, while there may have been in the minds of those who formed them the possibility of monopoly and increase of price, we are inclined, from a study of the proofs in this case, to the belief that the real underlying influence was the economy of management, the locality of production and market, and the continuity of process which resulted from such integration.   Take, for example, the last one formed, the American Bridge Company.   During the years it has been a subsidiary of the United States Steel Corporation its business has increased 42 per cent.   In that time, its competitors have increased their business 164 per cent.   During that time the American Company has had the help of all the associated subsidiary companies of the Steel Company, it has shared in all the economies of management, co-operation and financial help rendered by the parent company, yet with all these aids, its competitors have increased their business four times as fast as its own.   It would seem, therefore, that the American Bridge Company had even less hope or power to monopolize when it was originally formed and stood alone, when it could not, when bought by the Steel Corporation, so monopolize the steel structural business of the country.   In view of such facts, we have been impressed with the view that these consolidations and integrations, accomplished or in view at the close of 1900, were more largely made with a view to meeting the changing conditions in the steel trade in its transition from iron to steel and in its adjusting itself to the progress, improvement, and development in that industry rather than with monopolistic intent.   The proof in regard to the reasons for the formation of the American Bridge Company fairly states, as it seems to us, the basic reasons which led to the unifying of the separate branches of the steel industry.   Thus in volume 2, page 874, it is testified, with respect to that company's formation, as follows:

"A. The purpose of the formation of the American Bridge Company was simply along the lines of economical shop management, and had no reference whatever to any monopoly or to securing the entire industry of the country.   The plants which became a part of the American Bridge Company were believed to be in a position to be operated more economically as a combined whole than as independent units, and the foundation of that company was the securing of a steelworks whereby they could obtain, to a large extent, the control of their raw material for fabrication, the basis of practically all structural contracts being one of time; the time of delivery being the most important factor in practically 90 per cent. of all contracts taken.   These independent units found themselves at that time in a very disadvantageous position, due to the fact that the large steel plants were commencing to do their own fabricating, whereby they were enabled to control their rolling mill supplies and make such deliveries as these independent fabricating shops, having no control over the raw material, could not do.

"There was also another reason for it, namely, that contracts were increasing so rapidly in magnitude that as independent units they were unable to secure sufficient working capital to enable them to fabricate these large tonnages.

"You can trace from the very beginning of the securing and assembling of their raw material through the designing, fabrication, transportation, and erection work, and the increase in their working capital, the reasons for putting together those plants, which were of two principal characters:   First, they were partly competitive, I might say, by reason of a greater or less similarity of output and by reason of a common territory into which the transportation

rates enabled them to ship the material; and, second, plants absolutely non-competitive, due, (a) by reason of an entirely dissimilar output, and (b) by reason of their geographical location.

"The whole scheme was one to decrease cost of production and to operate along the lines of what, at the present time is termed 'scientific shop management.' As a matter of fact, any advance in prices was not discussed to my knowledge; nor did any such enhancement ever take place. Competition at all times was extremely severe, and the profit on the output decreased from the time of the formation of that company until the present day. A number of concerns were offered to the American Bridge Company at the time of its formation, which were declined for various reasons, because they did not seem to be essential in the rounding out of the proposition that I have referred to."

As we have said above, it may have been the fact that, apart from the operative necessity that led to many manufacturers putting their works into these consolidations, there was probably a purpose also to monopolize and restrain trade, yet by the time the Steel Corporation was formed the inability of these prior combinations to so monopolize trade was proven to those who gave heed to facts and figures. For example, Government Exhibit, vol. 7, p. 2017, shows that the production in 1898 of the pig iron plants subsequently acquired by the Steel Corporation had been 46 per cent. of the country's total production of 1898; in 1900, the proportion of these plants had fallen to 41 per cent. In the same way, Bessemer plants afterwards acquired by the Steel Corporation had fallen from 73 per cent. in 1898 to 70 per cent. in 1900. The Bessemer rail plants had fallen from 63 per cent. in 1898 to 61 per cent. in 1900; wire rod plants had fallen from 97 per cent. in 1898 to 82 per cent. in 1900; structural shape plants had fallen from 66 per cent. in 1898 to 61 per cent. in 1900; plate and sheet plants had fallen from 67 per cent. in 1898 to 66 per cent. in 1900; while the wire nail plants subsequently acquired by the Steel Corporation, which had in 1898 produced 89 per cent. of the country's total production, had by 1900 dropped off to 73 per cent. Indeed, as we gather the net results of these different plants in varied steel lines, the acquisition of which (1901) by the Steel Corporation is alleged to evidence a purpose to monopolize, the facts and figures show that in only one product, namely, that of ingots and castings, had there been an increase of proportion in the three preceding years by these plants and in nine other branches, the plants which the Steel Company subsequently acquired, had in point of fact in those three years clearly shown their inability to monopolize by a decrease of relative percentage ranging from 1 per cent. in the case of plates and sheets to 16 per cent. in wire nails. And that this three years' decrease in actual monopolistic control was the normal trend of the steel business is shown by the fact that such proportions continued to decrease after the Steel Corporation was formed. As an example of this tendency we may cite the wire plants subsequently acquired by the Steel Corporation, which in 1898 had 88 per cent. of the country's production and in 1890 had fallen to 72 per cent., had by 1911 so continued to lessen their proportion of the part sold in the American market that it was then but 42 per cent. of the country's production.

Moreover, these combinations were the subject of Congressional investigation from 1898 forward, and the proof (volume 28, p. 11760)

is that while the results of that investigation were published (they are not in evidence before us) they have resulted (volume 12, p. 4755) in no adverse action by the government. From all which we find support for our conclusion that these former combinations were largely the result of economic and manufacturing plans for the production of product rather than for monopolistic plans for selling product. At any rate, the proof is that, as a practical business experience, these combinations which existed prior to the Steel Corporation had, in the three years preceding the formation of the Steel Corporation, shown a waning power to monopolize, if any such power existed when they were formed.

We have thus seen the unifying, integrating, and rounding-up influences which were irresistibly forcing those engaged in the practical work of making steel to form these prior combinations of integrating units. The proofs show that Mr. Morgan was a director in the Federal Steel Company (volume 12, p. 4724), but that he personally knew nothing of the steel business. His firm had taken part in some of these consolidations, but the suggestion of the absorption by the Federal of the Carnegie Company had not appealed to him. The proof is (volume 12, p. 4274) that while he was a member of the board of directors of the Federal Steel Company and was financially interested in it, he had probably never attended a meeting of the board and taken no part in its management and knew nothing of the practical steel business. The conditions in the steel trade being such as we have shown above, Mr. Morgan, in December, 1900, attended a dinner in New York where some 80 men, prominent in steel manufacturing and the banking business, were present. This dinner was given to Mr. Schwab, the president of the Carnegie Steel Company. Whether the dinner was given for the purpose of affording an opportunity of interesting Mr. Morgan in buying the Carnegie Steel Company, which the bitter differences between the partners in that company (volume 6, p. 2189; volume 14, pp. 5655, 5656) and the desire of Mr. Carnegie to retire from business then made possible, there can be no doubt, in view of the outcome, that Mr. Schwab then gave to the bankers present, and particularly to Mr. Morgan, who was seated beside him, such a comprehensive view of the steel trade as was well calculated to show the possibility of carrying integration to its logical manufacturing and merchandising efficiency, and afforded the Federal Company, of which Mr. Morgan was a director, the opportunity to carry out, on a large scale, the policy of integration that company had planned and had (volume 12, p. 4719) attempted to carry out. And there can be no doubt that Mr. Schwab realized that if a sale of the Carnegie Company could be made the grave discord among the partners of the Carnegie Company (volume 14, pp. 5655, 5656) which had arisen, could be ended, and the policy of integration on which, as noted, that company had also embarked, could be carried out by some larger organization. Indeed, the evidence is clear that there was an earnest desire on the part of the owners of the Carnegie Company for several reasons to sell. The situation was summed up by James H. Reed, who (volume 14, p. 5655) testified:

"Q. The Carnegie management was originally a partnership, I believe, was it not?

"A. A limited partnership.

"Q. When was it turned into a corporation?

"A. In the spring of 1900, turned into two corporations.

"Q. What is that?

"A. Two corporations were formed at that time.

"Q. What were they?

"A. The Carnegie Company was the holding company of the stocks of the Carnegie Steel Company, the Frick Coke Company, and the Bessemer and Lake Erie Railroad Company; the Carnegie Steel Company was organized under the laws of Pennsylvania and was the operating company.

"Q. What do you know of the desire of the stockholders of the Carnegie Company to sell out in the year 1900?

"A. I think they were all desirous to make some permanent disposition of the property, for several reasons.

"Q. There had been dissensions among the partners a year or two before, had there not?

"A. Yes; that is the mild word for it; there had been quite serious dissensions between Mr. Frick and Mr. Carnegie as the leaders.

"Q. Resulting in litigation?

"A. Resulting in litigation.

"Q. That was ended, I believe, by the organization of the corporation or corporations?

"A. Ended by the formation of the two corporations of which I have spoken.

"Q. Was entire harmony restored between the gentlemen by its organization?

"A. No, sir; it was not.

"Q. Now, did you learn from these gentlemen themselves of their desire to sell out in 1900, or from any of them?

"A. Why, I could not say that it was said in so many words, but I know it was their desire, as I say, that some permanent disposition should be made of the property for the reason that Mr. Carnegie was growing old. He had the majority interest in the company. A manufacturing company, like the Carnegie Steel Company, that was intensely active could not be successfully operated with the majority interest in the hands of trustees in case of his death. He himself was anxious to get out of business and get his interest in these concerns put into investment shape, and so you can see that generally there was a desire among all of them to have some kind of a disposition made of the property during his lifetime that would be permanent.

"Q. Was Mr. Carnegie giving a personal and immediate attention to the business during that time?

"A. He was, but not in the sense of being on the ground. He was either in New York or Skibo, and was getting constant reports, and he was seeing the various officers of the company frequently, and he was sending them advice from time to time.

"Q. Skibo is where?

"A. In the north of Scotland.

"Q. About how much of the year was Mr. Carnegie spending there at that time?

"A. About half of it.

"Q. And the other half in New York?

"A. In the United States, either in New York, or during the winter in the South.

"Q. But formerly, in earlier days, he had been in Pittsburgh and attended personally and actively to business, had he not?

"A. I believe until about 1880, when he moved to New York.

"Q. Was that so early as that?

"A. Yes, I think about that time. But he was within practical reach of the business whenever he was in the United States.

"Q. He could reach it by letters, could he not?

"A. Yes, and telegrams.

"Q. Do you know whether he was desirous of giving up even that connection with the business, aside from his desire to put his holdings in investment shape? Do you know whether he wished to be relieved of the care and

attention and thought that the business required of him, and to devote his time and thought and energies to other things?

"A. Yes; I think he was.

"Q. What was it that he contemplated, if you know, from him?

"A. What he has done since; that is, devoting himself to philanthropy and peace, and one thing and another."

With these matters no doubt in view, Mr. Schwab made an address as already quoted, and brought into clear relief three propositions: First, that steel making had then reached the limit of improvement in metallurgical methods; second, that further advance was dependent on integrating processes; and, third, that to take care of the growing steel production a great foreign trade was possible. It is suggested that this whole talk of integration or rounding up of manufacturing facilities is an afterthought, and a mere cloak to veil a concealed purpose to monopolize trade. Let us examine what the proofs show in that regard.

Looking only at the two great companies, the union of which made possible the steel company, the Federal and the Carnegie, we have the fact (see statements in bill, volume and title, "Pleadings," pages 3 and 4) that both these companies had been themselves gradual integration growths, and their managements were then trying to integrate them further. The Illinois Steel (volume 14, p. 5472; volume 12, p. 4693) had entered into the wider field of the Federal; it had integrated back to ore; it was trying to integrate locally into eastern markets through Lorain and Johnstown, had considered the acquisition of the Carnegie Company and had planned to spend (volume 12, pp. 4719–4721; volume 14, p. 5473), some forty to fifty millions of dollars in further broadening its field of products. For making the great basic products of open-hearth steel, which was then becoming the dominant factor in steel, the proofs (volume 8, p. 2978) show the Federal was not equipped. The subsequent location of the great open-hearth plant at Gary alone (volume 10, p. 4074) shows the existence of the Federal's prior need of further integration without reference to the fact (volume 10, p. 4074) that it was lacking in finishing mills for rails, bars, structural, sheets, etc. In the same way we have seen the Carnegie Company was lacking in finishing plants for tubes, wire, hoops, and many other finishing plants to use its subbasic product. These patent facts and urgent needs— facts which, as we have seen, were set forth at the time in the minutes, letters, and communications heretofore quoted—evidence the existence of the practical manufacturing necessity of both these two great companies, either building or buying finishing mills. That such purpose of manufacturing integration should have been elaborated and formally set forth as the reason for its purchase by the Federal Company of the Carnegie Company would not, in the nature of things, be done. Every one concerned knew these facts without their being stated. It was a thing every steel man recognized so fully that no specific reference would be naturally made to it. But the proofs do show that, whatever purpose was in the minds of those forming the Steel Company, integration was certainly one of the special objects in view. Thus, Mr. Schwab (volume 11, p. 4139) makes it clear that "the economic advantages to be derived" were more enlarged upon even than foreign trade. "I

might say," is his testimony, "that I enlarged, and perhaps made a more strenuous talk to Mr. Morgan, upon the subject of export and our ability to export, and foreign business in foreign markets, than any other, excepting only the economic advantages to be derived." That "the ability to export" and "the economic advantages to be derived," thus enlarged upon, was integration, is shown in Mr. Schwab's testimony:

"With reference to the foreign situation, I pointed out to him that up to that time our business, the steel business in general, had been nominal with reference to export business, and that, in my opinion, it could only be made profitable and possible by such an organization; that no company selling an individual line, a single line, or one or two lines, could hope to successfully compete for foreign business, where they were not prepared to furnish the customer every line that he might require for a structure or business; and that half a dozen or a dozen individual companies could not afford the expense or the organization to secure the talent necessary to make a successful export business, while such a company as I outlined could."

That this plan of integration in varied products—and nothing in excess of the required integration—was carried out is also shown by the proofs. In that regard, the same witness, speaking of his visit later to Mr. Morgan, when he took him the figures at which Mr. Carnegie would sell, testified:

"Q. Did you have any further talk with him at that time that you can recall?

"A. We had quite some talk upon the general subjects outlined before, and I was consulted with reference to the other concerns. I had nothing to do with the negotiations for the other concerns.

"Q. Who consulted you? Mr. Morgan?

"A. Yes; Mr. Morgan and Mr. Bacon.

"Q. Asking questions about what?

"A. A great many questions relative to the other concerns, the various concerns.

"Q. As to their character and business?

"A. As to their character and business, and what changes would be made, and how they would be operated, etc.

"Q. Was there in any of that conversation any question of obtaining all the steel plants, or acquiring a monopoly, or anything of that kind?  *  *  *

"A. There was considerable discussion about the acquisition of other plants. I advised Mr. Morgan against it, because the other plants added nothing to the efficiency of the one I proposed. For example, plants like Jones & Laughlin, the Pennsylvania Steel Company, the Cambria, were discussed; but I said, 'No; they are in practically the same lines as the Carnegie Company, and they add no efficiency to this organization.'

"Q. At this time did the Federal have finishing mills?

"A. They did.

"Q. A sufficient number of them?

"A. They had a sufficient number in their own lines.

"Q. What were they lacking?

"A. The Federal did not make tubes; they did not make sheets; they did not make plates to any extent, and among the things needed there were few that the Carnegie Company made, other than rails, that the Federal Company made; and as to the Tube Company, the Carnegie at that time did not make tubes, nor did they make wire, which the Wire Company made. Indeed, the addition of these plants, the general whole, was the addition of the lines that the Carnegie or the Federal did not have.

"Q. Did either the Carnegie or the Federal have a complete line of finishing mills?

"A. No steel company had.

"Q. None of them had?

"A. None of them had, not nearly a complete line.

"Q. Which companies were there that you talked about as being capable of making up a complete line?

"A. There was the Carnegie and the Federal and the National; and then there was the Wire, the Tube, the Bridge, and the Sheet, and the Hoop Company, all of whom made their individual lines, and the Tin Plate Company also; I overlooked them.

"Q. As to the business of these companies, where was the business of the Federal principally done?

"A. Mostly in the Middle West.

"Q. And the Carnegie?

"A. When I say the Middle West, I mean Chicago and west. The Carnegie, from Chicago east.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"A. They made rails. They made blooms and billets. You asked what they made in common. They made blooms and billets that were supplied to other finishing companies, which they did not finish themselves. Then the Carnegie Company made a few, a very small percentage of, merchant bars, and so did the Federal Steel Company.

"Q. In what territories, respectively, did they sell their products chiefly?

"A. As I said, the Federal sold mostly in a circle of which Chicago would be the center. The Carnegie sold theirs in a circle of which Pittsburgh would be the center.

"Q. What was the difficulty in trading over an extensive territory?

"A. If the Carnegie shipped west of Chicago, of course, they made a very great sacrifice in freights; and if the Federal shipped east of Pittsburgh, of course, they made a very great sacrifice in freights."

It will thus be seen that here was a complete outline of a manufacturing plan which, if carried out, enabled the Federal Company to integrate from or to varied finished products, and this not only in the Chicago district, but, through the acquisition of the Carnegie Company, through the Pittsburgh district as well, and through this latter district to reach the foreign markets, which it was powerless to reach from its own district, and through acquisition of the finishing mills held by the Tube, the Sheet, the Wire, and Bridge Companies to obtain the varied product facilities by which alone successful foreign trade could be built up. The testimony of Robert Bacon also shows that the whole plan turned on the possibility and advisability of the Federal buying the Carnegie Company, and, if that could be effected, that certain other units should be bought to provide adequate finishing plants. Thus, referring to a meeting of the federal directors held to consider the offer Mr. Carnegie made, Mr. Bacon (volume 14, p. 5479) testified:

"Q. Were any steps taken to get the views of the other Federal directors that day or later?

"A. Yes. We succeeded in getting them in New York the next morning, with the exception of Mr. Marshall Field, with whom we communicated over the long-distance telephone, so that the next day we had, I believe, the opinion of all the Federal directors.

"Q. How long did they remain together on Monday, the Federal directors I mean, whom you assembled?

"A. Nearly all day, at different times.

"Q. Was a conclusion reached that day with reference to the Carnegie offer—I mean, as to whether it was wise to accept it or not?

"A. My recollection is that, although it was very difficult to persuade some of the gentlemen, a conclusion was reached in principle in the afternoon.

"Q. Was there any discussion that day as to how the thing might be financed?

"A. No discussion as to detail.

"Q. I do not mean detail at all.

"A. But naturally the supposition was that it would be financed by J. P. Morgan & Co.

"Q. Do you remember whether Mr. Morgan said anything on that subject to his associate directors, as to whether he was willing to undertake it, I mean?

"A. Yes; my recollection is that in a very few words Mr. Morgan finally, after having heard our opinions, said that if they approved and substantiated the estimates in a ·general way of the business, and its probable success, that he would undertake to finance it.

"Q. Was there any talk that day as to what, if any, other concerns should be taken over?

"A. Yes; it was believed by all the men present, the directors of the Federal Steel Company, that if the Carnegie was purchased, other units should be purchased as well.

"Q. And were the other units talked of and considered?

"A. Yes; they were all considered.

"Q. And upon what principle were they chosen?

"A. Upon what principle were they chosen? I should say upon the principle of furnishing each an essential part of a completed whole; a new company which should manufacture all kinds of iron and steel products, owning its raw materials, facilities for transportation of raw materials to the mills and finishing plants, I think that was the basis upon which each one of these elements was considered, and, of course, the price at which they could be acquired, based upon their actual value.

"Q. Was any arrangement made on that day or shortly thereafter for opening negotiations with the owners of the various plants that were talked of?

"A. Yes; I think it was determined that day to go right ahead and see if they could be bought upon a satisfactory basis.

"Q. Who was intrusted with the negotiations? If you remember?

"A. I think that J. P. Morgan & Co. bore the brunt of it.

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*

"Q. What was said by the gentlemen present with respect to the objects to be attained by the organization? \*   \*   \*

"A. It was said by all those gentlemen present, and I knew it to be their opinion, having been so closely associated with them for many years, that the object to be attained was the creation of a great new steel company, based upon the Federal Steel Company, which would be able, by the ownership of its raw materials, by all legitimate means of rail and lake transportation, and by the ownership of finishing mills of all descriptions both in the East and West to create a plant which should be able to manufacture every kind of iron and steel, and by reason largely of its ability to reduce the cost of production and the territorial distribution of its plants and activities, sell its products to the best advantage in every market in the world. I know that to be the object of those men that formed the United States Steel Corporation.

\*        \*        \*        \*        \*        \*   `        \*        \*        \*        \*

"A. Mr. Morgan believed that if he could take part in the formation of such a company it would be the greatest, the crowning, achievement of his business career. He believed that the effect of such a creation would be upon the whole industrial fabric, the industrial life of this country, of tremendous beneficial effect. Convinced as he was by Brother Schwab and the other experts that almost inconceivable results could be obtained in the way of lowering cost of production of iron and steel, that such a company would bring more good into our whole national life, constituting as it did the greatest single factor in the great constructive work of the country, than could possibly be attained in any other way. His first great object was, as I have said, by reason of the decrease in cost of production, to make it possible to so improve the conditions of labor by increasing wages and bettering the conditions, and, by enabling the consumer always to depend upon stability of prices, to bring about a new condition of things. Those briefly, were the ideals and ambitions of Mr. Morgan in forming the United States Steel Company.

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*

"It was said by all those gentlemen present—I believe all of them; I know by Mr. Morgan—that under no considerations would he take part in anything which was or might be considered to be a monopoly or any attempt to restrain competition. I know that that was one thing furthest from his willingness to participate in."

Referring to this meeting Judge Gary (volume 12, pp. 4732, 4733), says:

"Q. Now, what were the subjects considered by you, gentlemen, directors of the Federal, or owners of the Federal, at that time, and on account of which, or after considering which, you reached the resolution you mention?

"A. The question of securing the Carnegie properties with their ore reserves, which contained a class and character of ore in large quantities which the Federal or the Minnesota iron did not have, particularly their mills for diversified products, their location, and their organization, which was believed to be a very good one, and, if possible, the acquisition of other companies owning finishing mills, in order to diversify the product, including the Wire Company, which had been offered to us a number of times, and for the purpose, as I have said, of completing a rounded-out proposition for the development of the business, extension of the business, manufacturing at lowest cost, and, particularly, increasing the extent of export business."

And (volume 12, p. 4751) he adds:

"You see, in this whole plan, Mr. Lindabury, there was an effort made to acquire property that would be useful to each other, and by that I mean to acquire a plant that furnished certain commodities to another plant which we were acquiring and to acquire—the latter because it could, at good advantage, secure the products which it needed for its uses, and so all through the line, from the ore down to the conversion from one product into another and the final distribution of the finished product."

These proofs certainly tend to show that the practical manufacturing question of rounding out or integrating the Federal Company by acquiring finishing companies was one of the objects its directors had in view at this meeting. The proofs also show that these several finishing mills were consumers of such basic products as were made by the Federal and the Carnegie, and that those two companies had no such finishing mills of their own as was adequate to consume the product they made, which was suitable for such mill. Without entering into the details of the proof bearing on these several finishing companies, all of which, together with the comments thereon are to be found in the Statement of the Case, page 63 and following, we may say they fairly show that without the acquisition of each of the finishing companies named, viz., the American Steel & Wire, the National Tube, the American Bridge, the American Steel Hoop, and the American Sheet Steel, the Federal Steel Company, even with the acquisition of the Carnegie would not have been provided with adequate finishing facilities for consuming its sub-basic product. And further, without the acquisition of the first three, the Federal would lack several of the most important products (Defendant's Exhibit, volume 2, p. 204) that have entered into the foreign trade built up by the United States Steel Products Company. It will also be noted that, in addition to the affirmative testimony quoted above tending to show that integration along manufacturing lines and development of foreign trade were among the avowed purposes of those who formed the Steel Corporation, there is a negative testimony of those who took part in forming the Steel Corpora-

tion, and quoted below, that monopoly of the steel and iron business was not the purpose for which that corporation was formed.

First. That with the competition left outside of the Steel Company, the extent of which has already been shown, a monopoly of the steel and iron business of the United States was simply impossible, and that no effort was made to secure these companies (volume 12, pp. 4756, 4757).

Second. That in view of the fact that the proportionate volume of competitive business has increased since the Steel Company was formed and that the proofs show no attempt by it to monopolize it to the exclusion of its competitors, to now attribute to those who formed the corporation an intended monopolization would be to say that, having formed the corporation for the purpose of monopoly, they immediately abandoned such purpose and made no effort to accomplish it.

Third. That the publicity, which the proofs (volume 14, pp. 5669, 5585) show the Steel Company has from time to time made of its prices, its accounts, and its policies, would seem a practice in line with legitimate business, rather than with illegal monopolization.

Fourth. That in carrying out the plan the advice of Abraham S. Hewitt was (volume 14, p. 5484) taken by Mr. Morgan, and at the latter's request Mr. Hewitt went on the board and served until his death, is a fact which, in view of the high character of Abraham S. Hewitt, tends to negative the contention that the purpose in view was to violate the law.

And lastly, as stated above, there is affirmative testimony that no such object was in view. In that regard the testimony of Robert Bacon (volume 14, pp. 5485–5487) is not to be overlooked. His service as Secretary of State under one administration, as Minister to France under another, coupled with his selection on his retirement from business to positions of educational character, warrant this court in attributing weight to his testimony. The testimony of Judge James H. Reed (volume 14, p. 5663), of Judge Gary (volume 12, pp. 4753–4755), and of Charles M. Schwab is to the same effect. The latter (volume 11, p. 4175) says:

"From the moment when I first started with Mr. Morgan, the question of our gaining a monopoly or in any way controlling the steel industry was never mentioned. My whole argument with him, as advocating this company, was the economic development of the same, and the matter, to the best of my knowledge, never came up thereafter."

And in this connection it is to be noted that the poofs show that the Carnegie Company and the finishing companies which the Steel Company acquired in 1901 were formed at various times from 1898 to 1900, that (volume 12, p. 5754) these particular companies (volume 28, p. 11759) were made the subject of congressional investigation, that no steps were taken by the government to dissolve such companies for the 13 years following the formation of the earliest of these companies, and 11 years from the latest, until 1911, that the Steel Company was also in 1905 made the subject of further congressional investigation, and that no steps were taken to dissolve it until this bill was filed.

Recurring, therefore, to the particular question with which this particular part of his opinion deals, namely, whether we should now enter

a decree dissolving the Steel Corporation on the ground of its inherent illegal character in 1901, and whether we should also dissolve the several constituent companies which it acquired on the like ground of their original inherent illegal character when they were formed, we think there is ground for our holding, in view·of the facts, proofs, and views above set forth, that we are not, as a court of equity, warranted in taking such a drastic course as to now decree the dissolution of the Steel Corporation or its constituent companies.

We are, however, pointed to the subsequent acquisition by the Steel Company of several properties as being attempted monopoly or restraint of trade, and as evidencing an original purpose to monopolize and restrain. The first of such was in August, 1901, when the Steel Company bought the Shelby Steel Tube Company. Whatever may have been its motive at the outset, it is clear the purchase effected neither monopoly nor restraint of trade, for we have already seen that while, even with the acquisition of this company, the Steel Company's output of seamless tube, during the ten years of its existence, has doubled, during the same period its competitors' sales have grown sevenfold. In the light of such figures and facts, we are of opinion that the acquisition was simply in the due course of normal business, and, indeed, was but the virtual carrying out of integration plans of the Carnegie Steel Company that long antedated the formation of the Steel Company. Without entering into minor details, we may say that no proof of monopoly or trade restraint was shown beyond the conceded fact of purchase, and the fact that the new article of seamless tubing was in some uses supplanting lap-weld. We have examined, among others, the testimony found in Government Exhibits, volume 2, pp. 405, 411, 560, 562; Government Exhibit, volume 14, pp. 2902, 2823; volume 11, pp. 4198, 4199; .volume 13, pp. 5237–5260; volume 17, p. 7940; volume 13, pp. 5076–5089; volume 12, p. 4803; volume 13, p. 4986; Delaware v. Shelby, 160 Fed. 928, 88 C. C. A. 110; Shelby v. Delaware (C. C.) 151 Fed. 64; Delaware v. Shelby, 212 U. S. 580, 29 Sup. Ct. 689, 53 L. Ed. 659; and Defendants' Exhibit No. 31, volume 1, p. 166—and therefrom, without entering into details we deduce these conclusions. The old type of tubing was called "lap-weld," and made by the National Tube Company. The Shelby Company made a different article, called "seamless" tube. While in some ways lap-weld and seamless were in competition, yet their main uses (volume 13, p. 5803) were not the same. The Shelby Company held a basic patent·involving the piercing, at an early stage, of the billet from which the seamless tube was drawn. Before the purchase of the Carnegie Steel Company by the United States Steel Corporation, the former company, in pursuance of its purpose to enter the pipe business, was carrying on some experimental work in seamless tube making at the Shelby Company's plants, and its management had become convinced that the Shelby method was the proper one. Meanwhile the National Company had also determined to enter the seamless tube field, and to that end had bought the Standard Company. The latter made seamless tube under a patent granted to two former employés of the Shelby Company. Its business in the seamless tubes was (volume 13, p. 5083) very small, and it had (volume 19, p. 7940) previ-

ously tried to consolidate with the Shelby Company. Much patent litigation had resulted; the National Company carrying on the contest for the Standard Company.

When the Steel Company was formed, two divergent views were thus presented by the managements of two of its units. The National Tube, represented by Mr. Converse (volume 13, pp. 5243, 5244), contended the Standard's process and machinery was the proper mode of seamless tube making. The Carnegie Company, represented by its president, contended the Shelby method was the proper one. The determination of the matter seems to have been made by two directors of the Steel Company who had taken no part in the contest between the National Tube Company and the Carnegie Steel Company. Their testimony (volume 13, p. 4936, and volume 12, p. 4803) is that they became convinced that the patent of the Shelby Company controlled the situation. That company would only sell its patent, however (volume 12, p. 4805), if the Steel Company also bought its plant. Such purchase the Steel Company made in order to get the patent. In view of the fact that the Shelby patent has been sustained by the courts, that the Steel Company on its purchase abandoned the machinery used by the Standard Company, and has since manufactured under the Shelby process, we are satisfied that the acquisition of that company was an ordinary purchase, and had no other purpose than to acquire and use the legal monopoly which the Shelby Company had obtained from the government by its patent. And a purpose to restrain and monopolize the pipe business is negatived by the fact that no monopoly has resulted and that pipe (volume 11, p. 4481) sells for $20 a ton less than when the Steel Company was formed.

The next matter in the line of alleged monopoly and trade restraint was the purchase by the Steel Corporation of the Union Steel Company in December, 1902. The testimony bearing on that question on the part of the government will be found at volume 3, pp. 1086 to 1137; volume 5, pp. 1997 to 2009; volume 6, pp. 2141 to 2218; Government Exhibit, volume 4, pp. 1574, 1583; volume 5, p. 1883; and on the part of the Steel Company in volume 14, p. 5666; volume 12, pp. 4806 to 4810; volume 10, pp. 4037 and 4038. Without here discussing the testimony on the part of the Steel Company, we may say that the proof on the part of the government in itself shows that this sale was not made with any purpose of monopoly or trade restraint. The Union Steel Company had merged with the Sharon Steel Company. John Stevenson, Jr., who was the practical man in the Sharon Company, testified that such competition as there was between those companies and the defendant Steel Company was fair:

"I liked the competition. If you are bound to have competition, theirs was good competition."

He said he sold out his interest in the Union Company because he needed the money; that he had put more money into the enterprise than he owned and was hard up; that the effort to sell came from his company; that the sale was made on fair terms, cost and accrued profit. Their ore holdings were very valuable, had been definitely ascertained by spot borings, were owned in fee, and were sold in place at a price

based on the common ore royalty. He says that at the time of the sale the Union was only one of a number of competitors, all of whom were flourishing and doing an increased business, such as the Pennsylvania, Cambria, Bethlehem, Lackawanna, the Republic, and Jones & Laughlin. That his company's business with relation to the country's total production was less than 2 per cent., and that the Steel Company's percentage has decreased, and its competitors' percentage had increased, during that time. The testimony of Mr. Whitla, one of Stevenson's associates, is to the same effect, namely, that the competition of the Steel Company was fair, and that the business of the Union Company had grown to such an extent as to interfere with his own and some of his associates; that the sale was made at a fair price when the opportunity came to withdraw. To the same effect is the testimony of W. H. Donner. He started the Union Steel Company, was its practical man, and after the sale re-entered the steel business as president of the Cambria Steel Company, one of the principal competitors of the Steel Company. He says the Union Company, after its merger with the Sharon, had large ore reserves of very desirable quality; that they had valuable lake frontage harbor lands, and fine coking coal reserves; that they had large open hearth facilities (volume 12, p. 4806) in which the Carnegie Company was short; that they also had finishing mills in which the American Steel & Wire Company were short and which it needed (volume 12, p. 4807; volume 10, p. 4037), in foreign trade; that these finishing mills were adapted to using Bessemer steel with which the Carnegie Company was oversupplied; that the Carnegie Company (the Steel Company's subsidiary) had an overcapacity of Bessemer and an undercapacity of open hearth is conclusively shown by the subsequent integration of the Steel Corporation at Braddock (in the same district as the Union), where $11,000,000 was required in open hearth extensions. In that regard the proof (Farrell, volume 10, p. 4077) is:

"We are building at Pittsburgh a new steel works, a rail mill at Braddock, Pa., with a capacity of 750,000 tons a year of open-hearth steel; that is, to take up the rail business. This Bessemer equipment is obsolete; that is, the equipment is just as good as new, but the demand does not exist, so consequently we cannot employ it, and it necessitates producing steel that is required by the buyers. We are spending there about $11,000,000."

Donner says the movement to sell came from the Union Company, and not from the Steel Company; that he knows the Steel Corporation people were at first opposed to buying, and only changed their minds when shown how the Union would supply, as above stated, the features in which the former were short; that, in order to induce the Steel Corporation to buy, the Union Company was obliged to cut down their ore prices $1,500,000 below what these properties had been valued at when his company and the Sharon merged; that of the four men in the original Union Company he was in favor of selling in order to get out of debt, one of his associates was very anxious to sell, and in fact brought about the sale, because he was in an embarrassing position, because his connection with both the Union Company and the Steel Company prevented him from taking part in the affairs of either; that his other two partners were opposed to selling, and only acceded

to it on account of their personal relations to the partner who desired the sale. Without here detailing the defendant's testimony at length, which we may say corroborates the foregoing, we are of opinion that the purchase of the Union Company was a natural and normal acquisition, incident to the growth, increase, and needs of the Steel Corporation's business, and was not done with a view to monopolizing the steel business, or to restrain trade by eliminating competition. And we may say that this conclusion is in accord with the subsequent acts of the Steel Corporation. The proofs show (volume 10, p. 4037) that some $2,225,000 was spent by the Steel Company to further increase the Union wire plants and meet the needs of the company's foreign business. The whole wire capacity of the Union's wire plants (volume 10, p. 3845) is now being operated to the capacity of 83,000 tons of wire for foreign trade against 8,000 tons when it was bought. In connection with the work of these finishing mills, about a million and a half dollars were spent in open-hearth construction by which the finishing mills and furnaces—blast and open-hearth—were integrated into a continuous process. Indeed, the need of this plant to carry out the general unification problem of the Steel Company is shown by the fact (Donner, volume 6, p. 2185) that subsequent to its purchase of the Union Steel Company the Steel Corporation spent nearly $7,000,000 in extensions in view by the Union, and $10,000,000 in extensions planned after the purchase.

We next turn to the acquisition in May, 1904, of the Clairton Steel Company. The Crucible Steel Company was engaged in the manufacture of tool and finer grades of steel (volume 13, p. 4953), which the Steel Corporation did not make. In the spirit of complete integration which swept over the steel trade, the Crucible Company, as the sequel clearly shows, had in 1902, mistakenly through the Clairton Company, whose stock it owned, gone into ore ownership, furnace, open-hearth, bloom, billet, and slab integration on a scale far beyond its own requirements. In January, 1904, the Clairton Company had become insolvent and passed (volume 5, p. 2059; volume 14, p. 5669) into the hands of a receiver. The proofs (Government Exhibit, volume 2, p. 599; volume 14, p. 5587; volume 12, p. 4814; volume 13, p. 5236) show that several efforts had previously been made by the Crucible Steel Company to sell the Clairton Company to the Steel Corporation. That company declined to purchase. After the receivership, the negotiations were resumed with it and other interests (volume 5, p. 2061), and the property sold to the Steel Corporation with the permission (volume 5, p. 2061) of the court at $4,000,000 below cost. Clairton had a pig-iron capacity of some 420,000 tons. It had (volume 12, p. 4814, and volume 13, p. 5236) through its type of furnace construction been able for the first time to make pig iron from Mesaba ores without any mixture of old range ores. In connection with this sale, it should here be stated, as a matter of which this court cannot but take judicial notice, that the receivership of the Clairton Company and the sale of its property was under the direction of one of the judges now sitting in this case; that the bonds of the insolvent company were guaranteed by the Crucible Company; that, while the latter company was and has since

been prosperous, the guaranty by it of the Clairton Company's bonds seriously threatened not only the stockholders of the Crucible Company, as testified in this case (volume 14, p. 5669), but grave financial troubles in the community. To avoid these, the receivers, under the direction of the court, and in co-operation with the officers of the Crucible Company, sought to have the Steel Company buy this plant and thus relieve the Crucible Company of its large and threatening collateral liability.

The next of these acquisitions by the Steel Company, which it is alleged was made to monopolize or restrain trade, is known as the Great Northern ore lease, which was a lease on royalty of some thirty-nine thousand acres of Lake Superior ore lands in August, 1907. This lease provided for the payment of a minimum royalty of 750,000 tons to be mined in 1907, 1,500,000 tons in 1908, and an increase of 750,000 tons each year until 8,250,000 tons was reached in 1917. That yearly amount was then to be taken out until the lease ended in 50 years. The royalty was, using round figures, $1.17 per ton on 49 per cent. ore, $1.21 on 50 per cent., and $1.98 on 66 per cent. ore, with an increase of 3.4 cents per each year on all grades. The lease provided the Steel Company had the option to cancel it as of January 1, 1915. During that time the lessee had full rights to test the premises. In pursuance of such right of cancellation, the Steel Corporation early in 1911, and prior to the filing of this petition, gave notice of cancellation, in pursuance of which the lease was subsequently surrendered. It will thus appear that, whatever effect the leasing and continued control of this ore on the fact of the monopolization of ore reserves may originally have had, the surrender of the lease lessened the ore holdings of the company to a point far below any possibility of monopolization. A discussion by us of the question of the possible effect of this lease as giving monopolistic control would be problematical, and the uncertain character of any conclusion reached is best emphasized by the essentially different status of the ore business now and when this lease was made. This is due to the subsequent development of other fields and to the fact that ores which a few years ago were looked upon as not usable can now be used under new methods. Moreover, the facts cited in the former part of this opinion, in reference to the ore supplies of the competitors of the steel corporation, show not only that several of the large companies had a reserve for more years than the Steel Company, that the seaboard companies are wholly independent of the Lake Superior regions, and that the Steel Corporation's competitors have from time to time been able to acquire all additional ore reserves desired. In addition to this, we have the fact of large holdings by mining companies, who sell ore and who have been compelled (volume 16, pp. 6548 and 6544) to integrate into blast furnaces in order to dispose of it. The proofs of experienced witnesses (volume 16, p. 6232; volume 17, p. 7012) are that adequate ore reserves could be had by new companies. In view of these facts and proofs, and of the fact that the option to cancel the ore lease here in question had been exercised when the present petition was filed, it would seem that the ore reserve of the Steel Corporation held at that time gave it no monopoly in ore. Such being the

case, the ore lands in question having reverted to the owners, they and such defendants as were made parties to this cause by virtue of their relation to the acquisition of such ore lands appear to have no further part in this cause. So far as they are concerned, the petition will be dismissed.

We shall next consider the purchase by the Steel Company of the Tennessee Coal & Iron Company which was made in November, 1907. On the one hand, it is alleged the Tennessee Company was a competitor of great power and that its purchase was for the purpose of suppressing competition and effecting monopoly and restraint of trade. On the other hand, it is contended that the competition of the Tennessee Company was of relatively small extent, that its purchase was practically forced upon the Steel Company as a means of averting a threatening financial crisis during the panic of 1907, and that such purchase neither did, nor tended to, monopolize or restrain the steel and iron industry of the United States. Without here entering upon a detailed analysis of all the proofs, we may say that we have specially studied, in addition to other proofs, the evidence produced by the government and found at Buell, volume 1, pp. 15 to 34; Topping, volume 2, pp. 643–671 and 686–718; Perin, volume 2, pp. 792–982; Same volume 3, pp. 983–997, also 1005–1008, also 1016–1019, also 1024, 1025; Gov't Exhibit No. 90, vol. 1, p. 242; Gov't Exhibit, vol. 2, pp. 488, 493, 510, 544; Corey, volume 8, pp. 2973–2975; Alos, pp. 3045–3056; Grasty, volume 8, pp. 3140, 3153; Gov't Exhibit No. 341, vol. 8, p. 2132 (in that connection see Topping, volume 2, pp. 706, 709, 712, 714, 716, 755); also, Gov't Exhibit, vol. 2, pp. 488, 492, 510; and also the testimony produced by the Steel Company, to wit, Filbert, volume 14, pp. 5591–5593; Farrell, volume 10, pp. 4018, 4020, 4021, 4024, 4028; Witherbee, volume 18, pp. 7287–7290; Bowron, volume 25, pp. 10415, 10431, 10440, 10442; also, volume 20, p. 10408; Crawford, volume 13, pp. 6125–6178; Burr, volume 27, pp. 11573–11586; King, volume 25, pp. 10249–10260; Haas, volume 20, p. 8316; Farrell, volume 10, p. 3881; Defendant's Exhibit No. 12, vol. 1, p. 138—bearing on the question of monopoly and trade restraint as contended for by the government, and have arrived at the following conclusions: At the time the Steel Company bought the Tennessee Company, the latter's production of iron and steel was 1.7 per cent. of the production of the country. That up to that time the Tennessee Company had not been a business success. That it was making rails, which was its principal steel product, at a loss. That its ultimate success was problematic. That such success involved an outlay of upwards of $25,000,000 to put it on a dividend basis. That it had never really earned any dividends up to the time of its sale. That the whole testimony shows its relation as a successful, substantial competitor with the Steel Company in the volume of its business, the character of its product, and the breadth of its market, was negligible. We are warranted by this testimony, and find the fact to be, that its purchase by the Steel Company in no way tended to monopolize the steel and iron trade, and that it was not bought with the purpose or intent of monopolizing, or attempting to monopolize or restrain, that trade. Such negative conclusions and findings are con-

firmed by the affirmative proofs showing just how the purchase was made, namely, as a necessary part of comprehensive plans of bankers and business men, sanctioned by President Roosevelt to check the panic of 1907, which was then at its height. Without entering into details, we may say the situation was summed up in the letter of President Roosevelt to Attorney General Bonaparte, found in Gov't Exhibit No. 339, vol. 7, p. 2125, as follows:

"November 4th, 1907.

"My Dear Mr. Attorney General: Judge E. H. Gary and Mr. H. C. Frick on behalf of the Steel Corporation have just called upon me. They state that there is a certain business firm (the name of which I have not been told, but which is of real importance in New York business circles) which will un-doubtedly fail this week if help is not given. Among its assets are a ma-jority of the securities of the Tennessee Coal Company. Application has been urgently made to the Steel Corporation to purchase this stock as the only means of avoiding a failure. Judge Gary and Mr. Frick inform me that as a mere business transaction they do not care to purchase the stock; that under ordinary circumstances, they would not consider purchasing the stock because but little benefit will come to the Steel Corporation from the purchase; that they are aware that the purchase will be used as a handle for attack upon them on the ground that they are striving to secure a monopoly of the busi-ness and prevent competition—not that this would represent what could honestly be said, but what might recklessly and untruthfully be said. They further inform me that as a matter of fact the policy of the company has been to decline to acquire more than 60 per cent. of the steel properties and that this purpose has been persevered in for several years past, with the object of preventing these accusations, and as a matter of fact, their proportion of steel properties has slightly decreased, so that it is below this 60 per cent. and the acquisition of the property in question will not raise it above 60 per cent. But they feel that it is immensely to their interest, as to the interest of every re-sponsible business man to try to prevent a panic and general industrial smash-up at this time, and that they are willing to go into this transaction, which they would not otherwise go into, because it seems the opinion of those best fitted to express judgment in New York that it will be an important factor in preventing a break that might be ruinous; and that this has been urged upon them by the combination of the most responsible bankers in New York who are now thus engaged in endeavoring to save the situation. But they as-serted they did not wish to do this, if I stated that it ought not to be done. I answered that while of course I could not advise them to take the action proposed, I felt it no public duty of mine to interpose any objection.

"Sincerely yours,                                    Theodore Roosevelt."

When called by the government as a witness, President Roosevelt (volume 8, pp. 2903–2908) testified as to this letter as follows:

"I was dealing with a panic, and a situation where not mere merely twenty-four hours, but one hour, might cause widespread disaster to the pub-lic. * * *

"I ought to say that from New York I had been told by banker after banker that the Tennessee Coal & Iron Securities were valueless as securities that counted in that panic. * * *

"There were two matters to which my attention was especially directed. One was the condition of things in New York, the relief that the action would bring, not merely to New York, but throughout the entire country—just as much in Louisiana and Minnesota and California as in New York. That was one thing. The other thing to which my attention was particularly directed was the percentage of holdings that the Steel Corporation had and had had and would have after the Tennessee Coal & Iron properties were acquired. * * *

"The knowledge that I had was that the Steel Corporation had some years previously possessed nearly 60 per cent. of the holdings of the steel industry in the country; that its percentage had shrunk steadily; that the addition of

the Tennessee Coal & Iron Company, which was something in the nature of 4 per cent., somewhere between 2 and 4 per cent., I have forgotten the exact amount, somewhere around there, did not bring up the percentage of holdings of the Steel Corporation to what it had been a few years previously. * * *

"My knowledge was simply this, that it was a matter of general opinion among experts that the Tennessee Coal & Iron people had a property which was almost worthless in their hands, nearly worthless to them, nearly worthless to the communities in which it was situated, and entirely worthless to any financial institution that had the securities the minute that any panic came, and that the only way to give value to it was to put it in the hands of people, whose possession of it would be a guaranty that there was value to it. * * *

"I believed at the time that the facts in the case were as represented to me on behalf of the Steel Corporation, and my further knowledge has convinced me that this was true. I believed at the time that the representatives of the Steel Corporation told me the truth as to the change that would be worked in the percentage of the business which the proposed acquisition would give the Steel Corporation, and further inquiry has confirmed me that they did so. I was not misled. The representatives of the Steel Corporation told me the truth as to what the effect of the action at that time would be, and any statement that I was misled, or that the representatives of the Steel Corporation did not thus tell me the truth as to the facts of the case, is itself not in accordance with the truth."

An examination of the testimony, viz., letter of the Attorney General of the United States of November 4th, cited by the President, volume 8, p. 2907; Gary, volume 12, pp. 4834–4866; Tierney, volume 4, pp. 1559–1587; Thorne, volume 3, p. 1276; Topping, volume 2, p. 695; Corey, volume 8, pp. 3052, 3054; Gayley, volume 9, p. 3618; Ledyard, volume 15, pp. 6065–6114—shows that the matter was as stated by the President, and that the Steel Corporation's chairman absolutely refused to purchase (volume 12, p. 4854), unless the matter was submitted to the government authorities, his testimony in that regard being:

"While the President of the United States could not say that we might purchase this, or that we should not purchase this property, yet, I believed, inasmuch as he had the general direction of the law department of the United States, certainly we ought to know what would be the attitude of the administration in case we did buy this property."

Indeed, as to this purchase, as well as the others, which we have discussed above, sales made under different circumstances and for various reasons, we cannot but feel, in the light of the proofs, that they were made in fair business course, and were, to use the language of the Supreme Court in the Standard Oil Case, "the honest exertion of one's right to contract for his own benefit, unaccompanied by a wrongful motive to injure others."

It is strongly urged that the fact that standard Bessemer steel rails have for a long series of years, covering indeed the whole life of the Steel Corporation, been sold at the uniform price of $28 per ton, shows some controlling influence, and, in connection with the proofs, evidences the existence of a combination among all rail mills, including the Steel Corporation, to control the price. Generally speaking, railroad rails are as to their basic character either Bessemer or open-hearth. Bessemer was the earlier development, and of this type is the standard Bessemer rail which has kept the above uniform price. The proofs show (volume 10, p. 4049) that about 30

per cent. of the rails sold are of this kind, the consumption having fallen (Defendant's Exhibit, volume 3, pp. 323, 324) from 99.9 per cent. in 1901, to 33 per cent. in 1912. As we have said, the proofs show that these standard Bessemer rails have been almost uniformly sold at $28, though there is some proof (volume 26, p. 10942) that they were at times sold for less. The open-hearth rail is a later development; it has largely superseded the standard Bessemer, constituting (volume 10, p. 4051) 60 per cent. of the rail product. It ordinarily sells (volume 10, pp. 4960, 4050) at from $1.50 to $2 per gross ton higher than the Bessemer standard rails, and the price of such open-hearth rails (volume 13, p. 4961) according to specifications. This is so (volume 10, p. 4050) "because many open-hearth rails are made to special analyses, the chemical composition is different, due to the fact that some railroads insist upon greater physical tests than others, which, of course, while the open-hearth process is the basic operation, nevertheless we call them different qualities of rails." The other 10 per. cent. of rails consist of alloy or electric rails, the cost of making which (volume 10, p. 4051) is $40 per ton; nickle alloy rails, which vary (volume 10, p. 4051) from $34 to $60 per ton; and manganese, which sell for from $100 to $130 per ton, depending upon chemical analyses, they being especially made to serve for work on curves, under the shade of bridges, and other such trying places. It will thus be seen there is a wide variation in the character and price of the great bulk, namely, of 70 per cent. of the country's rail product, and that the standard Bessemer rails which it is alleged evidenced price-control, are in fact but 30 per cent. of the total rail consumption. The testimony (volume 13, p. 4959) throws some light on the uniform price of this remaining 30 per cent. of the standard Bessemer rails, namely, that $28 a ton is a foundation price from which the price of other rails, varying in specification and chemical requirements, can be figured. Another cause of price uniformity in rails, the proof (volume 13, p. 4960) shows is due to the change about 1900 in reference to freights; prior to 1900, there was an opportunity to bargain for transportation which was at no definite fixed price. Since 1900, by government regulation, railroads can no longer trade in transportation at varying figures. The extent to which special freight rates entered in the sale of rails prior to 1900 is illustrated by the incidents elsewhere referred to, where the proofs (volume 10, p. 3882) show that a special freight rate of 45 cents led to sales of rails being made from Chicago to Japan. The proofs also show that the real potential control over the price of rails is rather in the buyers than the makers of rails. Reflection will show why this is so. Freight rebating being out of the question, the price of a rail becomes purely a manufacturing question. A railroad is not compelled to buy its rails at once. It can defer its purchases, and the proof is that, when a large railroad like the Pennsylvania (volume 13, p. 4958) or the New York Central (volume 12, p. 4910) gives an initial order to one rail company, that sets the price of rails for other rail companies. At the argument of this case, in response to inquiries by the court,

it was stated that the Pennsylvania Railroad was a large stockholder in the Pennsylvania Steel Company, to which company reference was made in the first part of this opinion. Such being the case, it would seem as a business proposition that that road would be quite independent of any exaction in rail prices, and the fact and significance of this independence may be well connected with the proof that in the previous era of destructive rail price-cutting, there had been by means of such price-cutting an intent to drive the Pennsylvania out of business, and that company had been forced into a receivership. But whatever may have been the rail pool practices prior to the formation of the Steel Corporation, and in the earlier years following its formation to restrain or obstruct the rail trade, the proof in this case shows that in 1900 a new method of rail buying was begun, and was for some years prior to the filing of this bill prevailing between the railroads and five or six companies that make rails. In that regard Percival Roberts, Jr., who was a director of the Pennsylvania Railroad, testified (volume 13, p. 4957):

"During the presidency of Mr. Cassatt of the Pennsylvania Railroad, about the year 1900, he inaugurated a system for the Pennsylvania Railroad of making his purchases yearly at about the end of each calendar year for the succeeding one, and also proportioning his orders among the various rail mills, somewhat along the lines of their respective freight tonnages (see volume 10, p. 3996), not exactly accurately in regard to the latter point. This was done partially from the fact that they established a system of yearly budgets for their ensuing year's work, and they did it for the reason that they desired, as far as possible, to give uniform treatment to manufacturers along the lines of their road. Prior to that time purchases of rails were made from time to time as requirements might warrant. Many of the other leading railroads of the country, upon the inauguration of this policy, pursued the same, so that from that period on rails have usually been bought within a very few months covering the entire subsequent year. This is a distinct change from the method of handling this business prior to 1900."

The practical working out of this plan is shown in the proof (volume 13, p. 4050), and discloses the fact that, while the standard Bessemer rail still keeps to a standard price, there is a difference in non-Bessemer, which latter rails, with alloys, nickle, and manganese rails, constitute 70 per cent. of the product. These non-Bessemer, "open-hearth rails are made to special analysis, the chemical composition is different, due to the fact that some railroads insist upon greater physical tests than others, which, of course, while the open-hearth process is the basic operation, nevertheless we call them different qualities of rails." In describing the method of arriving at the rail price of the four different years of 1910, 1911, 1912, and 1913, Mr. Farrell, president of the Steel Company, and Mr. McCrea, president of the Pennsylvania Railroad, themselves fixed the price for the special rails sold to that company. The former (volume 10, p. 4052) says:

"Most of the large trunk lines have their own specifications. The Pennsylvania Railroad Company, for example, buys about 250,000 to 300,000 a year. They have their own rail specifications prepared by their engineer. We charge them for their rails $30.55 a ton, which we consider a fair price for rails of that specification. * * * We tried to get a little more. In this instance we figured those rails ought to net us $30.85 a ton, but Mr. McCrea talked

to me about the thing, and said, 'Now, I think that we might shade this a little bit,' so that finally, it was just a question of merchandising, two people sitting down and trading across the table, the seller getting the best price he could, and the buyer getting the best price he could, and we received $30.55. We make these special qualities of rails for a great many people."

It will also be seen from other proof (volume 11, p. 4145; volume 26, p. 10834) that the fact of a rail mill being situate on the line of a railroad is naturally a large element in securing it as a rail buyer. Indeed, a study of the testimony—from which we refer to Shook, volume 25, p. 10491; Welborn, volume 26, p. 10937; Schwab, volume 11, pp. 4162, 4327, 4387; Smith, volume 19, p. 7940—satisfies us that, whatever may have been the practices of rail pools, combinations, etc., prior to 1900, and during possibly some of the earlier years of the Steel Corporation, the dealings between the railroads and the rail-making companies have been of later years on a competitive basis, individual railroads dealing with individual companies. The policy of the Pennsylvania Railroad Company of distributing the railroad's annual requirements on the basis of the freight furnished by each mill would seem to have put an end to the trade wars between rail mills when rails were sold below cost (Roberts, volume 13, p. 5015; Scranton, volume 8, p. 3200) and companies were driven into and threatened with bankruptcy. The proof is explicit (volume 11, p. 4162) that $28 has for years been accepted by the railroads as a fair base price for rails, and that they have asked no reduction. There is no proof that such price is unfair, and the proof (volume 11, p. 4165) is that the mill cost of rails is from $22 to $23 per ton. The testimony of one large railmaker (volume 11, p. 4162) that, in his judgment, rails are too low, has support from the fact testified to by the president of the Republic Iron & Steel Company, who says (volume 28, p. 12002):

"We quit manufacturing rails because there is no money in them. * * * (Volume 28, p. 12018.) I came into the Republic Company in 1906, and we had, according to my recollection, 50,000 to 60,000 tons of rails on our books which I did not care to produce. I saw possibilities of making money on something else, so I replaced those contracts; in other words, I bought the rails from other producers and satisfied my contracts, and changed the rail mill into a sheet and tin bar mill. That was in the early part of 1907, according to my recollection, or the latter part of 1906."

To the above manufacturing cost must be added overhead, interest, and depreciation. The general nature of the last item, particularly in the change from Bessemer (volume 10, p. 3857) to open-hearth, we have already seen. The proofs (volume 8, p. 3034) show that for several years the price of rails, $28, has been lower in this country than in France, Germany, Austria, Italy, and Russia. It will also be noted that the practice of rerolling rails, an industry that has lately sprung into existence (volume 10, p. 4028) and grown to large proportions, enables railroads to have their old rails rerolled into lighter sections, has, in its simple mills, created another factor by which the railroads can protect themselves. It would seem, therefore, that on the whole, the weight of these proofs would tend to show that at the date of the filing of this petition the price of $28, at which the standard Bessemer rail was selling, was not chargeable to the Steel Company

as a violation by it of the statute here involved. Indeed, in connection with the continuance of this uniform price of $28 for standard Bessemer rails, which, as quoted elsewhere in this opinion, was testified (volume 17, p. 7909) as being tacitly accepted and continued by the sales managers of different rail companies, we can readily see how rail manufacturers simply followed that basic price to prevent the ruinous rail wars of the past. In that regard one of them (volume 11, p. 4387) testified:

"There is not a manufacturer of rails in the United States to-day—I, for example, as a rail manufacturer, feel that if I were to vary that price of $28 for rails, which seems to have been recognized by all rail manufacturers as a fair price and giving a fair profit, if I were to vary that 10 cents a ton, I would precipitate a steel war, to use such a word or expression, that would result in ruining my works without any profit. Everybody by tacit and mutual understanding felt the same about that. * * * I would not vary the price of my rails under any circumstances, not if I knew it was to get 100,000 tons in order, for the reason that my competitor next door would put the price down $1 a ton, or $.50 a ton even, and we would be in a position where we would be running without any profit at all."

Under all the evidence bearing on this subject, we cannot regard the uniform price of $28 as the generally accepted price of a standard Bessemer rail evidences an unlawful restraint or control of price by the railmakers of the United States.

[5] We take up next the subject of the "Gary Dinners," which (as already stated) we have reserved for separate treatment. We use the term to cover a comparatively short period, beginning at an exceptional business situation, and continuing until normal conditions were re-established. These dinners—which were business meetings with a social aspect—began in November, 1907, and were held at irregular intervals during the next 15 months, and perhaps a later date. We speak of a later date, because the government understands the term to cover committee meetings, also with some other gatherings, which were held infrequently until early in 1911. Probably it will be sufficient to say that, whether the period was longer or shorter, the element that marks it and calls for consideration now is what may be called the "co-operation" of the Steel Corporation with a large number of independent competitors, who, it will be noted are not made parties to this bill, and who comprise some 45 per cent. of the steel and iron industry of the United States. This is the only instance of such co-operation, and the whole movement was exceptional. There is some dispute in the briefs concerning the essential characteristics of these meetings, but, in our opinion, the real facts appear with sufficient clearness.

We may begin the discussion by quoting the government's concession in the original petition:

"It is not here alleged that merely assembling and mutually exchanging information and declaration of purpose amount to an agreement or a combination in restraint of trade."

With this concession we are in full accord. In these days every large business has its societies and associations, and these meet periodically to exchange information of all kinds, to compare experiences, to take note of improvements in machinery or process, to discuss

problems, and generally to profit by the interchange of ideas and the study of observed facts. When the business is manufacturing, of course, all this has a direct bearing on the subject of prices, and these conferences may therefore consider that subject specifically. It is probably unusual, however, to find such a meeting making a declaration of intention to charge such and such prices, although a mere declaration to that effect could hardly be regarded as unlawful. Freedom of speech and freedom of individual action are justly prized in American society, and no legislation forbids men to come together and speak freely to each other about every detail of their common business. And if each individual should choose to announce at such a meeting the specific price he intends to charge for his wares, we are aware of no law that forbids him so to do. But at this point we approach debatable ground, for an individual is permitted to do some things that are denied to an association of individuals; and where at a meeting of many persons such action is taken whose legality is afterwards called in question, the decision may be vitally affected by ascertaining the fact whether the action was really taken by each individual acting for himself, or whether those present were, in fact, pursuing a common object.

This country has always been committed to the principle of fair and real competition in business—the struggle between individuals to sell goods in a market free from artificial control or influence—and the Sherman Act merely repeats this principle when it condemns, in the first section, "every contract or combination in restraint of trade." When, therefore, individuals or corporations make distinct contracts with each other, either in the form of pools or other agreements, dividing territory, limiting output, or fixing prices, there can be no question about the illegality of such contracts. And it makes no difference whether or not the agreement attempts to fix a penalty for its breach. The essence of the offense is that agreement; the penalty is merely an incident; so that a so-called "gentlemen's agreement" to divide territory, etc., is quite as illegal as a formal pool with a formal penalty. In a gentlemen's agreement the sanction is the sense of honor, the moral obligation, the indefinite, but real, force that in some instances compel persons to keep their promises simply because they have promised.

But suppose what happens is this: A number of persons take no action about territory or output, their discussions being mainly concerned with the subject of price, and suppose, further, that they refrain from making a definite formal agreement, and limit themselves to an understanding, a declaration of purpose—an announcement of intention—what, then, is to be said? Have they offended against the law? This question cannot be answered until we know what the participants were really doing. It is not enough to rest upon the varying names that may be given to the transaction. It is of the utmost importance to know how these names are to be interpreted, and this is the crucial matter to be looked for in the present record. Fortunately we find no material dispute on this point after we get below the mere surface of much that has been said by the witnesses.

The first Gary Dinner was held in November, 1907, at a time of unusual financial danger, when the threat of a serious panic was still in the air, and when ruin to many important interests was by no means improbable. The meeting was attended by representatives of from 90 to 95 per cent. of the iron and steel trade, including the corporation and a large majority of its competitors, and the course of the meeting has been described by several of those in attendance. Charles M. Schwab, now president of the Bethlehem Steel Company (volume 11, p. 4194), testified:

"The steel trade promised to become in a very demoralized condition. * * * Prices had gone very low. There was a very scant demand for steel. As I stated before, many people had their warehouses full of steel. When I say there was a demoralized condition, I mean people felt that the market was going to go very low, and they were loaded with stocks. In general, there was a very uneasy feeling throughout the whole situation.

"Q. To what class was this situation—to what class, I mean, of persons interested in the steel-industry, was this situation—particularly threatful?

"A. To the people who had stocks; the merchants of steel, the sellers of steel, the retailers.

"Q. The middlemen or merchants; the retailers?

"A. Exactly; the warehousemen.

"Q. Were they especially loaded up at that time?

"A. They were. * * * (Volume 11, p. 4195.) A. The keynote of the whole dinner was an address by Judge Gary, or rather a talk to all the members there, with a view of their not becoming panic-stricken; with a view of their not sacrificing the situation by too great a cut in prices, and a precipitation of bad business methods; that we ought to retain our heads and not become excited over a situation of that sort, and that we should calmly await the return of prosperity; that our usual pro rata of business would probably come to each one regardless of the prices at which it was done; and that it was unwise business policy and bad for the industry, and especially bad for. the people who carried stocks to precipitate and make worse such à demoralized condition. That was the keynote of everything that was said at that dinner.

"Q. Was anything said about entering into an agreement fixing prices or output?

"A. Nothing whatever.

"Q. Were prices mentioned?

"A. Not at all.

"Q. Was any price of any product mentioned?

"A. No; not at all.

"Q. I mean a definite price for a definite product.

"A. It was not discussed at all.

"Q. Only a general talk along the line mentioned?

"A. Just a general talk along the lines indicated.

"Q. Was it voted to appoint a general committee or subcommittees at that meeting to study and take care of the situation?

"A. I do not know whether those committees were appointed at the first meeting or not, but they were ultimately, I know. Committees were formed of people in the various lines of industry, people familiar with that particular line of industry, to take up in detail the keynote expressed at the first dinner."

James Campbell, president of the Youngstown Sheet & Tube Company (volume 5, p. 1853) says:

"Q. Now, Mr. Campbell, will you describe the conditions which existed when these meetings about which you have been questioned were begun?

"A. Prior to the first Gary Dinner, in the fall of 1907, there was a money panic in New York, as they called it. Money was very tight, and you could not get currency, and you could not get credit, and the conditions to the business man and to the banker were very grave at that time. Judge Gary called the leading manufacturers in the steel business. together at a dinner, and afterwards that was named the Gary Dinner.

"Q. Did the alarm as to these conditions exist among others than the manufacturers of steel and iron?

"A. Among everybody.

"Q. Was it felt by the banking interests throughout the country, by the small country banks, as well as the big banks in New York City?

"A. Yes; we had $1,750,000 on deposit with our bankers in New York and Cleveland and Youngstown at the time, and we were obliged to pay our men in clearing house certificates, rather than to try and draw that money out of the bank to pay them in currency. We felt that we ought to assist the banks to that extent in securing the currency, as it was almost impossible at that time to make up pay rolls and pay in currency.

"Q. Then the condition of affairs which existed at that time was a menace not merely to the manufacturers and the banks, but to the laboring man as well?

"A. To everybody—the laboring men and men in every class of business.

"Q. What were the conditions with respect to the jobbers especially with respect to stocks on hand; were they in danger?

"A. The jobbers had quite large stocks. It had been a very prosperous year, the largest year up to that time that we had known, and all jobbers and all consumers, as far as we could learn, had very large stocks of material on hand.

"Q. And a sudden and great fall in the value of those stocks would have been a great financial harm to those jobbers and consumers?

"A. Put about one-half of them, I think, in the hands of receivers, and would have carried down banks and business houses generally, besides bankrupting most of the small manufacturers, if they had suffered similar depreciations with reference to their material.

"Q. Were these conditions strong in the minds of you gentlemen when you commenced to meet, as you have described?

"A. They were. Those were the days when we were lying awake nights. I think everybody was alive to the situation, and everybody was alarmed.

"Q. Was there a desire on the part of you gentlemen meeting there to sink selfish interests for the general advantage in the situation?

"A. There was; yes; but it was a selfish interest after all. If we put our jobbers and consumers out of business, they would not be able to pay us for the material they already had bought from us. We all had large sums of money on our books, and nobody was in a position to pay anything at that time, and we were anxious to protect them in order to protect ourselves. It was not unselfish entirely, but, of course, I think we were all broad enough to feel that we wanted to protect the general country for the general good, because it would have been a bad thing for us, as well as anybody else, if we had had a panic that would have carried with it wreck and ruin all along its path.

"Q. Was the advantage hoped to be gained, if any was gained, that which followed from these meetings as great or greater to the independents as it was to the subsidiary companies of the United States Steel Corporation?

"A. I think it was greater to the independents, because I think it kept a number of them from going into the hands of receivers, and the corporation probably would not have failed even though they had had serious losses.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Was not the purpose of those meetings to enable every one present to form his opinion as to what was the best course to follow individually under the conditions which were bound to exist, with a full knowledge of those conditions as given by all the other members present?

"A. It was."

Judge Gary, chairman of the Steel Corporation (volume 12, pp. 4775, 4887) testified:

"The trouble ordinarily with a purchaser of our commodities is that he is obliged to stock up, so to speak; he has on hand large stocks of goods which he has purchased at a certain price, and many times he has purchased those goods by borrowing money at the banks. Now, if a wide and sudden fluctuation comes, the inventory value of his stock on hand is immediately decreased accordingly, and he has a very severe loss, and his bank calls upon him for the payment of his loan, and he is unable to do it because he cannot dispose of that stock at a reasonable price, or at a price which will return him the money he had invested. * * * Just to refer to the panic of 1907, we had repeated letters and repeated calls from people we were selling goods to, who had stocks on hand, and who were not in a financial condition to survive, if the demoralization which was threatened should become actual, asking us, so far as we could, to try and steady the market in order to prevent demoralization, which would bring great loss upon them, and in many cases absolute ruin. * * * The meeting was held shortly after the beginning of the panic of 1907, after the worst had passed, but while the effect remained to a less extent. We were importuned, or, I will say, we were requested, in various ways, by various consumers, to do all we could to prevent demoralization in business. Many of our customers reported to us they had large stocks of goods on hand, and, if the prices became demoralized, as they had in previous years, there was great danger of loss to them, and perhaps failure. In those days particularly iron and steel were considered the barometers of trade, so to speak, that is, the market for steel largely affected all other business conditions. In conversation at different times with bankers and others I knew the question was asked whether or not the steel business was going to pieces; whether we were liable to get into the condition that had obtained previously. We were all in very great danger of demoralization. I believed, if the iron and steel trade got into that condition, the panic would be long continued, and a great loss and injury would result, not only to the manufacturers of steel, but to every one else who was interested in the manufacture of steel or dependent upon the manufacturers.

"I might add to that we had on our books accounts receivable aggregating hundreds of millions of dollars, and of course an ordinary old-fashioned steel war meant destructive competition, the survival of the fittest and ruin, or at least the temporary suspension of a great many people, and would result in great loss to us and loss to all other manufacturers, great hardship to our employés, and very serious injury to the business world in general. * * *

"I stated the purpose and object of the meeting were if possible to prevent the demoralization of business. I stated that the first object of the meeting was to secure a better acquaintance with each other and come into close contact in order to know one another, hoping that we might deal with and towards one another as gentlemen and not as enemies. That the purpose was, if possible, to prevent demoralization of business, to secure as far as practicable stability of business conditions, as opposed to wide and sudden fluctuations, to prevent, if possible, failures on the part of our customers, and to comply with their wishes in every respect, to prevent, if we could, a long continuance of the panic, which meant failures to a great many people and manufacturers themselves, because of their debts at the banks or because of their commitments for extensions and to customers because of the large stocks they had on hand, the sudden change in the prices of which might be very damaging, and, so far as we properly could, to maintain or to assist in maintaining business conditions generally, the opposite of which should be deplored. I am giving you the substance of it. (Page 4894.)

*     *     *     *     *     *     *     *     *     *

"I stated distinctly * * * at that time that, as they all understood, we could not make any agreement, express or implied, directly or indirectly, which bound us to maintain prices or restrict territory or output; it must leave us free to do as we pleased, and must rely upon a disposition of all

others to do what they considered fair and right and for the best interests, not only of themselves, but all others who had any interest in that or any other work. I made that perfectly plain." (Page 4895.)

We think it likely that, if this first meeting had not been followed by others and by the appointment of committees to continue the association (loose as it was) that resulted from that meeting, no complaint would be heard from the government. But we think the evidence makes it plain that a period of co-operation, or action with a common object, did begin in November, 1907, between the Steel Corporation and the great majority of its independent competitors, and that this period was chiefly marked by an understanding concerning the maintenance of price. Other matters were discussed at various meetings, but the principal concern was the subject of prices, and other subjects were subordinate. Without quoting too freely from the testimony, we think the following extracts are typical: A representative of the Carnegie Company testified:

"Q. You were asked about whether you had any agreement, and you said, 'No.' What did you mean by agreement, in the sense that you answered that question?

"A. I meant a formal undertaking, either written or expressed by word.

"Q. What do you mean by a formal undertaking?

"A. I mean by a formal undertaking, an expression in a formal way.

"Q. In what way? I would like you to explain that.

"A. Either in writing, or by word of mouth.

"Q. What kind of an expression in a formal way? Do you mean something of the nature of a contract?

"A. I presume you mean by passing a promise?

"Q. No, I am not saying what I mean, but I am trying to get at what you mean.

"A. What I mean is this: That there was no absolute promise made by anybody.

"Q. That is what you meant when you said that there was no agreement?

"A. Yes.

"Q. I will ask you whether or not you left with the general understanding, each relying upon the other, that the prices announced would be maintained?

"A. Yes, sir. Yes, sir.

"Q. And what would interrupt the maintenance of that price according to that understanding that you left with?

"A. Usually one competitor would take some business away from another competitor.

"Q. As I understand you, that would be the occasion of another meeting?

"A. Yes, sir.

    *      *      *      *      *      *      *      *      *      *

"By Mr. Lindabury:

"Q. I will read from the bill in this case: 'It is not here alleged that merely assembling and mutually exchanging information and declaration of purpose amounts to an agreement or combination in restraint of trade.' I will mark that so you can read it and hand it to you (handing witness the paper referred to). My question—and you may pause to consider it if you choose—is whether or not, at any of these meetings you attended, beginning in the autumn of 1907, anything more was done than is there stated.

"A. No, sir.

"By Mr. Dickinson:

"Q. You said that you assembled?

"A. Yes, sir.

"Q. You exchanged information?

"A. Yes, sir.

"Q. And you declared purposes as to prices?

"A. Yes, sir.

"Q. I understood you to say, also, that you left, each relying upon the other that that price would be observed by them, and that the announcement of that price was made to the trade?

"A. Yes, sir.. (VI, 2505–2509.)"

A representative of the McKeesport Tin Plate Company testified:

"Q. .Was there or not what you understand as a gentlemen's agreement as to following the price that was named, until the next meeting?

"A. There would be a general understanding that we would do what we would say we would do—quote a certain figure until, as I say, we found reason to change it; and, if we found reason to change it, we would notify our competitors, or talk with them about it, when another meeting would be held and conditions discussed.

"Q. Another meeting would be held?

"A. Yes.  *  *  *

"Q. Would or not a price be suggested?

"A. A price would always be suggested.

"Q. State whether or not, before they left, there was any difference as to what each one said he was going to charge, or whether it would be the same.

"A. It was always unanimously agreed, or the statement was unanimous on the part of all that they would quote a certain price.  (V, 1777).

*    *    *    *    *    *    *    *    *    *

"Q. What would you do, if anything, in regard to the future prices?

"A. Then we would say: 'Well, we will quote a certain price until we find reason to change it.'

"Q. Then you would leave with the same understanding that each was going to sell at that price?

"A. Yes, sir.

"Q. State whether or not any one made any remark at any such meetings that if they cut the price it would be found out?

"A. I think we discussed that among ourselves in general.  I might say that, if any one quoted a lower price to a particular customer of mine than we did, I would find it out.  (Vol. V, 1778.)

*    *    *    *    *    *    *    *    *    *

"Q. Was it or not a part of your understanding, after these prices were announced, that you were under a moral obligation to sell at that price until you did notify your competitors?

"A. Yes, sir."  (V, 1793.)

Now to our minds the testimony taken as a whole makes the conclusion inevitable that the result of these meetings was an understanding about prices that was equivalent to an agreement.  We have no doubt that among those present some silently dissented and went away intending to do, what they pleased; but many, probably most, of the participants, understood and assented to the view that they were under some kind of an obligation to adhere to the prices that had been announced or declared as the general sense of the meeting.  Certainly there was no positive and expressed obligation; no formal words of contract were used; but most of those who took part in these meetings went away knowing that prices had been named and feeling bound to maintain them until they saw good reason to do otherwise, and feeling bound to maintain them even then until they had signified to their associates their intention to make a change.  We cannot doubt that such an arrangement or understanding or moral obligation—whatever name may be the most appropriate—amounts to a combination or common action forbidden by law.  The final test, we think, is the object and the

effect of the arrangement, and both the object and effect were to maintain prices, at least to a considerable degree.

We have said that this was the effect intended, and we believe it to be true, also, that in actual effect prices were more or less maintained. But it is quite as true that a large section of the trade paid little attention, if any, to this effort at co-operation. We need not quote again from the record to establish this point, for we have already made sufficient extracts earlier in this opinion. The testimony quoted on pages 84 to 88, will make it abundantly clear, we think, that, even during the period of co-operation, the prices announced and informally assented to at these meetings were not regarded at all by many manufacturers; for it is plain that the consumers who testified had no difficulty in buying at rates sensibly below the prices thus referred to. It is only fair to add that in our opinion the participants in this movement did not intend to act illegally. No doubt they did intend to exercise their full legal rights, but, of course, such exercise could not be wrong, and they believed they had succeeded in keeping within the proper limits. For the reasons given, we think they were mistaken; but we acquit them of trickiness or attempted evasion.

But the period of co-operation had passed away before the bill was filed, and as far as we can see it is not likely to be repeated. We do not think the Gary movement would justify us in imposing so drastic a penalty as the dissolution of the corporation; but we will, if the government moves for such action, retain the bill for the purpose of restraining any similar movement by the defendants that might be contemplated hereafter. We may perhaps suggest that under recent legislation Congress may have provided a sufficiently inclusive remedy for any future action that might have for its object the adoption or the maintenance of unreasonable prices.

In brief, the conclusions of the court are these: As to some of the defendants it is apparent the bill should be dismissed. Concerning the principal relief sought against the corporation and its subsidiaries, we are of opinion that the government has not made out a case that should be followed by a decree of dissolution, and we are also of opinion that sufficient reasons have not been afforded to justify us in now awarding an injunction. But, as already stated, if the government so desires, the court will retain jurisdiction of the cause for the purpose above outlined.

In concluding this opinion, we are requested by each of the members of this court to express the thanks of this court to all the counsel engaged in the cause and to record our appreciation of the labor on their part evidenced in their several briefs, digests, cross-references, indices, etc. It is but just to say that the thorough preliminary work on the part of counsel has greatly aided our labors and has enabled us within the limits of reasonable time, and without delaying our routine work, to reach a reasonably prompt determination of this cause.

A decree may be prepared in accordance herewith.

WOOLLEY, Circuit Judge, with whom HUNT, Circuit Judge, concurs. In an endeavor to state with brevity the matters of law and fact which have directed and controlled my judgment in this case, no

attempt will be made to review the great mass of testimony or to discuss the law bearing upon it.

[6] Whether the Steel Corporation is a combination in restraint of trade, or has monopolized, or has attempted to monopolize, commerce among the states in violation of the Anti-Trust Law, depends upon the inherent nature or effect of the combination, the evident purpose of its acts, or the intent to be inferred from the extent of the control secured over the industry, the method by which such control has been brought about, and the manner in which it has been exerted, resulting in prejudice to the public interests by unduly restricting competition or unduly obstructing the course of trade. United States v. Terminal R. R. Ass'n, 224 U. S. 383, 394, 32 Sup. Ct. 507, 56 L. Ed. 810; Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232; Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 179, 31 Sup. Ct. 632, 55 L. Ed. 663.

There is no question that the Steel Corporation is a combination. The question is, whether it is a "combination * * * in restraint of trade," and whether the corporation, its subsidiaries, and the individual defendants who actively engaged in its organization, monopolized, or attempted to monopolize, or combined with others to monopolize or restrain, trade within the meaning of the act. Inquiry to this end may be pursued along four lines:

First. Was the direct and necessary effect of the organization of the corporation to unduly restrain trade or create a monopoly?

The important business units which at or about the time of its organization comprised the United States Steel Corporation (which in default of a better term will be called the "constituent combinations") were the Carnegie Steel Company, Federal Steel Company, National Tube Company, American Bridge Company, National Steel Company, American Steel Hoop Company, American Sheet Steel Company, American Tin Plate Company, and American Steel & Wire Company. Each of these units was in itself a combination of concerns engaged in the manufacture of the same or allied products. The effect of the organization of these combinations was to suppress competition between their component parts, and the effect of the organization of the Steel Corporation, by embracing these combinations, was to give it a control over the industry equal in the aggregate at least to that which its constituent parts and their subsidiaries had theretofore possessed. The Steel Corporation therefore is a combination of combinations, by which, directly or indirectly, approximately 180 independent concerns were brought under one business control, thereby giving it not only the assets and business of that number of producers, but the advantage of their elimination from the field of competition. It is therefore pertinent to ascertain whether the amount of competition suppressed by the combination of producing units was so great, the percentage of business acquired so large, or the resultant control over the industry so potential, as in and of itself to constitute the Steel Corporation a monopoly, independent of any question of intent.

The inherent power or the direct and necessary effect of the corporation to unduly restrain trade must be gathered from what it did with the power it had during the period between the date of its organization and the date of the institution of this suit, and what it was unable to do with that power.

What the corporation did constitutes conduct, a subject which will presently be considered, and what the corporation did not do is so related to conduct that the two will be considered together. What the corporation had the power, or did not have the power, to do, must first be determined.

The power of the corporation may be ascertained by its position in the industry. Its position has doubtless been attained by a combination of forces, which may include high efficiency of plants, excellence of organization, capacity of employés, and its measure of control over raw materials and the production of finished products. As there can be no monopoly of efficiency and capacity, inquiry concerning the power of the corporation therefore leads mainly to its dominion over the raw materials and finished products of the industry.

The ore reserves acquired by the corporation at and subsequent to its organization, the relation which such reserves bear to ore bodies then existing and subsequently discovered, and their bearing upon the question of monopoly of raw materials, are matters which have been discussed in the preceding opinion, and with the reasoning as well as with the conclusion that the corporation has not a monopoly of the raw materials of the steel industry, I am in entire accord.

A more extended consideration of the power of the corporation, derived from its ore reserves, is unnecessary, further than to dispose of a transaction connected with the acquisition of certain ore properties.

[7] Prior to the organization of the Steel Corporation, John D. Rockefeller became interested in a number of ore properties in the Mesabi Range, in Minnesota, and in properties primarily intended for the transportation of ores to the market. These properties were the Lake Superior Consolidated Iron Mines, which owned a considerable group of iron ore properties in that region; a railway company running from Mesabi Range to Duluth, called the Duluth, Missabe & Northern Railroad Company; and a steamship company, owning a group of steamers plying the Great Lakes, called the Bessemer Steamship Company. The mining company owned the railway company. John D. Rockefeller owned $25/29$ of the stock of the mining company. He owned all the stock of the steamship company.

After its formation, the Steel Corporation contracted with John D. Rockefeller for the purchase of his interest and the interest of the other stockholders in the Lake Superior Consolidated Iron Mines and the Bessemer Steamship Company and paid for the latter $8,500,000 in cash, and for the former, stock of the Steel Corporation at the rate of $1^{35}/100$ shares of the preferred and $1^{35}/100$ shares of common for each share of the Consolidated Iron Mines, reckoned on a capitalization of $48,000,000; the current market price for the Steel shares being, respectively, 83 and 38.

John D. Rockefeller and his son, John D. Rockefeller, Jr., were made directors of the Steel Corporation. The former resigned in 1904, and the latter in 1910. John D. Rockefeller disposed of all of his stock, and John D. Rockefeller, Jr., disposed of a considerable portion of his stock in the Steel Corporation, acquired by the afore-recited transaction, prior to the filing of the bill in this case.

The bill charges the acquisition of the Consolidated Iron Mines and Bessemer Steamship Company subsequent to the organization of the corporation. It also charges generally that the individual defendants named in the bill, by the subsequent acquisition and control of proper-ties, entered into a combination with the corporation in restraint of trade; but in this connection the defendants Rockefeller are not named. The sole specific statement of fact in the bill with respect to the defend-ants Rockefeller relates to the sale to the corporation of stock of the Consolidated Iron Mines and the Bessemer Steamship Company, and the sole specific charge is that these defendants were largely interested in those properties, and that "both of them participated in bringing about the combination and became members of the first board of di-rectors of the corporation."

By the prayer of the bill, the properties acquired from the defend-ants Rockefeller are not asked to be returned to them, or that the sale be avoided, but that the ore properties of the corporation, which of course include those acquired from the defendants Rockefeller be di-vided among certain corporations contemplated by a decree of dis-solution in proportion to their capacity for the production of steel.

There is no evidence or assertion that the purchase of the Consoli-dated Iron Mines and the Bessemer Steamship Company, and inci-dentally the Duluth, Missabe & Northern Railroad Company, was in-cluded in the original scheme for the organization of the Steel Cor-poration, nor is there evidence which shows that the defendants Rocke-feller took part in the promotion or organization of the corporation. By stipulation with the government, it is in evidence that, at the time the bill was filed, the defendants Rockefeller had no relation of manage-ment or control to the Steel Corporation, and there is nothing to show that they were then, or are now violating or threatening to violate the statute.

We find that the transaction of the sale of the Lake Superior Consol-idated Iron Mines and the Bessemer Steamship Company was no part of the original plan for the formation of the Steel Corporation; that the transaction was not only in form, but was in substance, a sale; and that the single fact that the purchase price of one of the properties was paid with stock of the corporation does not alter the legal character of the transaction as a sale or prove that it was violative of the statute. We also find that the purchase of these properties from the defendants Rockefeller did not so increase the ore reserves and the transportation facilities of the corporation as to give it a monopolistic power over the raw materials of the industry. For the reasons given, we are unani-mously of opinion that the bill should be dismissed as to the defend-ants Rockefeller.

[8] Further inquiring whether the corporation inherently possesses monopolistic power attention is next given to its proportion of the manufacture and sale of finished iron and steel products of the industry. Upon this subject there is a great volume of testimony, a detailed consideration of which in an opinion would be quite inexcusable. As a last analysis of this testimony, it is sufficient to say it shows that, large as was the corporation, and substantial as was its proportion of the business of the industry, the corporation was not able in the first ten years of its history to maintain its position in the increase of trade. During that period, its proportion of the domestic business decreased from 50.1 per cent. to 40.9 per cent. and its increase of business during that period was but 40.6 per cent. of its original volume. Its increase of business, measured by percentage, was exceeded by eight of its competitors, whose increase of business, likewise measured by percentage, ranged from 63 to 3779. This disparity in the increase of production indicates that the power of the corporation is not commensurate with its size, and that the size and the consequent power of the corporation are not sufficient to retard prosperous growth of efficient competitors.

From the vast amount of testimony, it is conclusively shown that the Steel Corporation did not attempt to exert a power, if such it possessed, to oppress and destroy its competitors, and it is likewise disclosed by the history of the industry subsequent to the organization of the corporation that if it had made such an attempt it would have failed. It is also shown by the testimony that, acting independently and relying alone upon its power and wealth, great as they were, the corporation has never been able to dominate the steel industry by controlling the supply of raw materials, restraining production of finished products, or enhancing and maintaining the prices of either.

If in its early history the Steel Corporation, singly and alone, endeavored to dominate the steel industry in any one or several of the customary ways (and such is not disclosed by the testimony), it ceased early to rely upon its own power. In fact, its lack of power to dominate the industry alone is established by the methods it was forced to institute and pursue with respect to the important matter of the fixation of prices, the legality of which, in my opinion, becomes the main point of inquiry in the case. Instead of relying upon its own power to fix and maintain prices, the corporation, at its very beginning, sought and obtained the assistance of others. It combined its power with the power of competing corporations, and then with its competitors concerted, co-operated, contracted, and then by tacit understandings contributed to the establishment and maintenance of prices. The co-operation by the Steel Corporation with its competitors to fix and maintain prices neither sprang from its inherent nature, nor was it the direct and necessary effect of its organization. It constituted conduct, and conduct of the same character as that pursued by the corporation's competitors participating therein. The testimony does not show that the corporation in and of itself ever possessed or exerted sufficient power when acting alone to control prices of the products of the industry. The testimony abundantly shows that the power of the corporation to control prices was efficient only when in co-operation with its competitors. It has never

raised and maintained prices by its own action. It has done it only by joint action, and when joint action was either refused or withdrawn, the corporation's prices were controlled by competition. To the conduct of the corporation in fixing and maintaining prices by methods it with others employed the charge of violation of the statute is most pertinently addressed.

Distinguishing the power of the corporation from its conduct subsequent to its organization, I am of opinion, for the reasons here given, that in its inherent nature the Steel Corporation is not a monopoly, and that the direct and necessary effect of the organization of the corporation was not unduly to restrain trade.

[9] Second. Was an intent to monopolize or to unduly restrain trade shown by the circumstances which led up to and surrounded the organization of the corporation?

For several years preceding the organization of the corporation in 1901, the steel industry was undergoing a revolution in business methods. Combinations of manufacturers producing the same, as well as diversified products, were formed upon tremendous scales, embracing in many instances a majority, and in some instances nearly all, the producers of a particular product. This industrial revolution and the combinations which grew out of it have been explained upon two theories.

The first theory is based, as it is contended, upon the discovery made at or about that time that the economic manufacture of a finished steel product required the ownership of the raw material and the manufacture of the unfinished product by the same corporation, and the manufacture of the unfinished product required facilities for finishing the same in order to secure a regular and certain output. In other words, a necessity for integration developed, that is, the manufacture of steel products on a large scale, beginning with the ore and concluding with the finished product, to accomplish which aggregations of mills that produced different commodities were essential. That this was in the minds of the steel masters of that day is without question, and it is now contended by the defendants that to attain this was the object of the formation of the Steel Corporation.

The other theory advanced in explanation of the tremendous and rapid combination of steel-producing plants at that period, in which less regard was paid to combining plants producing diversified products than to combining plants producing the same products, is that by such combinations, competition in trade could be suppressed to an extent commensurate with the amount of trade combined, and that by the resultant control, prices could be raised and maintained that would yield great profits.

Much testimony has been produced in this case by the opposing parties in support of and in opposition to these opposing theories, a review of which within the limits of an opinion is quite impossible to be made. Evidence of the acts and things done at the time they were done, the character of the combinations made, and the results then and subsequently attained, as disclosed by testimony which corresponds in point of time with the doing of the things, carry to my

mind a greater probative force in determining the reasons for the combinations and the purpose of the organization of the Steel Corporation than explanations thereof made at after periods. There is much testimony given by witnesses, looking back over the history of the corporation and its constituent combinations, to the effect that the purpose of the organization of the constituent combinations and then of the larger combination, the Steel Corporation, was to assemble huge properties so as to procure perfect integration. Yet the testimony which impresses me most is that which relates to and concerns the things said and done preliminary to and connected with the organization of these various combinations at the time of their creation. These circumstances indicate that the various combinations were made upon a scale that was huge and in a manner that was wild. Properties were assembled and combined with less regard to their importance as integral parts of an integrated whole than to the advantages expected from the elimination of the competition which theretofore existed between them.

Without referring to the great mass of figures which bears upon this aspect of the case, it is clear to me that combinations were created by acquiring competing producing concerns at figures not based upon their physical or their business values, as independent and separate producers, but upon their values in combination; that is, upon their values as manufacturing plants and business concerns with competition eliminated. In many instances, capital stock was issued for amounts vastly in excess of the values of the properties purchased, thereby capitalizing the anticipated fruits of combination. The control acquired over the branches of the industry to which the combinations particularly related measured by the amount of production, extended in some instances from 80 per cent. to 95 per cent. of the entire output of the country, resulting in the immediate increase of prices, in some cases double and in others treble what they were before, yielding large dividends upon greatly inflated capital.[3]

[3] The organization of the constituent combinations, their overcapitalization, and the increase in the prices of their products are matters so complex in their recital, and embrace such a considerable portion of a record altogether unprecedented in size, that nothing more than a single instance can be briefly stated in a footnote.

The National Tube Company was incorporated in February, 1899. It was a combination of manufacturers representing from 80 to 90 per cent. of the production of iron and steel wrought tubes in the United States. (V, 1891, 1913; G. E., V, pt. II, 1785, 1794.) An expert valuation of the properties acquired, exclusive of the Western Tube Company, was the sum of $22,303,500. (V, 1867–72.) For the properties and plants, so valued at $22,303,500, personal assets estimated at $10,000,000, and $2,500,000 cash furnished by the promoters, making a total of $34,803,500, plus the value of a part interest in the Western Tube Company, the National Tube Company issued to the consolidation purchasers over $79,000,000 in stock. (G. E., No. 2, 381–384, 392–394.) Of the approximate amount of $40,000,000 of preferred and $40,000,000 of common issued to the consolidation purchasers for the properties acquired by it (G. E., II, 372–394), it appears that the common stock received by the consolidation purchasers to the amount of about $40,000,000 was to be distributed approximately as follows: To the vendors of the properties acquired, between $3,000,000 and $11,000,000 in excess of the cash valuations of their properties; to the syndicate in excess of the amount of cash furnished

The immediate, as well as the normal effect of such combinations, was in all instances a complete elimination of competition between the concerns absorbed, and a corresponding restraint of trade. That for a time during that period monopoly was created and trade unduly restrained in certain steel products by the combinations which almost exclusively produced them is seriously charged and not satisfactorily denied. Such was the common knowledge of those conversant with the steel industry; and, as many of the men who participated in the organization of such combinations participated actively in the organization of the Steel Corporation, it is difficult to believe that they did not know that to some extent, and probably to what extent, such combinations restricted and suppressed competition, and that they did not expect, by force of the multiplied absorption of trade and by the power resulting from the increased elimination of competition, the Steel Corporation would be enabled to fix and regulate the production and prices of all commodities in the industry. Such would seem to be a natural thing to expect of a combination of competing corporations which in themselves were combinations of competing corporations, and it is but fair to charge that those who created such a combination of combinations intended what in the nature of the situation would be thought to be its natural and probable consequence.

It was insistently urged by the corporation, both in the briefs and at the arguments of this case, that in the conversations between Mr. Schwab and Mr. Morgan preliminary to and during the negotiations for the combinations which were afterwards acquired by the Steel Corporation, no word passed between them concerning increased profits hoped for or expected to be derived from the elimination of competition, and that their discussions were addressed and limited to economies of manufacture and business. It is worthy of comment in this connection that, in so far as those conversations are repeated in the testimony, the word "integration" was not mentioned, and, excepting by inference, the idea of integration was not suggested by the one who gave, or by the one who responded to, the inspiration to create such a combination as the Steel Corporation. The purpose of its organization, in so far as it was expressed by either of those gentlemen, as disclosed by the testimony, was to acquire a number of mills in each of which to manufacture but one thing instead of many things, and to procure enough mills to make and manufacture every product in the steel industry, with the hope of acquiring the foreign trade. The precise reasons for the formation of such a combination, and the particular advantages to be expected therefrom, as

by it $5,000,000; to Morgan & Co., $3,500,000; and to the consolidation purchasers and Morgan & Co. for promotion between $20,000,000 and $28,000,000. The net earnings of the National Tube Company for the first six months were $7,909,060, a rate of 19 per cent. per annum on the capitalization of $80,000,-000; and the net earnings for the first fiscal year, after deducting expenses, depreciation, and reserve, were $13,878,364.69, which is something over 17 per cent. on its total capitalization. Before the formation of the National Tube Company the price of tubes was $30.00 a ton. During 1899, the year of its formation, the prices of tubes rose to $67 a ton, and in the early part of 1900, reached their maximum of $89.00 a ton (XXVII, 11390, 11391, 11426, 11427, 11433).

stated by Mr. Schwab to Mr. Morgan, in the conversations which are represented to contain the ideas which suggested and which justified the formation of the Steel Corporation, are:

"That instead, as was then the practice, of having one mill to make 10 or 20 or 50 products, the greatest economy would result from having one mill make one product and make that product continuously; * * * that various lines of steel should be so specialized; * * * that great economies would result from locating mills at the point of consumption by which the cost of transportation * * * would be reduced or saved; * * * that great economic results would follow from being able to manage these concerns in a manner that would stimulate the most effective effort in the management of the different concerns; * * * that the great export business of this country in iron and steel could only be done in that way; * * *" the companies to be acquired were "such as to cover all the branches of the industry, * * *" and that "successful manufacture was only possible where every single step in the line of manufacture was carried out by some one concern; and that for the greatest economy, for the greatest development of the business, it was an absolute necessity."

Continuing, Mr. Schwab said:

"I felt, furthermore, that great economies would result in all these general items of expense which are met in the manufacture of iron and steel on account of selling, traveling, office expenses, and all the general items of each individual concern which an individual line had to cover with a full organization. That could be covered by one such organization, and I felt that such economy would result in that direction, and indeed the whole line of my talk that evening was intended to show that the next great economic step to be made in the manufacture of steel—or indeed any business in general; I did not confine myself entirely to the steel business, directly to the steel business—but in general that the great economic result to be next obtained in manufacture was in the direction of these methods, and then I made that application generally to the steel industry."

Mr. Schwab then pointed out to Mr. Morgan the plants, which if acquired, "could be made ultimately to conform to this theory." It does not appear in the testimony just what plants Mr. Schwab suggested should be acquired, nor does it appear that Mr. Morgan acquired, or attempted to acquire, any plants of any independent producers of that day. It does appear, however, that Mr. Morgan proceeded immediately to acquire, not plants, but the huge combinations themselves which had but recently been formed, and which had but recently demonstrated their ability to suppress competition.

The objects of the formation of the corporation, as stated by Mr. Schwab, were those avowed at the time of its organization, and the things done to accomplish those objects must be accepted to have been done in the light of the situation as it then existed.

The declarations of Mr. Schwab with respect to the objects of the organization, and the conduct of Mr. Morgan and his associates in creating the corporation by combining the most powerful combinations which then existed, the conspicuous features of which were overcapitalization, and the elimination of competition, constitute evidence which must be considered in seeking the purposes for which the corporation was organized. That evidence, as against the testimony to the contrary, impels me to the opinion that the primary purpose of the organization of the Steel Corporation was not integration. Integration was a result of the organization, and afterward became a neces-

sity. When integration was undertaken it was but imperfectly accomplished by employing the units acquired. It was only perfected by building new mills at a cost of over $400,000,000. After a consideration of the character and conduct of the combinations absorbed by the corporation, and of the complete knowledge of the industries possessed by those who brought the corporation into existence, I am irresistibly drawn to the conclusion that the object of the formation of a corporation which embraced such combinations, and the intent of those who undertook its accomplishment, were to secure great profits by restraining trade in the manner and upon the scale thought possible in the light of the history of the constituent combinations.

The constituent combinations absorbed by the corporation were strongest at their birth. Their percentage of output and their corresponding control over their particular branches of the industry were greatest when organized, but diminished year by year in combat with competitors who entered the field against them, supplied with ample resources, equipped with modern plants, and unincumbered with obsolete or dismantled properties. As an illustration, the American Tin Plate Company, incorporated in December, 1898, was a consolidation of 39 plants with 279 mills engaged in the manufacture of tin plate. It is charged and not denied that at the time of its formation this combination comprised 90 per cent. of the tin plate manufacturers of the country, which controlled 95 per cent. of the total output of tin plate in the United States. The result was an immediate rise in the price of its product and a decrease in the number of its producing units. As a consequence of its policy, 86 mills of 19 plants, about one-third of the mills acquired, were promptly dismantled. Notwithstanding this initial and potential control over the product and prices of the tin plate industry, it nevertheless happened that while in 1899 the American Tin Plate Company produced 95 per cent. of all the tin plate manufactured in the United States, its control from that year gradually decreased until in 1912, its proportion of the manufactured output was but 53.7 per cent. After it was absorbed by the corporation, it ceased to rely upon its own power to fix and maintain prices, complete as was its power at first, and, like the other subsidiaries, was forced to co-operate with its competitors.

The experience of the American Tin Plate Company is illustrative of the history of various combinations absorbed by the Steel Corporation. It is likewise the explanation of the seeming anomaly that the corporation, at the time of its organization, in and of itself, possessed less power as a monopoly than certain of its constituent units possessed at the dates upon which they were respectively created. The absorption by the Steel Corporation of combinations which in themselves possessed monopolistic powers, potential in their beginning, though waning as they progressed, irresistibly draws me to the conclusion that those who organized the Steel Corporation expected to accomplish permanently what had been demonstrated could be accomplished temporarily, and thereby to monopolize and unduly restrain trade. But when organized, the corporation discovered that it was confronted by forces beyond its control, that it was affected by

trade laws and conditions which in its organization were either forgotten or ignored, and that therefore it was without the power alone to do what its organizers expected of it, and was immediately forced to resort to the old device of pools in order to control and maintain the prices of its products. I am of opinion that the circumstances which led up to and surrounded the organization of the Steel Corporation show that those who organized the Steel Corporation intended it to monopolize and unduly restrain trade.

Third. Was intent to monopolize or to restrain trade shown by the after conduct of the corporation?

There are a number of customary tests by which the existence of trade restraint may be ascertained and the extent thereof may be gauged. In applying these tests to the after conduct of the corporation, the testimony responds, in my opinion, by disclosing but one line of the corporation's conduct violative of the statute.

There is nothing in the evidence that suggests that the corporation used its power to gain advantage over its competitors by securing freight rebates. On the contrary, it appears that early in its history the corporation announced a policy and promulgated a rule against soliciting and accepting rebates.

There is nothing to show that the corporation increased its profits by reducing the wages of its employés. The increased volume and reward, as well as the improved conditions of labor, for which the corporation, at considerable length, takes credit to itself, have no bearing upon the issue of monopoly, except as they tend to prove that monopoly was neither attempted nor acquired at the expense of labor.

There is nothing in the evidence that suggests the corporation increased its profits by lowering the quality of its products. The testimony that the quality of the corporation's products has not deteriorated, but has improved, is pertinent to the inquiry whether monopoly was attempted or accomplished at the expense of the quality of its products, but the considerable volume of testimony as to the high quality of its products and the excellence of its service has no probative bearing upon the issue of monopoly. The question is not whether the corporation is a serviceable monopoly. The question is whether the corporation is a monopoly.

There is nothing which discloses that the corporation either increased its power or augmented its profit by creating an artificial scarcity of its products.

The testimony does not show that the corporation oppressed or coerced its competitors. In fact, there is an abundance of testimony contributed by the competitors of the corporation to the effect that its competition, though vigorous, was fair.

The corporation did not undersell its competitors in particular localities, by reducing prices below the prices at which it sold in other localities, nor did it require its customers to enter into contracts either limiting their purchases to the corporation or restricting them in resale prices. While purchasing pig iron at prices higher than the market, in order by reflection to maintain or increase the price of steel, purchases were not made by the corporation beyond its needs, nor with the intent or re-

sult of cornering the market. It did not obtain customers of competitors by secret rebates, or departures from its published prices, so long as the prices agreed to were adhered to by others pursuant to methods presently to be considered. There is no evidence that it attempted to crush its competitors or drive them out of the market, and in its competition it seemed to make no distinction between large and small competitors. In fact, its conduct towards its competitors, as shown by the testimony, has been conspicuously free from that business brutality, meanness, and unfairness which characterized the conduct of certain large corporations found guilty of violating the Anti-Trust Law.

The charge that the corporation offered lower prices in return for large purchases running over long periods, if true, does not constitute unfair trading. In those instances, the corporation endeavored and succeeded in obtaining contracts for large purchases of unfinished, or semifinished materials, so as to secure a steady trade for a long period, and thereby secure steady and certain employment for its mills.

. The corporation's reply to the charge of undue restraint of trade, by combining with others to fix and maintain prices, and the assumption to itself of credit for the benefits arising from its conduct "in *steadying* the market and preventing rapid and extreme fluctuations," is somewhat of an admission that it (with others) controlled prices by artificial means. I know of no law which makes the *steadying of the market* a justification for fixing and maintaining prices by the concerted action of otherwise competing companies, when the effect of steadying the market is to dominate the industry by establishing prices for its products. The perfection of stabilizing prices can be reached only when monopoly is perfect, and as nothing justifies monopoly, I am of opinion that the stabilizing benefits claimed by the defendants in fixing and maintaining prices are no justification or excuse for what they did. Prices are perfectly stabilized by pools, when entered into and lived up to, yet no one would contend that a pool, however beneficent its results, is either justifiable or legal. If the establishment of uniform prices for the products of an industry should ever be found advantageous or necessary, such an economic policy should be inaugurated and pursued under authority of law, and not by the will of the industry itself.

Competition with the corporation in all of its products has been real and keen from the date of its organization to the date of the filing of the bill in this suit. About this there is no question, with the possible exception of seamless tubes, which were made under important patents acquired or controlled by the corporation. Every commodity which it made was sold in substantial competition. This is conclusively proved. It is not proved, however, that the competition which existed between the corporation and its competitors extended to prices. While during that period competition was real, it was pursued along levels and at figures agreed upon expressly or tacitly by pools, or at meetings and dinners. At different times when price undertakings and understandings between the corporation and its competitors were broken, notably in 1909, the feature of prices entered into the competition, and then competition was complete and without restraint. Otherwise, and at other times, competition was real, but it was restrained as

to prices. Therefore, in searching the after-conduct of the corporation for evidence of an intent on its part to monopolize and restrain trade, the participation of the corporation in the old and the new means pursued and devised, by which prices were raised and maintained, demands serious consideration.

Before and at the time of the organization of the corporation, and for several years thereafter, a great many of the companies that became its constituents and subsidiaries were allotting trade and fixing prices for different iron and steel products by pool agreements. It is quite unnecessary in this opinion to discuss the legality of such agreements. It is sufficient to state that it was known by all that they were denounced by the law. With this knowledge, the corporation, through its president, in 1904, commanded its subsidiaries to withdraw from pools, yet notwithstanding the policy then announced, certain of its subsidiaries, notably the American Steel & Wire Company, continued in pools formed as late as 1908. It is defended, however, that the participation of the American Steel & Wire Company in the pool last mentioned was without the sanction of the corporation and without the knowledge of its president. It is really unimportant to give consideration to the corporation's claim of exoneration upon this ground, in view of the fact that the corporation itself, with the concurrence of its president, at the very same time, at periodical meetings with its competitors, was fixing prices covering a wide range of commodities, not by agreements, but by understandings by which all were morally bound, and from which no one deviated without notice to the others. By these methods the corporation and its subsidiary, the American Steel & Wire Company, were contemporaneously and quite as effectually naming and maintaining prices in different products. Measured by the successful results of each, there can be little difference between the methods employed.

When pools and associations were very generally abandoned in 1904, they were succeeded by trade meetings attended by representatives of the same concerns which theretofore had been parties to the pools. At these meetings agreements respecting prices were not made, but understandings were reached with respect to prices which quite as effectually resulted in their maintenance. The legality of these meetings was questioned, and about the year 1907 they were abandoned, and in the same year the Gary Dinners were inaugurated.

The Gary Dinners were dinners given by E. H. Gary, the president of the corporation, to which were invited representatives of steel-manufacturing concerns which theretofore had participated in the trade meetings, associations, and pools, and which produced "90 per cent. or more" of the total output of the diversified products of the steel industry of the country.

The first Gary Dinner was given on November 20, 1907, to meet an unquestioned exigency arising out of the panic then existing. The steel industry, like many industries, was demoralized and threatened with disaster by the panic which began in the month preceding. The dinner was given in order to devise ways and means to prevent calamity to the industry. Ways and means were found which no doubt con-

tributed greatly in preventing disaster, not alone to the producers of steel, but also to those intermediate consumers who were carrying large and costly supplies. The ways and means consisted then of nothing more than the urgent request of a strong man that in the stress of panic all should keep their heads and avoid the consequences of reckless cutting of prices. In this the others acquiesced, and in the light of the emergency then existing, and the disaster averted, I am of opinion that the purpose and the conduct of those who participated in the first Gary Dinner were not unlawful, improper, or questionable. But after the exigency had passed, and the means to meet it had been exerted, Gary Dinners were found to be potential things, and they were afterwards called and employed to exert their potentiality, not in averting disaster, but in creating greater profits, by raising and maintaining prices in periods of industrial calm.

Gary Dinners, while not regularly held, never adjourned. They were made continuous by the peculiar character of their organization. Being nothing more than business meetings, they were conducted in a business fashion. A general supervisory committee was appointed, and subcommittees were appointed to deal with the different products of the steel industry. These latter committees were known as the Steel Bar Committee, Ore and Pig Iron Committee, Rails and Billets Committee, etc. The membership of each committee was composed of representatives of the leading concerns which manufactured the particular product with which the committee had to do. These committees met between dinners and were accessible, through their chairmen, at all times between meetings. The only difference between the Gary Dinners and the meetings of the committees was that at the dinners the general business of the industry was discussed, while at committee meetings the business of a particular branch of the trade was discussed. At neither were agreements made concerning prices at which the participants would sell their products. In fact, it was asserted and reasserted that such agreements were impossible, because illegal; but in lieu of agreements, the parties, both at the dinners and at the committee meetings, severally made what they chose to call "declarations of purpose"—that is, declarations of the prices at which they respectively proposed to sell their products, to which prices it is testified all adhered until some one chose to deviate therefrom, in which event he was "in decency" bound to notify his dinner associates or the members of his committee.

Excepting the feature of trade allotments and money penalties, Gary Dinners were in effect pools, with the right reserved to each participant to withdraw upon notice to the others. They differed from pools only in the difference between the binding force of a moral understanding and the legal obligation of an express agreement. They were pools without penalties. They constituted a scheme which did not make it fatal for a competitor of the corporation to stay out, but made it attractive for him to stay in, the result of which was that prices were maintained with greater uniformity and stability than when the same participants engaged in pool agreements, violations of which carried penalties.

This method of co-operative price regulation was pursued uninterruptedly from November, 1907, to February, 1909. Throughout this time prices were fixed and maintained by "understandings" enforced by "moral obligations." Through the period of depression of 1908, business so decreased in volume that early in 1909 independent producers broke their "understandings" with the corporation and with one another, and sold at prices which each fixed for itself, in complete disregard of previous "understandings." The corporation attempted to maintain for its products prices at the figures understood; that is, to maintain high prices in a period of business depression, and "to force the issue against all economic conditions." It attempted this alone, and in its attempt it failed. Therefore, in that year, the corporation was forced to declare for an "open market"; that is, it sold at prices with respect to which there were no "understandings," and permitted "natural laws" to take their course. The immediate results were *lower prices* and a *largely increased volume of trade*. If the abandonment by the corporation of its co-operative policy of fixing and maintaining prices "brought out a large volume of business," it logically follows that by the pursuit of that policy "a large volume of business" had theretofore been held back—that is, restrained—and therefore that the policy of co-operation as to prices, based upon mutual understandings and enforced by moral obligations, operated effectually and unduly to restrain trade.

That the corporation did not dominate the industry by compelling the trade to sell at prices it desired is shown by the break of 1909. When the independents broke away, the corporation had to break away too. When the independents lowered prices, the corporation had to lower prices too. When they all broke away, two things happened: First, competition *in prices;* second, an increased volume of trade, indicating theretofore a limitation of the former and the restriction of the latter. This is persuasive evidence that the establishment and maintenance of prices from 1901 to 1909 were accomplished by the corporation and its competitors, by keeping agreements made by pools and adhering to understandings reached at meetings and dinners.

Coincident with the breaking of prices by the breaking of understandings made or reached at Gary Dinners, Gary Dinners were temporarily discontinued. It has been contended all along that Gary Dinners had nothing to do with the fixation and maintenance of prices; that while stabilizing prices resulted from such dinners, nevertheless their primary purpose was to secure the establishment and maintenance of good relations between competitors, and to afford opportunities for the exchange of trade information and experience. Is it not strange that a breach of an understanding as to the one matter of prices should have caused a discontinuance of the dinners, with the consequent loss of their primary benefits?

Gary Dinners were resumed in October, 1909, and with their resumption higher prices were resumed.

By the proceedings at the Gary Dinners, and at the meetings of the dinner committees, the fixing and maintaining of prices were

as successfully accomplished as by meetings called for that purpose during the period from 1904 to 1907, and by the pools created for that purpose from 1901 to 1904. It therefore appears that from the organization of the corporation in 1901 until the Gary Dinners were discontinued in January, 1911, the corporation, first by one method, and then by a second method, and then by a third method, employed means to procure the establishment and maintenance of uniform prices for its diversified products, and by these means the Steel Corporation, with its competitors, did combine and control prices, and in controlling prices restrained trade. If by the three methods pursued, in the three periods named, prices were not artificially and successfully maintained, as shown by the history covering those three periods, I am at a loss to know by what means it would be possible to fix and maintain prices that would unduly restrain trade in the sense of violating the Anti-Trust Law.

The raising and maintaining of prices of steel products from 1901 to 1911 cannot be attributed to the dominancy by the corporation over the industry, because of its size. It was due to co-operation between it and nearly all other producers in a joint effort to raise and maintain prices, in which they persisted and succeeded. Without the co-operation of independent producers, prices of steel products could not have been raised and maintained by the corporation alone. The offense of the corporation, therefore, was not its dominancy over the trade, but was an offense precisely similar to that of which every independent and co-operating producer was guilty, and consisted in the act of *combining with its competitors,* to produce an unlawful result. If it had not combined with its competitors, or if they had not combined with it, restraint of trade, due to the fixation of prices, would in my opinion have been impossible. Therefore those who participated in such meetings, with the intention of doing that which was accomplished, participated in unlawfully restraining trade. I am in no wise convinced that those competing corporations which associated themselves with the Steel Corporation, were forced, either by the conduct or the power of the corporation, to co-operate with it in fixing prices. The corporation produced less than 50 per cent. of the steel products of the country. Those of its competitors which participated with it in the fixation of prices produced more than 40 per cent. Those which comprised the 40 per cent. could have taken care of themselves, and could have competed with the corporation in prices, if they had so desired, and therefore those which comprised the 40 per cent. and which co-operated with the corporation in the methods pursued from 1901 to 1911 did so voluntarily, and not because of the dominance of the Steel Corporation. The corporation dominated only in the sense of contributing substantially to what was done and making attractive what it desired to be done, and the others yielded cheerfully. Their offense was no different from that of the corporation, and the offense of the corporation was distinguished from theirs only in the leadership it assumed in promulgating and perfecting the policy.

The record does not disclose the names of all the iron and steel

producing concerns which were represented at the Gary Dinners, and which co-operated in the price-fixing policy there inaugurated and pursued. Those corporations which were of sufficient size and importance to secure representation from time to time upon the principal committee and the subcommittees of the Gary Dinners, including the Steel Corporation, its subsidiaries, and its competitors, appear by stipulation (Record, volume 9, pp. 3745–3750), which is excerpted in the margin.[4]

The Anti-Trust Law was enacted "to protect trade and commerce against unlawful restraints and monopolies." The word "trade" means the buying as well as the selling of property, and the statute extends its protection to those who buy as well as to those who sell. A practice that is helpful to the seller, but is hurtful to the buyer, is as fully within the inhibition of the statute as a practice pursued by one seller which unlawfully restrains the trade of another seller. Therefore it may be assumed without discussion, that the statute intends to protect the purchasing public from the consequences of combinations, which, either in their purpose or effect, so raise and maintain prices that trade, in the sense of buying, cannot exist except upon terms fixed by combinations of sellers.

When the Steel Corporation and its competitors, which together produce 90 per cent. of the iron and steel output of the country, com-

[4]General Committee.—United States Steel Corporation. Competitors: Cambria Steel Company, Pennsylvania Steel Company, Bethlehem Steel Company, Jones & Laughlin Steel Company, Central Iron & Steel Company.

Ore and Pig Iron Committee.—United States Steel Corporation. Competitors: Shenango Furnace Company, Pickands, Mather & Co., Bessemer Pig Iron Association, Republic Iron & Steel Company, Thomas Iron Company, Sloss-Sheffield Iron & Steel Company, Buffalo & Susquehanna Iron Company, Warwick Iron & Steel Company, Allegheny Ore & Iron Company.

Rails and Billets.—Illinois Steel Company, subsidiary. Competitors: Pennsylvania Steel Company, Lackawanna Steel Company, Dominion Iron & Steel Company, Alan Wood Iron & Steel Company.

Billets and Sheet Bars.—Carnegie Steel Company, subsidiary. Competitors: Pennsylvania Steel Company, Republic Iron & Steel Company, Lackawanna Steel Company, Jones & Laughlin Steel Company, Youngstown Sheet & Tube Company, Alan Wood Iron & Steel Company.

Structural Material.—Illinois Steel Company, subsidiary. Competitors: Bethlehem Steel Company, Cambria Steel Company, Jones & Laughlin Steel Company.

Plates.—Carnegie Steel Company, subsidiary. Competitors: Cambria Steel Company, Central Iron & Steel Company, Lukens Iron & Steel Company, Worth Bros. Company.

Steel Bars.—Carnegie Steel Company, subsidiary. Competitors: Jones & Laughlin Steel Company, Republic Iron & Steel Company, Crucible Steel Company of America, Cambria Steel Company.

Pipes and Tubular Goods.—National Tube Company, subsidiary. Competitors: Wheeling Steel & Iron Company, Youngstown Sheet & Tube Company, Reading Iron Company, La Belle Iron Works.

Sheets and Tin Plate.—American Sheet & Tin Plate Company, subsidiary. Competitors: La Belle Iron Works, Inland Steel Company, National Enameling & Stamping Company, Youngstown Sheet & Tube Company.

Wire Products.—American Steel & Wire Company, subsidiary. Competitors: Pittsburgh Steel Company, John A. Roeblings Sons Company, Grand Crossing Tack Company.

bined, and first by one method, and then by another, and then still by another, deliberately fixed and successfully maintained almost uninterruptedly for a period of 10 years the prices at which the public was compelled to purchase their products, I am convinced that the corporation and every producer which combined with it and with one another in so fixing and maintaining prices violated the provision of the statute which declares illegal "every * * * combination· * * * in restraint of trade or commerce among the several states. * * *"

Fourth. Was the corporation engaged in restraining or monopolizing trade, or was it threatening so to do, at the institution of this suit?

As the several means resorted to by the corporation, with others, for raising and maintaining prices constitute, in my opinion, the only conduct of the corporation violative of the statute, the first part of the question just propounded may be answered by ascertaining when that conduct ceased. The Gary Dinner movement ended with the dinner of January 11, 1911, and the bill in this suit was filed on October 26, 1911. The testimony does not show that since the date of the last Gary Dinner the corporation, either alone or in co-operation with others, has fixed or maintained prices of the products of the steel industry, or attempted so to do, nor does the testimony disclose anything which suggests an intention on the part of the corporation to return to its former practices. That it may do so, if it desires, unless prevented by the decree of this court, is of course obvious.

My conclusions of fact and of law are that the *organizers* of the corporation (1) intended to create a monopoly and to restrain trade, and (2) combined with others and attempted to monopolize trade, within the meaning of the act, and that the *corporation* (1) neither attempted nor possessed the power alone to do the unlawful things intended by its formation, but (2) that it unlawfully combined with others to restrain trade by controlling prices.

[10] Whatever remedy there may be against the organizers of the corporation for acts violative of the statute, certainly in this proceeding in equity a decree of dissolution cannot be awarded against the corporation for the unlawful intent and the unsuccessful attempt of its organizers to violate the law. Upon the finding that the corporation, in and of itself, is not now and has never been a monopoly or a combination in restraint of trade, a decree of dissolution should not be entered against it. Having found, however, that the corporation violated one of the provisions of the statute by combining with others to unduly restrain trade, and that it possesses the power to again unlawfully combine with others to do the same unlawful acts, and though not actively threatening, yet because of the disposition displayed throughout the larger portion of its history, it may again do so, I am of opinion, that the corporation should be prevented doing the things and repeating the practices respecting the fixing and maintaining of prices herein viewed illegal. The ordinary relief, obviously, is the injunction process of the court, which, in an ordinary situation, would follow such a finding as of course. I am satisfied, however, that the same end will be attained, in a manner consistent with recent legislation, by retaining jurisdiction of the bill, if desired by the government, for the purpose

of restraining the defendants against engaging in the price fixing practices found illegal.

Having stated the reasons for my conclusions, and the matters which have principally controlled my judgment in this case, I join in the decree to be entered.